UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.

JAMES TRACY,

     Plaintiff,

v.

FLORIDA ATLANTIC UNIVERSITY
BOARD OF TRUSTEES, a/k/a
FLORIDA ATLANTIC UNIVERSITY;
ANTHONY BARBAR, Chairman of the Board
of Trustees of Florida Atlantic University;
DANIEL CANE, Vice Chairman of the Board
of Trustees of Florida Atlantic University;
CHRISTOPHER BEETLE, Trustee of Florida
Atlantic University; MICHAEL DENNIS,
Trustee of Florida Atlantic University;
KATHRYN EDMUNDS, Trustee of Florida
Atlantic University; JEFFREY FEINGOLD,
Trustee of Florida Atlantic University;
MARY MCDONALD, Trustee of Florida Atlantic
University; ABDOL MOABERY, Trustee
of Florida Atlantic University; ROBERT RUBIN,
Trustee of Florida Atlantic University; ROBERT
STILLEY, Trustee of Florida Atlantic University;
PAUL TANNER, Trustee of Florida Atlantic
University; JULIUS "BUTCH" TESKE, Trustee of
Florida Atlantic University; THOMAS WORKMAN,
JR., Trustee of Florida Atlantic University;
JOHN W. KELLY, President of Florida Atlantic
University; GARY PERRY, Provost of Florida
Atlantic University; HEATHER COLTMAN, Dean
of Florida Atlantic University; DIANE ALPERIN,
Associate Provost of Florida Atlantic University;
FLORIDA EDUCATION ASSOCIATION;
UNITED FACULTY OF FLORIDA; ROBERT
ZOELLER, JR., President of United Faculty of Florida,
Florida Atlantic University; and MICHAEL MOATS,
Service Unit Director of United Faculty of Florida.

     Defendants.

_____/

**JURY TRIAL DEMANDED**

1

## COMPLAINT

COMES NOW Plaintiff, JAMES TRACY, by and through the undersigned counsel, and complaining of Defendants FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES; ANTHONY BARBAR; DANIEL CANE; CHRISTOPHER BEETLE; MICHAEL DENNIS; KATHRYN EDMUNDS; JEFFREY FEINGOLD; MARY MCDONALD; ABDOL MOABERY; ROBERT RUBIN; ROBERT STILLEY; PAUL TANNER; JULIUS TESKE; THOMAS WORKMAN, JR.; JOHN W. KELLY; GARY PERRY; HEATHER COLTMAN; DIANE ALPERIN; FLORIDA EDUCATION ASSOCIATION; UNITED FACULTY OF FLORIDA; ROBERT ZOELLER, JR. and MICHAEL MOATS; states as follows:

### Introduction

1.     Plaintiff, Professor James Tracy, is an award-winning American academic with expertise in communications, media and conspiracy studies who was wrongfully stripped of his tenured faculty position by senior officials and administrators at Florida Atlantic University, with the help of officials and representatives from the University's faculty union.

2.     Through their collective actions, the Defendants violated Professor Tracy's constitutional rights to due process and free speech, and also trampled on their own long-standing principles of academic freedom.

3.     Professor Tracy's prominent scholarship and excellent teaching credentials allowed him to obtain a lifetime-tenured Florida Atlantic University faculty position—the ultimate achievement for an academic. Professor Tracy has suffered severe economic and reputational damage as a result of the wrongful conduct of the Defendants.

4.     Professor Tracy has also, as a result of the Defendants' wrongful acts, been denied the opportunity to teach, is without tenure and his academic career has been destroyed. Moreover,

without his Florida Atlantic University affiliation, Professor Tracy suffers irreparable harm since, among other things, his ability to publish articles in academic journals and to present his scholarship to his colleagues is severely diminished.

5.     Plaintiff James Tracy brings this action under 42 U.S.C. 1983 and 1985, and state law. He seeks equitable and monetary relief for violations of his constitutional rights, including free speech and due process, and for breach of contract and breach of fiduciary duty.

### The Parties

6.     Plaintiff JAMES TRACY is a resident of the State of Florida. At all times material to the Complaint, Professor Tracy was a tenured Associate Professor at Florida Atlantic University's School of Communication and Multimedia Studies, Dorothy F. Schmidt College of Arts and Letters. Professor Tracy was also former President of the UFF-FAU Chapter of Defendants UFF and FEA between 2009-2011. Professor Tracy holds a Ph.D. in mass communications and taught courses at Florida Atlantic University in Communications, including a course entitled "Culture of Conspiracy".

### *The Defendant University and FAU Defendants*

7.     Defendant FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES, is a Florida public university, commonly referred to as Florida Atlantic University (hereinafter sometimes "BOT", "Board of Trustees", "FAU" and/or the "Defendant University"). According to the Defendant University's website, the Board of Trustees is "a thirteen member board of trustees, six of whom are appointed by the governor, five by the Board of Governors plus the student body president and the president of the University Faculty Senate. The trustees are responsible for cost-effective policy decisions appropriate to the university's mission, the implementation and maintenance of high-quality education programs, the measurement of performance, the

reporting of information and the provision of input regarding state policy, budgeting, and education standards."

8.      According to Section 1.1 of the Defendant University's ; Policies and Procedures, the "Board of Trustees ("BOT") is vested by law with all powers and authority to effectively govern and set policy for Florida Atlantic University...." [See Exhibit "A"].

9.      According to Section 2.3 of the Defendant University's Board Operations Policies and Procedures, the Board of Trustees "shall serve as the governing body of FAU" and "shall select the President of FAU to serve at the pleasure of the BOT and shall hold the President responsible for the University's operation and management, performance, its fiscal accountability, and its compliance with federal and state laws, rules and regulations."

10.     According to Section 4.6 of the Defendant University's Board Operations Policies and Procedures, the President and Chief Executive Officer of the University, is specifically responsible for, *inter alia*, the following duties:

> "To be responsible for the organization, operation, and administration of the University, including efficient and effective budget and program administration, leading the University to accomplish its educational missions and goals, including regional and discipline-specific accreditations; monitoring educational and financial performance; consulting with the BOT in a timely manner on matters appropriate to its policy-making and fiduciary functions; and serving as the University's key spokesperson," Section 4.6(2);

> "To execute all documents on behalf of the University and the BOT consistent with law, BOG and BOT resolutions, rules, regulations, and policies, and the best interest of the University. No such document may purport to limit any BOT member's individual discretion in discharging the responsibilities of a Trustee." Section 4.6(3);

> "To serve as the principal liaison officer and official contact between the BOT and the faculty, staff and students of the university." Section 4.6(5);

> "To establish and implement policies and procedures to recruit, appoint, transfer, promote, compensate, evaluate, reward, demote, discipline, and remove personnel, in accordance with regulations, rules or policies approved by the BOT

4

and applicable collective bargaining agreements…" Section 4.6(10);

"To ensure [FAU's] compliance with federal and state laws, rules, regulations, and other requirements which are applicable to the University." Section 4.6(23).

11.     The Defendant University receives more money from the federal government than from the State of Florida, through student tuition and fees, and federal grants and contracts.

12.     At all times relevant to the actions described in this Complaint the Defendant University was acting under color of law.

13.     The Defendant University is not protected by state sovereign immunity under the Eleventh Amendment.

14.     At all times material to this Complaint, individual Defendants ANTHONY BARBAR, DANIEL CANE, CHRISTOPHER BEETLE, MICHAEL DENNIS, KATHRYN EDMUNDS, JEFFREY FEINGOLD, MARY MCDONALD, ABDOL MOABERY, ROBERT RUBIN, ROBERT STILLEY, PAUL TANNER, JULIUS TESKE and THOMAS WORKMAN, JR. were members of the Defendant University's Board of Trustees and are all residents of Florida. Each of these Defendants approved, facilitated, and/or voted for Professor Tracy's firing.

15.     At all times material to this Complaint, Defendant JOHN W. KELLY, an individual and resident of Florida, is and was the President and Chief Executive Officer of Florida Atlantic University, designated by the Defendant University's Board of Trustees. Defendant Kelly supervised, facilitated, recommended and/or approved Professor Tracy's firing.

16.     At all times material to this Complaint, Defendant GARY PERRY, an individual and resident of Florida, is and was Provost and Vice President of Academic Affairs at Florida Atlantic University. According to the University's website, Defendant Perry "leads the Division of Academic Affairs and is the institution's Chief Academic Officer, directing the development

and delivery of all academic programs at FAU while overseeing the division's budget and personnel." Defendant Perry supervised, facilitated, recommended and/or approved Professor Tracy's firing.

17.     At all times material to this Complaint, Defendant HEATHER COLTMAN, an individual and resident of Florida, is and was Dean of the Dorothy F. Schmidt College of Arts and Letters at Florida Atlantic University. Defendant Coltman supervised, facilitated, recommended and/or approved Professor Tracy's firing.

18.     At all times material to this Complaint, Defendant DIANE ALPERIN, an individual and resident of Florida, is and was Vice Provost of the Florida Atlantic University Boca Raton campus. Defendant Alperin supervised, facilitated, recommended and/or approved Professor Tracy's firing.

19.     Each of the individual Defendants listed above (collectively referred to hereinafter as the "FAU Defendants"), all Board of Trustee members or senior administrative officials at Florida Atlantic University, is sued in his or her official capacity for equitable and injunctive relief, and monetary damages because the Defendant University is not entitled to sovereign immunity. Each of the individual Defendants above is also sued in his or her individual capacity. Each of the individual Defendants above acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

*The Union Defendants*

20.     Defendant FLORIDA EDUCATION ASSOCIATION ("FEA") is a Florida corporation and labor union organization that has at all times material to the Complaint existed and operated in Florida with its principal place of business located at 213 South Adams Street, Tallahassee, Florida 32301. The FEA is self-described, according to its website, as "the most powerful public

education advocacy group, the largest professional organization and education association in [Florida]..." and purports to protect "the employment rights of members with both emergency and long-term legal services, the best and broadest representation of any professional union in the state."

21.     Defendant UNITED FACULTY OF FLORIDA ("UFF"), whose principal place of business is 115 N. Calhoun Street, Suite 6, Tallahassee, Florida, is a "Member", "Chapter" and "Local" of Defendant FEA, and purports to represent faculty and professionals at all eleven Florida universities, including Defendant Florida Atlantic University, through its United Faculty of Florida, Florida Atlantic University Chapter ("UFF-FAU").

22.     At all times material to the Complaint, Defendants UFF and FEA, by and through its agents and representatives at UFF-FAU, collected dues from tenured and non-tenured faculty at Florida Atlantic University, including Professor Tracy. Most of these dues went directly to Defendants UFF and FEA.

23.     At all times material to this Complaint, Professor Tracy was a dues paying member of UFF-FAU and Defendants UFF and FEA.

24.     At all times material to this Complaint, Defendant MICHAEL MOATS, an individual and resident of Florida, was a union representative for Florida Atlantic University employees [a/k/a "Service Unit Director"], employed by and an agent of Defendants UFF and FEA.

25.     At all times material to the Complaint, Defendant ROBERT ZOELLER, JR., an individual and resident of Florida, was a union representative for Florida Atlantic University employees and the President of UFF-FAU chapter of the Defendants UFF and FEA.

26.     At all times material to the Complaint, Defendants UFF and FEA, and Defendant MOATS and Defendant ZOELLER, collectively are sometimes referred to herein as the "Union

7

Defendants". The Union Defendants, at all times material to this Complaint, actively purported to represent and otherwise safeguard the rights of Professor Tracy.

## Jurisdiction and Venue

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Counts I, II, III, IV, V, VI and VII of this action arise under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.

28.     Venue is proper under 28 U.S.C. 1391 because a substantial part of the events and violations complained of in this action occurred in this judicial district, and Defendants conduct business in this judicial district.

## General Allegations

*Professor Tracy's Tenured Employment at Florida Atlantic University*

29.     On June 18, 2002, Florida Atlantic University offered Professor Tracy a tenure-earning position as Assistant Professor of Communication in the Dorothy F. Schmidt College of Arts and Letters, which he accepted on June 30, 2002.

30.     In December of 2003, Professor Tracy was appointed as one of the first members of Florida Atlantic University's Arts and Letters Fellows for 2004-2005.

31.     In July of 2005, Florida Atlantic University appointed Professor Tracy to the graduate faculty in the Dorothy F. Schmidt College of Arts and Letters.

32.     In April of 2006, Professor Tracy was awarded Florida Atlantic University's Summer 2006 Scholarship, Creative Accomplishment and Teaching Development Award.

33.     On May 30, 2008, Professor Tracy was awarded tenure at Florida Atlantic University. [See Exhibit "B"].

34.     In early 2009, Professor Tracy was elected by FAU faculty to serve a one year term as President of the UFF-FAU Chapter of Defendants UFF and FEA, where he led the faculty union in defeating the FAU Administration's wrongful termination of five tenured faculty members in the Defendant University's College of Engineering.  Professor Tracy was re-elected to serve a second term as UFF-FAU President in 2010.

35.     In December of 2011, Professor Tracy was appointed Coordinator of the Multimedia Studies area of the FAU School of Communication and Multimedia Studies by FAU's Interim Chairperson for the Spring 2012 Semester.

36.     At all times material to this Complaint, Professor Tracy's employment at Florida Atlantic University was governed by the Florida Atlantic University Board of Trustees/United Faculty of Florida Collective Bargaining Agreement, a copy of which is attached hereto as Exhibit "C". This agreement also governed the operation, responsibilities and duties of the Defendant University, by and through the FAU Defendants, as well as the Union Defendants, including but not limited to the Defendants UFF and FEA.

*The University's Espoused Commitment to Free Speech and Academic Freedom*

37.     Like most American universities, Florida Atlantic University holds itself out as committed to freedom of speech and principles of academic freedom. According to Section 1.2 of the FAU's Board Operations Policies and Procedures, it is *"vested by law with all powers and authority to effectively govern and set policy [for FAU] in accordance with the laws and constitution..."* and *"is committed to promoting "academic freedom and an atmosphere of free and open inquiry;" "provide equal access, equal rights and equal justice, and encourage mutual regard for the rights and liberties of all persons;"* and *"assure clear and open communication and sharing of information."* (emphasis added). [See Exhibit "A"].

9

38.     Section 1.3 of the Defendant Board of Trustees' Board Operations Policies and Procedures states that it *"supports the principle of academic freedom and is committed to the search for new knowledge and to the effective dissemination of that which came before it. In furtherance of this commitment, the BOT will defend the right of faculty and students to pursue their academic goals free from constraints that hinder lawful intellectual inquiry and discourse, and will protect the freedom of faculty to teach and of students to learn from ideas that might be unpopular or not in the mainstream of accepted thought."* (emphasis added).

39.     Section 5.1 of the Florida Atlantic University Board of Trustees/United Faculty of Florida Collective Bargaining Agreement, which also sets forth and governs the operation of the Defendant University, states, *inter alia*, "*The Board, the University and the UFF are committed to maintaining and encouraging full academic freedom. Academic freedom and academic responsibility are the twin guardians of the integrity of institutions of higher learning. The integrity is essential to the preservation of a free society and explains the willingness of society historically to accept the concept of academic freedom and, in addition, to protect it through the institution of academic tenure.*" (emphasis added). [See Exhibit "C"].

40.     Section 5.2 of the Florida Atlantic University Board of Trustees/United Faculty of Florida Collective Bargaining Agreement, further provides that "[t]he principal elements of academic freedom include the freedom to:

> *(a) Present and discuss academic subjects, frankly and forthrightly, without fear of censorship.*
>
> *(c) Speak freely on, and seek changes in, academic and institutional policies.*
>
> *(d) Exercise constitutional rights without institutional censorship and discipline."*
> (emphasis added).

41.     The United States Supreme Court has underscored that protection of academic freedom is of constitutional significance, as it is vital to the American universities' unique commitment to fostering free thought and advancing knowledge: "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (internal citations omitted).

*Professor Tracy's Protected Speech*

42.     At all times material to the Complaint, Professor Tracy maintained and operated a personal, independent blog entitled "Memory Hole: Reflections on Media and Politics" where Professor Tracy, for no compensation and on his own time, freely shares with the public his independent research and analysis on current events, socio-political issues and matters of public importance; Professor Tracy's blog also includes the research and findings of his peers and colleagues around the world, including but not limited to other professional journalists, researchers, bloggers, educators and concerned citizens.

43.     At all times material to the Complaint, the Defendants knew Professor Tracy operated his blog freely and independently from the Florida Atlantic University, on his own time, using his own internet service provider, domain and email address.

44.     At all times material to this Complaint, Professor Tracy's personal blog clearly indicated that his opinions were not the Defendant University's.

45.     Professor Tracy's blog prior to and throughout most of 2013 included the following

disclaimers:

> "All items published herein represent the views of James Tracy and are not representative of or condoned by Florida Atlantic University or the State University System of Florida. James Tracy is not responsible for and does not necessarily agree with ideas or observations presented in the comments posted on memoryholeblog.com."

46.     Following threatened discipline by senior administrative officials at the Defendant University in 2013, Professor Tracy removed any reference to "Florida Atlantic University" from his blog's disclaimer, and instead incorporated the following language requested by the FAU Administration:

> "The views expressed in the posts and comments of this blog do not reflect the opinions or positions of any institution or entity. They should be understood as the personal opinions of the author. No information of this blog will be understood as official."

47.     At all times material to the Complaint, the Defendants knew Professor Tracy was an independent journalist and blogger, sharing freely with the world his research and analysis on various matters of public importance.

48.     At all times material to the Complaint, the Defendants knew that Professor Tracy's blog and his independent journalism was not operated or conducted in furtherance of his duties and employment at Florida Atlantic University, and that Professor Tracy's independent publications did not reflect the views or opinions of Florida Atlantic University.

49.     At all times material to the Complaint, the Defendants knew that Professor Tracy's blog was not affiliated with the Defendant University, and that the content therein was fully protected as free speech guaranteed by the First Amendment of the U.S. Constitution.

*Retaliation by Defendant University and Initial Union Response*

50.     On December 14, 2012, a national and international media frenzy ensued after an alleged

mass casualty event in Newtown, Connecticut. (hereinafter the "Newtown incident").

51.     Immediately following the national media's initial reports about the Newtown incident, countless independent bloggers and journalists, and concerned American citizens, including Professor Tracy, provided additional reporting about questionable video and photographic evidence surfacing from Newtown, in addition to inconsistencies and anomalies in the official findings and reports, which were ignored by the national media.

52.     At all times material to the Complaint, Professor Tracy's academic freedom and constitutionally protected speech included reporting about the incomplete national media coverage of the Newtown incident and how it has and continues to be used by politicians, legislators, lobbyists and others to misappropriate massive amounts of public tax dollars and charitable donations from sympathizers and unsuspecting Americans, and to promote and install irrational and unconstitutional reforms upon the American public.

53.     In early January of 2013, three weeks after Professor Tracy's coverage of the Newtown incident, the Tribune Company, a national media company of newspaper, television and radio companies, by and through its locally owned newspapers in Palm Beach County, including the Sun Sentinel, began publishing opinion columns publicly demonizing, disparaging and defaming Professor Tracy, and openly inviting the Defendant University to terminate Professor Tracy's employment.

54.     After the initial media onslaught against Professor Tracy, senior administrative officials at Florida Atlantic University, including but not limited to the FAU Defendants, began searching for ways and means to discipline and terminate Professor Tracy.

55.     In January 2013, senior administrative officials at the Defendant University, including but not limited to Defendant Alperin, began strategizing how they could use the public

controversy surrounding Professor Tracy to not only discipline Professor Tracy, but to also undermine and prevent meaningful union faculty representation.

56.    Defendant Alperin and other senior administrative officials internally labeled Professor Tracy, *inter alia*, a black eye on all faculty, the one man argument against tenure and poster-child for quitting faculty union membership.

57.    On January 9, 2013, the former President and Chief Executive of the Defendant University, Mary Jane Saunders, issued a public video response to the media stating, "I want to make it clear that [Professor Tracy's] views and opinions are not shared by Florida Atlantic University…."

58.    On January 18, 2013, FAU Defendants Alperin and Coltman summoned Professor Tracy to a meeting regarding his blogging and constitutionally protected speech. During this meeting, Defendants Alperin and Coltman strongly discouraged Professor Tracy from making any further public statements regarding the Newtown incident. Defendants Alperin and Coltman also directed Professor Tracy to complete "Outside Activities" forms for his personal blogging and constitutionally protected speech. At this meeting, Professor Tracy and his representative from Defendants UFF and FEA, UFF-FAU's Grievance/Contract Enforcement Chair Douglas Broadfield, informed Defendants Alperin and Coltman that Professor Tracy's personal blogging and online speech was uncompensated and protected free speech which did not constitute a reportable outside activity pursuant to the Defendant University's "Conflict of Interest/Outside Activities" policy.

59.    On January 28, 2013, FAU Defendant Coltman wrote Professor Tracy denying that he faced any "issues related to freedom of speech", outlining the concerns of the Defendant University and then issuing Professor Tracy an official directive to complete and submit an

"Outside Activities" form for his personal blogging and constitutionally protected speech (hereinafter sometimes the University's "Initial Directive" or the "January 2013 Directive"). [See Exhibit "D"].

60.     Attached as Exhibit "E" is a copy of the Defendant University's "Outside Activities" form Defendant Coltman directed Professor Tracy to complete for his personal blogging and constitutionally protected speech at all times material to the Complaint.

61.     Prior to and following the Defendant University's Initial Directive, and at all times material to the Complaint, Professor Tracy sought advice and counsel from his union representatives at the UFF-FAU chapter of Defendants United Faculty of Florida and Florida Education Association, regarding whether his personal blogging should be included on the Defendant University's "Outside Activities" form.

62.     At all times material to this Complaint, and both prior to and following the University's Initial Directive, Professor Tracy was advised and instructed by union representatives from the Defendants United Faculty of Florida and Florida Education Association, including Defendant Moats, that Professor Tracy's personal blogging and uncompensated online speech was constitutionally protected and not subject to the Defendant University's "Conflict of Interest/Outside Activities" policy.

63.     Immediately following the Defendant University's January 2013 Directive, Defendants UFF and FEA, by and through Defendant Moats, advised and instructed Professor Tracy not to complete the "Outside Activities" forms, insisting that Professor Tracy's personal blogging and uncompensated online postings were constitutionally protected, fell outside the scope of FAU's "Conflict of Interest/Outside Activities" policy and thus should not be reported on FAU's "Outside Activities" forms. Defendant Moats also advised Professor Tracy that if he did not

stand up for his rights to express his views in his personal time, he could not expect to exercise such freedom in the classroom.

64.    Defendant Moats, as an agent and representative of Defendants UFF and FEA, also counseled Professor Tracy during telephone consultation and directed him to prepare a response to the University's Initial Directive denying any obligation of Professor Tracy to submit "Outside Activities" forms for his personal blogging and constitutionally protected speech.

65.    Attached as Exhibit "F" is copy of the letter Professor Tracy drafted pursuant to the directives, counsel and advisement of Defendant Moats and Defendants UFF and FEA.

66.    On or about March 28, 2013, the Defendant University, by and through Defendant Coltman issued Professor Tracy a "Notice of Discipline" with the threat of further punishment for referencing or writing about Florida Atlantic University on his personal blog. The Notice of Discipline did not mention Professor Tracy's "Outside Activities" forms, or failure to comply with the University's January 2013 Directive specifically, but rather outlined Defendant Coltman and the Defendant University's concerns with the disclaimer on Professor Tracy's blog. Defendant Coltman wrote:

> "You have ignored your obligations… You may, of course, blog in your personal time. You must stop dragging FAU into your personal endeavors. Your actions continue to adversely affect the legitimate interests of the University and constitute misconduct… If you continue to fail to meet your professional obligations and respond to directives from your supervisor, you will face additional disciplinary action. [See Exhibit "G"].

67.    On April 3, 2013, Union Defendant Moats, on behalf of Defendants UFF and FEA, emailed Professor Tracy, again insisting that the Defendant University has no right to discipline Professor Tracy for his personal blogging and constitutionally protected speech, or the disclaimer on his personal blog. Defendant Moats stated:

> "…I think the union should file a grievance on grounds as we discussed before

16

that the blog is not work-related, does not express the views of FAU and states so in the disclaimer, and is not done on work-time. Therefore, the University has no right to discipline you. We previously discussed several arguments applicable to this." [See Exhibit "H"].

68.    On April 7, 2013, Professor Tracy proposed a new undergraduate course at FAU entitled "Media, War and Crisis" which was approved by the Defendant University for Fall of 2013 and offered on its website.

69.    On April 16, 2013, the American Association of University Professors ("AAUP") issued a public letter to the President of Florida Atlantic University asking that the Defendant University's disciplinary action against Professor Tracy be rescinded, pointing to the fact that it set a precedent for "chill[ing] the spirited exchange of ideas—however unpopular, offensive, or controversial—that the academic community has a special responsibility to protect." [See Exhibit "I"].

70.    On April 23, 2013, the Foundation for Individual Rights in Education also appealed to the President of the Defendant University, asking that the University's March 2013 "Notice of Discipline" be rescinded based on academic freedom and constitutional grounds. [See Exhibit "J"].

71.    On April 24, 2013, Defendant Alperin held a meeting with senior University officials to discuss Professor Tracy. The next day, the Defendant University canceled Professor Tracy's approved course, "Media, War and Crisis" without explanation. Professor Tracy, who always taught night classes due to his parental responsibilities, was then reassigned to an undergraduate course he had not previously taught, at times of the day that conflicted with his child care schedule.

72.    On April 26, 2013, UFF-FAU's Grievance/Contract Enforcement Chair, as advised and

recommended by Defendant Moats and Defendants UFF and FEA, filed a formal grievance on behalf of Professor Tracy concerning the University's March 28, 2013 unconstitutional Notice of Discipline.

73.     On April 28, 2013, an unidentified party with access to the University's secure faculty mailroom distributed a copy of a letter to the press, entitled "Why James Tracy, FAU's Conspiracy Theorist Should Resign," purportedly authored by University senior faculty members and administrative officials, disparaging Professor Tracy and attempting to pressure him to resign. [See Exhibit "K"].

74.     At all times material to this Complaint, officials at the Defendant University failed to investigate the April 28, 2013 harassment and other retaliatory and abusive conduct by Florida Atlantic University personnel against Professor Tracy for his personal blogging and constitutionally protected speech, despite repeated efforts by Professor Tracy to bring such misconduct to their attention.

75.     On July 23, 2013, the Defendant University and FAU Defendants, by and through Defendant Coltman, denied Professor Tracy's grievance. She wrote, "Dr. Tracy has the same rights as any private citizen to write up his opinions and post them on the web. The university has [the] right to require [Professor Tracy] to clearly indicate that his opinions are not the University's positions." The denial however made no mention of Professor Tracy's "Outside Activities" forms or his failure to submit them for his personal blogging or constitutionally protected speech.  [See Exhibit "L"].

76.     In September of 2013, the Defendant University, Defendants UFF and FEA, and Professor Tracy entered into a settlement agreement concerning the University's Notice of Discipline and Professor Tracy's grievance. It was agreed that Professor Tracy would remove

"Florida Atlantic University" from his blog's disclaimer, and the Defendant University would retract its disciplinary action against Professor Tracy and remove the Notice of Discipline from his file. The University did not discipline Professor Tracy for failure to submit "Outside Activities" forms as directed by Defendant Coltman in the Defendant University's January 2013 Directive. [See Exhibit "M"].

77. The Defendant University and FAU Defendants did not remove the March 28, 2013 Notice of Discipline from Professor Tracy's personnel file, despite their agreement to do so.

78. The Defendant University and FAU Defendants took no disciplinary action against Professor Tracy during the 2013-2014 school year, and did not request "Outside Activities" forms for Professor Tracy's personal blogging and constitutionally protected speech.

79. The Defendant University and FAU Defendants took no disciplinary action against Professor Tracy during the 2014-2015 school year, and did not request "Outside Activities" forms for Professor Tracy's personal blogging and constitutionally protected speech.

80. Other than Professor Tracy, the Defendant University and FAU Defendants have never terminated any University faculty for alleged non-compliance with the University's "Conflict of Interest/Outside Activities" policy.

### The Unconstitutional Firing of Professor Tracy

81. In the Fall of 2015, the Defendant University changed its policies regarding the submission of faculty annual assignments, to require, for the first time, all faculty to electronically agree to the following affirmation and agreement:

> "I affirm that I am required to report any outside activity (compensated or uncompensated) and any financial interest on Florida Atlantic University's Report of Outside Employment or Professional Activity as required in FAU regulations and policies. Questions regarding this requirement are explained at http://www.fau.edu/hr/OEguidelines_final.php, and the form is available at http://www.fau.edu/hr/files/OutsideBusinessV2.pdf.

82. On October 20, 2015, Defendant Coltman sent an email to Professor Tracy's department chairperson, David Williams (hereinafter "Williams"). This email was forwarded to Professor Tracy and stated, "Just a friendly reminder that if you have outside employment income, you will need to fill out the linked outside employment form." [See Exhibit "N"]. This message included a link to the University's "Outside Activities" form. [See Exhibit "E"].

83. After receiving the Defendant University's new electronic "Conflict of Interest/Outside Activities" policy affirmation and instructions, Professor Tracy immediately contacted Defendant Zoeller and his other union representatives from Defendants UFF and FEA, expressing concerns about the University's confusing "Conflict of Interest/Outside Activities" policy. [See Exhibit "O"].

84. When Professor Tracy, who was on parental leave at the time, received Williams' and Defendant Coltman's October 20, 2015 instructions, he immediately responded to University officials explaining that he felt that the University was forcing him to affirm that he is in compliance with a policy that he and other University faculty members did not understand. [See Exhibit "N"].

85. On October 28, 2015, Defendant Zoeller wrote Professor Tracy regarding his request for clarification of the Defendant University's vague and confusing "Conflict of Interest/Outside Activities" policy, stating: "We're going to address this in collective bargaining. As you observe, this is part of a larger problem. And just one of many lately!" [See Exhibit "O"].

86. In effort to comply with the Defendant University's assignment submission policy, Professor Tracy initially printed and completed his annual assignment and personally submitted it to the Defendant University, without affirming compliance with the confusing "Conflict of

Interest/Outside Activities" policy. Professor Tracy also indicated to University administrative officials and their support staff that he could not affirm that he is in compliance with a policy which he did not understand and believed to be unconstitutional and conflicting with his September 2013 Settlement Agreement with the Defendant University. [See Exhibit "P"].

87.     On November 9, 2015, Professor Tracy again sought advice from Defendant Zoeller, regarding the Defendant University's "Conflict of Interest/Outside Activities" policy and new electronic affirmation. Defendant Zoeller advised Professor Tracy to comply with the Defendant University's instructions, assuring Professor Tracy that the Union Defendants, including Defendants UFF and FEA, would file a grievance on his behalf afterward.

88.     On November 10, 2015, Defendant Zoeller emailed Professor Tracy stating: "In addition to pursuing this in collective bargaining, I'm also in consultation with Michael Moats to see if we can address this in others forums such as a grievance…. Did you sign the outside activity portion or not? I've always been advised [by] those more experienced in these matters to sign now and fight after." [See Exhibit "Q"].

89.     On November 10, 2015, Defendant Coltman issued a "Notice of Discipline" to Professor Tracy, directing Professor Tracy to submit "Outside Activities" forms for his personal blogging and constitutionally protected speech for 2013-2014, 2014-2015 and 2015-2016 and to complete the electronic affirmation regarding compliance with the University's confusing and unconstitutional "Conflict of Interest/Outside Activities" policy. (hereinafter sometimes referred to as the University's "November 2015 Notice of Discipline") [See Exhibit "R"].

90.     On November 19, 2015, Professor Tracy wrote Defendant Zoeller informing the Union Defendants of the University's November 2015 Notice of Discipline and seeking counsel and representation. Defendant Zoeller responded to Professor Tracy advising Professor Tracy to

"…sign the current Conflict of Interest form (under duress) and then we fight it." [See Exhibit "S"].

91.     On November 22, 2015, Professor Tracy responded to the Defendant University's November 2015 Notice of Discipline outlining his concerns and defenses against the unfounded and unconstitutional disciplinary action, asking that the reprimand be removed from his personnel file. This correspondence was also sent to Defendant Zoeller and other current and former representatives of the Union Defendants. [See Exhibit "T"].

92.     On November 24, 2015, Professor Tracy contacted Defendant Zoeller and other representatives of the Union Defendants requesting that the Union Defendants file a grievance with respect to the University's November 2015 Notice of Discipline. [See Exhibit "U"].

93.     On December 1, 2015, Defendant Zoeller emailed Professor Tracy denying his right to file a grievance, referencing a November 30, 2015 meeting held, without Professor Tracy's knowledge or participation, by representatives of the Union Defendants, including Defendant Moats. He wrote:

> "We met with Michael Moats yesterday and discussed your situation at length. It was our collective decision that your situation is not grievable." [See Exhibit "V"].

94.     On December 10, 2015, the Sun Sentinel published another defamatory and disparaging article against Professor Tracy falsely accusing Professor Tracy of committing harassment, extracurricular misconduct and threatening the Defendant University with financial harm should it not terminate Professor Tracy's employment.

95.     On December 11, 2015, Defendant Coltman emailed Professor Tracy again demanding that he complete and submit "Outside Activity" forms for his personal blogging and constitutionally protected speech, or "receive further disciplining up to and including

termination." [See Exhibit "W"].

96.     On December 15, 2015, Professor Tracy responded to Defendant Coltman's threats and submitted "Outside Activity" forms for his personal blogging and constitutionally protected speech under duress, as advised and counseled by Defendant Zoeller, and the Union Defendants, including Defendants UFF and FEA. The forms Professor Tracy submitted under duress are attached hereto as Exhibit "X".

97.     On December 16, 2015, the Defendant University, by and through Defendant Alperin issued "Notice of Intent to Terminate" Professor Tracy, indicating Professor Tracy was being terminated for his failure to timely submit "Outside Activities" forms for his personal blogging and constitutionally protected speech, and to electronically acknowledge compliance with the vague and confusing policy. [See Exhibit "Y"].

98.     On or about December 16, 2015, Professor Tracy again sought representation and counsel from the Union Defendants, including Defendant Moats, Defendants UFF and FEA, and Defendant Zoeller, requesting that a grievance be filed on his behalf.  Defendant Zoeller responded, "Michael [Moats] contacted me last night. Feel free to call me today. We need to start on the grievance process ASAP." [See Exhibit "Z"].

99.     During telephone consultations on December 17 and 18, 2015, Defendant Moats condemned Professor Tracy for not previously submitting "Outside Activities" forms for his personal blogging and constitutionally protected speech, and attempted to pressure Professor Tracy into resigning to avoid a termination. Defendant Moats also instructed Professor Tracy not to speak to anyone other than his "defense" team. Attached as Exhibit "AA" is an email sent by Defendant Moats to Professor Tracy after his December 17, 2015 telephone consultation, stating:

> "I have asked for an extension of the ten day response time for you until at least January 6, 2016. While I do not expect your response to make any difference…"

and "…as I suggested on the telephone, you need to seriously consider an agreement to resign to avoid the termination."

100.     On December 18, 2015, Defendant Moats again emailed Professor Tracy notifying him that the Union Defendants, including Defendants UFF and FEA, had retained a lawyer on Professor Tracy's behalf. Defendant Moats also stated that he and the Union Defendants would respond to the Defendant University, on Professor Tracy's behalf, within the ten (10) day response period afforded by the Florida Atlantic University Board of Trustees/United Faculty of Florida Collective Bargaining Agreement. [See Exhibit "AB"].

101.     On December 20, 2015, Defendant Moats again rebuked Professor Tracy for speaking publicly about his plight, and further attempted to pressure Professor Tracy into resigning, for the first time falsely claiming that the Defendant University's disciplinary action was lawful. Defendant Moats wrote:

> "I would think you would understand the very first rule in such a situation is to talk to no one but your defense team. You are quickly limited if not eliminating any chance that the university would or could entertain a resignation. I advised you not to talk to the media and I am reiterating that advice now. More importantly, you know that the university is not terminating you over free speech issues. Your refusal to properly complete required documents gave them another – likely valid – reason to terminate." [See Exhibit "AC"].

102.     Afterward, Professor Tracy emailed Defendants Moats and Zoeller, attaching his February 2, 2013 Response to the University's Initial Directive [Exhibit "F"], which Defendant Moats had helped Professor Tracy prepare, wherein freedom of speech was asserted in defense of previous attempts by FAU officials to discipline Tracy for his personal blogging.

103.     The Union Defendants, including Defendant Moats, Defendant Zoeller, and other representatives and agents of Defendants UFF and FEA, including the lawyer retained by the Union Defendants, failed to respond, as promised, to the Defendant University's Notice of Intent

to Terminate. The Union Defendants also failed to file a grievance on Professor Tracy's behalf.

104. As a result of the Union Defendants failure to represent Professor Tracy's interests, including their failure to defend against and respond to the Defendant University's Notice of Intent to Terminate, or file a grievance as promised, Professor Tracy was automatically terminated by the Defendant University, by and through the FAU Defendants on January 6, 2016.

105. The Union Defendants, by and through the counsel it assigned to Professor Tracy, provided Professor Tracy with the following reasoning for failing to respond to the University's Notice of Intent to Terminate: "Nothing we could have said would have satisfied them, so there was no reason to put anything on the record to use against us later." [Exhibit "AD"].

106. After Professor Tracy's termination, the Union Defendants, by and through Defendant Moats, Defendant Zoeller, and their appointed attorney, attempted to pressure and coerce Professor Tracy into accepting a meager severance package offered by the Defendant University. The Union Defendants also discouraged Professor Tracy from taking any legal action against the Defendant University, claiming that any challenge to the termination would be unsuccessful.

*Florida Atlantic University's Confusing & Controversial*
*Conflict of Interest/Outside Activities Policy*

107. Article 19 of the FAU BOT/UFF Agreement, which governs the Defendant University, is entitled "Conflict of Interest/Outside Activities" and provides as follows:

> 19.1 Policy. In all official acts, an employee is bound to observe the highest standards of ethics consistent with the code of ethics of the State of Florida (Chapter 112, Part III, Florida Statutes and related advisory opinions) and Board and University 57 regulations.
>
> Nothing in this Article is intended to discourage an employee from engaging in outside activity in order to increase the employee's professional reputation, service to the community, or income, subject to the conditions stated herein.

25

19.2 Definitions.

(a) "Reportable Outside Activity" shall mean any compensated or uncompensated professional practice, consulting, teaching or research, which is not part of the employee's assigned duties and for which the University has provided no compensation.

(b) "Conflict of Interest" shall mean

(1) any conflict between the private interests of the employee and the public interests of the University, the Board of Trustees, or the State of Florida, including conflicts of interest specified under Florida Statutes;

(2) any activity which interferes with the full performance of the employee's professional or institutional responsibilities or obligations; or

(3) any outside teaching employment with any other educational institution during a period in which the employee has an appointment with Florida Atlantic University, except with written approval of the Dean.

19.3 Conflicts of Interest Prohibited. Conflicts of interest are prohibited and employees are responsible for resolving them by working with their supervisors and other University officials.

19.4 Reportable Outside Activity An employee who proposes to engage in outside activity shall provide his or her supervisor a detailed written description of the proposed activity. The report shall include where applicable, the name of the employer or other recipient of services; the funding source; the location where such activity shall be performed; the nature and extent of the activity; and any intended use of University facilities, equipment, or services. A new report shall be submitted for outside activity previously reported at the beginning of each academic year for outside activity of a continuing nature and whenever there is a significant change in an activity (nature, extent, funding, etc.)… Any outside activity which falls under the provisions of this Article and in which the employee is currently engaged but has not previously reported, shall be reported within sixty (60) days of the execution of this Agreement and shall conform to the provisions of this Article."

19.5 Expedited Grievance Procedure. In the event the proposed outside activity is determined to constitute a conflict of interest, and the employee disagrees with that determination, the employee may file a grievance under the expedited grievance procedure contained in Article 20, Section 20.15.

19.6 Use of University Resources. An employee engaging in any outside activity shall not use the facilities, equipment, or services of the University in connection with such outside activity without prior approval of the President or representative. Approval for the use of University facilities, equipment, or services may be

conditioned upon reimbursement for the use thereof.

> 19.7 No University Affiliation. As specified in Article 5.3(d), an employee engaging in outside activity shall indicate that he/she is not an institutional representative unless specifically authorized as such. The employee will take reasonable precautions to ensure that the outside employer or other recipient of services understands that the employee is engaging in such outside activity as a private citizen and not as an employee, agent, or spokesperson of the University.

108.   At all times material to this Complaint, Professor Tracy and other FAU faculty members repeatedly expressed confusion and concern regarding the Defendant University's "Conflict of Interest/Outside Activities" policy to the Defendant University's senior administrative officials, including Defendant Alperin and Defendant Coltman.

109.   Although senior administrative officials at the Defendant University repeatedly acknowledged faculty and administrative confusion and fear surrounding FAU's "Conflict of Interest/Outside Activities" policy, these concerns were disregarded and the FAU Defendants continued to the use the vague and confusing policy as a pretext to restrict constitutionally protected speech.

110.   At all times material to this Complaint, Professor Tracy and other FAU faculty members repeatedly expressed confusion and concern regarding the Defendant University's "Conflict of Interest/Outside Activities" policy to agents and representatives of the Union Defendants, including but not limited to Defendant Moats and Defendant Zoeller.

111.   At all times material to this Complaint, Professor Tracy attempted to, but could not understand the Defendant University's vague and confusing "Conflict of Interest/Outside Activities" policy. Professor Tracy also repeatedly requested from the Defendant University, by and through Defendant Coltman and other University officials, clarification regarding the policy.

112.   At all times material to this Complaint, both faculty and administrative officials tasked

with enforcement of the Defendant University's "Conflict of Interest/Outside Activities" policy could not understand the policy.

113.   On September 4, 2015 a FAU Senate Faculty meeting was held at the Defendant University, where various Defendants were present, including Defendants Kelly, Perry, Alperin, Beetle and Zoeller. During the recorded meeting, many of the Defendant University's faculty members expressed outrage over letters sent by senior administrative officials to faculty members threatening discipline for failure to report outside activities.

114.   At the September 4, 2015 FAU Faculty Senate Meeting, when presented with an administrative proposal to increase community engagement and outside activities by faculty, Professor Timothy Lenz, a FAU Faculty Senator who teaches constitutional law at the Defendant University, vividly described the "fear and uncertainty" shared by many FAU faculty members about the Defendant University's confusing and vague policy. His initial remarks, which were met with applause and support by many other concerned faculty members, were as follows:

> "Please call off your dogs... The Administration has been sending faculty members who are engaged in outside activity nasty letters, letters of discipline or letters that threaten faculty members who are engaged in outside activity with discipline, and this should stop until the Administration gets its act together...we're supposed to increase outside activity, increase faculty engagement with the community...but the very actions that I've been describing are discouraging this activity. There's a lot of fear and uncertainty, and if you read the language in our collective bargaining about outside activity, it says that, like the collective bargaining agreements at other universities in the state, that we have to report all professional-related activity paid or unpaid if it's not part of our assignments. No one knows what that means. The deans don't know what this means. Faculty supervisors don't know what this means. And until there's some clarity about what outside activity has to be reported I would recommend, as a good piece of advice, that any new faculty member who asks their supervisor or their peer about what kind of outside activity they should engage in, I would say, do nothing, because any outside activity exposes you to risk, and that risk includes discipline up to dismissal from the University. This is serious, and no one knows what outside activity the University is targeting. There has been a change in the language in the collective bargaining agreement.... For you to come to us asking for more faculty engagement and outside activity, while some other arm of the

University is sending these nasty letters, that's a problem. And it's a problem that eventually will probably have to be addressed with a Freedom of Information Act request because there's a great deal of suspicion that you can say, or write, or do something, but if you say, write, or do something that the Administration disagrees with you're going to get one of these nasty letters put in your personnel file and that's untenable...."

115.     Professor Marshall DeRosa, another constitutional law professor at the Defendant University, agreed with Professor Lenz at the September 4, 2015 FAU Senate Faculty Meeting, proclaiming:

"I've chaired the Academic Freedom and Due Process Committee, this going on my third year, and this is a very serious matter. I have a couple of questions, one of which is by what authority is the Vice President for Public Affairs writing letters to faculty members? ...I agree with the Provost [Defendant Perry], absolutely, that we issue a disclaimer when not speaking on behalf of the University. I mean that's almost a no-brainer. But we have to get prior approval? I consider this a form of prior restraint of academic freedom for academics engaged in the community without getting a permission note from the Administration. I have a colleague that was taken into the woodshed because he wrote an op-ed letter to the local newspaper. This is highly inappropriate. I don't think we need a committee for community engagement when it comes to academic freedom. To be quite frank I don't care what the collective bargaining agreement says. We have certain rights as academics to engage in the community, to speak our minds, to engage and participate in the marketplace of ideas...we need to have a cease and desist order for this Vice President, who is not an academic, to stop writing letters to professors. I don't want to get a permission note before I write something on the internet, or go to a meeting someplace that's unrelated to the University. This is absurd. It's insane.... Would somebody please explain to me, perhaps the President could, why this Vice President is writing letters to academics, to professors, and more or less chastising them for engaging in their First Amendment rights?"

116.     Other faculty members at the Defendant University, including Defendant Beetle, went on record during the September 4, 2015 FAU Senate Faculty meeting agreeing with Professor Lenz and Professor DeRosa and other concerned faculty. Defendant Beetle stated, *inter alia*, "Senator [Lenz], I share your opinion about this.... I'm still trying to figure out exactly what the policy is at the moment, and I'm not sure that I understand...." Despite his obvious confusion, however, Defendant Beetle denied multiple requests by various FAU Faculty Senators to refer the matter

to the FAU Faculty Senate's Academic Freedom and Due Process Committee.

117.    Attached as Exhibit "AE" is a copy of the September 4, 2015, FAU Faculty Senate Meeting Minutes and Attendance Record. The only reference to the lengthy discussion and concerns expressed by the Defendant University's faculty members is as follows:

> Dr. Beetle opens up the floor for questions. A concern is brought up about faculty engaging in outside community activities and being reprimanded for such activity via letter or email. A discussion follows regarding the faculty's ability to engage in the community and violation of Academic Freedom. Dr. Beetle brings the discussion to a close, suggesting that there is more conversation to be had. He requests that the discussion be tabled at the moment and approached at a later meeting.

118.    In response to repeated inquiries from concerned Faculty Senators, as well as Defendant Beetle, on the topic of confusion about the Defendant University's "Conflict of Interest/Outside Activities" policy and threats of discipline made to faculty members by FAU administrative officials, Defendant Perry asked FAU faculty to follow the rules and provisions of the FAU BOT/UFF Agreement. Defendant Alperin later acknowledged and agreed there needed to be clarity in the Defendant University's "Conflict of Interest/Outside Activities" policy, and stated that she and other administrative officials at the Defendant University had been trying to "get a change" to FAU's "Conflict of Interest/Outside Activities" forms for years.

119.    Despite concerns and complaints from FAU faculty that the Defendant University's vague and confusing "Conflict of Interest/Outside Activities" policy was being used by senior administrative officials at the Defendant University to infringe upon the constitutional rights of FAU faculty members, and repeated requests by multiple faculty members that senior administrative officials at Florida Atlantic University stop sending letters threatening discipline for failure to comply with the vague and confusing policy, such concerns and complaints were ignored by the FAU Defendants.

120.    Attached as Exhibit "AF" is a copy of a document made available by administrative officials at the Defendant University on FAU's website, located at the following web address http://www.fau.edu/artsandletters/Outside%20Activity%20Form%20Explanation%2011-19%2015Final%20eg.docx, entitled "FLORIDA ATLANTIC UNIVERSITY REPORT of OUTSIDE EMPLOYMENT or PROFESSIONAL ACTIVITY FORM ADDITIONAL EXPLANATION" and dated "November 2015" (hereinafter the FAU Defendant's "November 2015 Explanation"). This additional explanation changed the definition of "Outside Activity" as follows:

> "Outside Activity" is defined as private practice, private consulting, additional teaching or research for someone or an entity that is not FAU, or other professional activity, compensated or uncompensated, which is not part of the faculty member's assigned duties and for which the University has provided no compensation.

121.    The Defendant University's November 2015 Explanation also provided that:

> "Conflict of Interest" is defined as any conflict between the private interests of the employee and that employee's obligations to FAU, the public interests of FAU, or the interests of the State of Florida. This includes conflicts of interest specified under Florida Statutes (Section 112.313), federal regulations, or University policy (see FAU's Report of Outside Employment available online or from Human Resources). It also includes any activity that interferes with the full performance of the employee's professional or institutional responsibilities or work obligations.

122.    FAU's "Outside Employment Guidelines" which was also posted on the Defendant University's website is attached as Exhibit "AG". It states:

> The department of Human Resources is responsible for maintaining a record of Outside Employment and Professional Activity of FAU employees. The "Report of Outside Employment or Professional Activity" form is to be completed by FAU employees who are or may become engaged in outside employment/professional activity. Any outside employment/professional activity must be reported. The obligation of the employee is to report outside employment annually in accordance with the Code of Ethics of the State of Florida, Chapter 112, Part III of Florida Statutes. The reporting period is July 1 through June 30 of each year. Those needing assistance in filling out this form can visit the following online guide: http://www.fau.edu/hr/OE_Guidelines.php

123.    Below is a screenshot of the web address provided by the Defendant University online to

assist faculty with filling out the "Outside Activities" form at all times material to the Complaint:





124.    Attached as Exhibit "AH" is a copy of another document also made available on the

Defendant University's website entitled, "Florida Atlantic University Monitoring Plan for

Potential Conflicts of Interest". The nine (9) page form and agreement also further changes and

broadens the scope of the Defendant University's "Conflict of Interest/Outside Activities"

policy, and requires faculty to affirm their understanding and agreement to the unconstitutional

policy.

125.    On January 6, 2016, Professor Tracy was terminated by the Defendant University for

questioning the Florida Atlantic University's "Conflict of Interest/Outside Activities" policy and

failing to submit "Conflict of Interest/Outside Activities" forms for his personal blogging and

constitutionally protected speech as directed by Defendant Coltman. [See Exhibit "AI"]

126.    In March of 2016, Defendant Perry distributed to some FAU faculty a draft memorandum

attempting to further clarify the Defendant University's vague and confusing "Conflict of

Interest/Outside Activities" policy. [See Exhibit "AJ"].

## COUNT I – 42 U.S.C. § 1983
Facial Challenge to Florida Atlantic University's "Conflict of Interest/Outside Activities" Policy
Under the First and Fourteenth Amendments
*Against the Defendant University and FAU Defendants*

127.   Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

128.   The First and Fourteenth Amendments extend to campuses of state colleges and universities. *Healy v. James*, 408 U.S. at 180 (1972).

129.   A law is impermissibly vague if persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v General Construction Company*, 46 S.Ct. 126 (1926).

130.   The Defendant University's "Conflict of Interest/Outside Activities" policy is unconstitutionally overbroad and vague, does not serve a significant governmental interest, is not narrowly drawn, and impermissibly restricts faculty expression and freedom of speech.

131.   There is no set of circumstances that exist under which the Defendant University's "Conflict of Interst/Outside Activities" policy would be valid.

132.   The Defendant University's "Conflict of Interest/Outside Activities" policy is so vague and overbroad persons of common intelligence must necessarily guess at its meaning and differ as to its application. Even senior administrative officials at the Defendant University, including the FAU Defendants, do not understand the scope and application of the policy.

133.   As a direct result of the Defendant University's unconstitutional "Conflict of Interest/Outside Activities" policy, faculty at the Defendant University are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution, one of whom was Professor Tracy.

134.   The Defendant University's "Conflict of Interest/Outside Activities" policy deters or chills persons of ordinary firmness from engaging in constitutionally protected speech, and will continue to do so in the future.

135.   Without intervention from this Court, employees and faculty at Florida Atlantic University, and other employees and faculty at universities around the United States, will be deterred or chilled from exercising their constitutional rights, including but not limited to sharing unpopular information or expressing unpopular opinions.

136.   As a legal consequence of the Defendants' violation of Professor Tracy's and other similarly situated individuals' First and Fourteenth Amendment rights, all of which is irreparable injury *per se*, Professor Tracy is entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including but not limited to reasonable attorneys' fees.

COUNT II – 42. U.S.C. § 1983
"As-Applied" Violation of Professor Tracy's Rights to Free Speech
Under the First and Fourteenth Amendments
*Against the Defendant University and FAU Defendants*

137.   Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

138.   Professor Tracy engaged in constitutionally protected expression and was disciplined and fired in response to his exercise of constitutional rights pursuant to the Defendant University's "Conflict of Interest/Outside Activities" policy.

139.   At all times material to this Complaint, the Defendant University's "Conflict of Interest/Outside Activities" policy, as applied to Professor Tracy's personal blogging and constitutionally protected speech, was unconstitutional.

140.   The termination of Professor Tracy's tenured position with Florida Atlantic University, pursuant to the Defendant University's unconstitutional "Conflict of Interest/Outside Activities"

34

policy, directly resulted in substantial and irreparable harm to Professor Tracy, including lost income, reputational disparagement, the loss of a tenured appointment at Florida Atlantic University and out of pocket expenses, including but not limited to attorneys' fees and costs, as a consequence of being denied his First and Fourteenth Amendment rights.

COUNT III – 42. U.S.C. § 1983
Retaliation in Violation of Professor Tracy's Rights to Free Speech
Under the First and Fourteenth Amendments
*Against the Defendant University and FAU Defendants*

141. At all times material to the Complaint, Professor Tracy engaged in constitutionally protected activities, which included his independent research, analysis and viewpoints expressed on his personal blog.

142. Academic freedom is a "special concern of the First Amendment." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967).

143. The Defendant University claims to be "committed to maintaining and encouraging full academic freedom" and that academic freedom includes the freedom to "speak freely on, and seek changes in, academic and institutional policies" and to "exercise constitutional rights without institutional censorship or discipline." [See Exhibit "C"].

144. Professor Tracy's exercise of academic freedom is itself an issue of public concern protected by the First Amendment. See *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Silva v. University of New Hampshire*, 888 F. Supp. 293, 315 (D. N.H. 1994).

145. When the scope of the Defendant University's "Conflict of Interest/Outside Activities" policy was questioned by Professor Tracy and other faculty at Florida Atlantic University to senior administrative officials, the FAU Defendants failed to clarify the vague and overbroad policy or to demonstrate that the policy was not being used to impermissibly restrict faculty expression and freedom of speech.

146.    Instead, the FAU Defendants sought to further broaden the scope of FAU's "Conflict of Interest/Outside Activities" policy and force faculty at the Defendant University, including Professor Tracy, to affirm compliance with FAU's unconstitutional policy and to submit constitutionally protected speech on "Outside Activities" forms for administrative evaluation and censorship.

147.    Professor Tracy's constitutionally protected speech, including his independent research, analysis and viewpoints expressed on his personal blog, was a motivating factor in the decision of the Defendant University, by and through the FAU Defendants, to terminate Professor Tracy's tenured employment.

148.    Professor Tracy's constitutionally protected speech, including his questioning of the Defendant University's "Conflict of Interest/Outside Activities" policy, and other decisions and policies made or sought by administrators at the University, was a motivating factor in the Defendant University and FAU Defendants' decision to terminate Professor Tracy's tenured employment.

149.    The Defendant University and FAU Defendants' retaliatory actions in response to Professor Tracy's constitutionally protected speech have had a chilling effect that acts as a deterrent to free speech.

150.    Each individual FAU Defendant violated clearly established constitutional rights of which all reasonable college administrators and staff should have known, rendering them liable to Professor Tracy under 42 U.S.C. § 1983.

151.    The Defendant University, by and through the FAU Defendants acted intentionally, knowingly, willfully, wantonly, and in reckless disregard or Professor Tracy's federally-

protected constitutional rights, and without regard to the significant emotional and reputational damage such actions would cause.

152.    The denial of constitutional rights is irreparable injury *per se*, and Professor Tracy is entitled to declaratory and injunctive relief.

153.    The termination of Professor Tracy's tenured position with Florida Atlantic University directly resulted in substantial and irreparable harm to Professor Tracy, including lost income, reputational disparagement, the loss of a tenured appointment at Florida Atlantic University and out of pocket expenses, including but not limited to attorneys' fees and costs, as a consequence of being denied his First and Fourteenth Amendment rights.

Count IV – 28 U.S.C. § 2201
Declaratory Judgment and Injunction
*Against Defendant University and FAU Defendants*

154.    Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

155.    An actual controversy has arisen and now exists between Professor Tracy and the Defendants concerning Professor Tracy's rights under the United States Constitution. A judicial declaration is necessary and appropriate at this time as to Counts I, II and III above.

156.    Professor Tracy desires a judicial determination of his rights against Defendants as they pertain to Professor Tracy's right to speak without being subjected to the Defendant University's unconstitutional "Conflict of Interest/Outside Activities" policy that imposes prior restraints on speech, gives public school officials unfettered discretion whether to allow expression and under what conditions, and that are vague, overbroad, and not narrowly tailored to serve a substantial government interest.

157.   To prevent further violation of constitutional rights by the Defendant University and FAU Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the Defendant University's "Conflict of Interest/Outside Activities" policy unconstitutional.

**Count V - 42. U.S.C. § 1983**
Violation of Professor Tracy's Right to Procedural Due Process
*Against the Defendant University and FAU Defendants*

158.   Professor Tracy repeats and realleges all of the paragraphs in this Complaint as if fully set forth herein.

159.   Professor Tracy possessed a  property interest in his membership in the Defendant University's tenured faculty, by virtue of the contractual agreement between Professor Tracy and the Defendant University, which he was deprived of when the Defendant University wrongfully terminated Professor Tracy for his constitutionally protected speech.

160.   Professor Tracy also suffered a deprivation of his liberty interest as a result of the false and defamatory statements the Defendant University made about Professor Tracy, by and through the FAU Defendants, in conjunction with the Defendant University's wrongful and unconstitutional firing of Professor Tracy. The false and defamatory statements—including but not limited to public statements  falsely claiming that Professor Tracy had been insubordinate and failed to comply with the Defendant University's policies—caused Professor Tracy to suffer substantial  harm and stigma to his professional, intellectual and business reputation.

161.   Based on the manner in which Professor Tracy's employment was terminated, he was denied any hearing or opportunity to challenge the termination either before or after it was taken. The Defendant University, by and through the FAU Defendants, thereby deprived Professor

Tracy of a property interest and a liberty interest in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

162.    Furthermore, by terminating Professor Tracy for alleged non-compliance with the Defendant University's "Conflict of Interest/Outside Activities" policy, when the actual reason the Defendant University terminated Professor Tracy's was for exercising his constitutionally protected speech, the Defendant University and FAU Defendants failed to provide Professor Tracy with notice or a fair opportunity to be heard, or to challenge their unconstitutional actions.

163.    As a direct and proximate result of the denial of actual notice of the reason for his termination, or a fair opportunity to be heard or to challenge the termination through pre-termination or post-termination procedures, Professor Tracy suffered substantial and irreparable harm, including lost income, reputational damage, the loss of a tenured appointment at Florida Atlantic University, monetary damages and other out of pocket expenses, including but not limited to attorneys' fees and costs.

**Count VI - 42 U.S.C. § 1983 and 1985**
**Conspiracy to Violate Professor Tracy's Right to Procedural Due Process**
*Against the Defendant University, FAU Defendants and Union Defendants*

164.    Professor Tracy repeats and realleges all of the paragraphs in this Complaint as if fully set forth herein.

165.    All of the Defendants, in addition to other co-conspirators, known and not yet known to Professor Tracy, shared the common goal of terminating Professor Tracy's employment at FAU and violating his constitutional rights, and acting alone or in concert with others, conspired to terminate Professor Tracy's tenured appointment at Florida Atlantic University and to violate Professor Tracy's constitutional rights, including his right to due process.

39

166.     The Union Defendants, including but not limited to Defendant Zoeller and Defendant Moats, in addition to other co-conspirators, known and not yet known to Professor Tracy, jointly participated in the unlawful disciplinary action by the FAU Defendants by failing to defend or act on behalf of Professor Tracy when he was faced with unconstitutional disciplinary action.

167.     The Union Defendants, including but not limited to Defendant Zoeller and Defendant Moats, in addition to other co-conspirators, known and not yet known to Professor Tracy, jointly participated in the unlawful disciplinary action by the FAU Defendants by failing to file a grievance or respond to the FAU Defendants' unlawful conduct on his behalf, as was promised by representatives and agents of the Defendants UFF and FEA, including Defendant Moats.

168.     As a result of the Union Defendants' failure to file a grievance on behalf of Professor Tracy, and failure to defend Professor Tracy and respond to the Defendant University's Notice of Intent to Terminate, Professor Tracy was denied the opportunity to challenge the Defendant University's wrongful discipline, to tell his side of the story and be heard by an impartial decision maker.

169.     Based on the manner in which Professor Tracy's employment was terminated, he was denied any hearing or opportunity to challenge that action either before or after it was taken. The Defendant University, by and through the FAU Defendants, and with the assistance of the Union Defendants, thereby deprived Professor Tracy of a property interest and a liberty interest in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

170.     As a direct and proximate result of the denial of pre-termination or post-termination procedures, Professor Tracy suffered substantial and irreparable harm, including lost income, the loss of a tenured appointment at Florida Atlantic University and out of pocket expenses, including but not limited to attorneys' fees and costs.

Count VII – 42 U.S.C. § 1983 and 1985
Conspiracy to Interfere With Professor Tracy's Civil Rights
*Against All Defendants*

171.    Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

172.    All of the Defendants, in addition to other co-conspirators, known and not yet known to Professor Tracy, reached an agreement amongst themselves to terminate Professor Tracy's tenured appointment at the Defendant University, all in violation of Professor Tracy's constitutional rights.

173.    In this manner, the Defendants, acting alone or in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

174.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

175.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Professor Tracy's constitutional rights.

176.    As a direct and proximate result of the illicit agreement referenced above, Professor Tracy's rights were violated and he suffered substantial and irreparable harm, including lost income, the loss of a tenured appointment at Florida Atlantic University and out of pocket expenses, including but not limited to attorneys' fees and costs.

Count VIII – State Law
Breach of Contract
*Against Defendant University and FAU Defendants*

177.    Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

41

178.    At all times material to this Complaint, there was a valid and enforceable contract between Professor Tracy and the Defendant University, the FAU Defendants and the Union Defendants. [See Exhibit "C"].

179.    Article 5 of the BOT/UFF Agreement sets forth the various duties and obligations of the Defendant University and Union Defendants, to Professor Tracy, including but not limited to the safeguarding and protecting the "principal elements of academic freedom".

180.    Article 1.2(b) of the BOT/UFF Agreement states, "No new, existing or amended Board of University regulation, policy, or resolution shall apply to employees if it conflicts with the express term of the Agreement."

181.    Article 1.2(c) provides that the Defendant University, by and through the Board, "shall provide to the UFF advance copy of any proposed regulation or policy changing a term or condition of employment contained in this Agreement... The advance copy of a policy shall be provided to the UFF, at least two (2) weeks in advance of its effective date..."

182.    Article 16.5 of the BOT/UFF Agreement provides that a tenured appointment may be terminated for just cause.

183.    The Defendant University and FAU Defendants breached the FAU BOT/UFF Agreement, including but not limited to, section 5.3(c) and (d), by attempting to censor Professor Tracy, and prevent him from exercising his constitutional rights.

184.    In addition to violating Professor Tracy's constitutional rights, the Defendant University and FAU Defendants breached the FAU BOT/UFF Agreement by changing the Defendant University's "Conflict of Interest/Outside Activities" policy without providing proper advance notice to FAU's faculty, by and through UFF, as required by the Agreement.

42

185.    Furthermore, the Defendant University and FAU Defendants breached the FAU BOT/UFF Agreement by disciplining Professor Tracy for requesting clarification on the FAU's vague and confusing "Conflict of Interest/Outside Activities" policy.

186.    The Defendant University and FAU Defendants also breached the FAU BOT/UFF Agreement by wrongfully disciplining and terminating Professor Tracy's tenured appointment without just cause.

187.    As a result of the breach of the FAU BOT/UFF Agreement by the Defendant University and FAU Defendants, Professor Tracy has suffered damages, including but not limited to monetary damages, lost income and benefits, the loss of a tenured position at the Florida Atlantic University, reputational damage, in addition to attorneys' fees and costs.

Count IX – State Law
Breach of Contract
*Against the Union Defendants*

188.    Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

189.    At all times material to this Complaint, there was a valid and enforceable contract between Professor Tracy and Union Defendants, including Defendant Zoeller, Defendant Moats and Defendants UFF and FEA. [See Exhibit "C"].

190.    At all times material to the Complaint, the BOT/UFF Agreement set forth the various duties and obligations of the Union Defendants, to Professor Tracy, including but not limited to the safeguarding and protecting the "principal elements of academic freedom".

191.    The Union Defendants, including Defendant Zoeller, Defendant Moats and other representatives of the Defendants UFF and FEA, breached the FAU BOT/UFF Agreement,

43

including Section 20, by failing to file a grievance or response on behalf of Professor Tracy when faced with unlawful disciplinary action by the Defendant University and FAU Defendants.

192.    The Union Defendants, including Defendants Zoeller and Moats and other agents and representatives of the Defendants UFF and FEA, also breached the FAU BOT/UFF Agreement by failing to represent and defend Professor Tracy when faced with unlawful disciplinary action.

193.    As a result of the Breach of the FAU BOT/UFF Agreement by the Union Defendants, Professor Tracy has suffered damages, including but not limited to monetary damages, lost income and benefits, the loss of a tenured position at the Florida Atlantic University, reputational damage, in addition to attorneys' fees and costs.

Count X – State Law
Breach of Fiduciary Duty
*Against the Union Defendants*

194.    Professor Tracy repeats and realleges all of the paragraphs of this Complaint as if fully set forth herein.

195.    The Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA, knew or had reason to know that Professor Tracy was placing trust and confidence in them and that Professor Tracy was relying on their representations to ensure proper protocol and procedures were followed in all matters pertaining to safeguarding Professor Tracy's constitutional rights and tenured employment with the FAU Defendants.

196.    The Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA, had a fiduciary relationship and duty expressly and impliedly based upon the BOT/UFF Agreement and the specific circumstances

described herein surrounding the long term employment relationship and personal assurances of the Union Defendants.

197.     Professor Tracy was justified in placing trust and confidence in the Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA.

198.     The Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA, breached their fiduciary duty to Professor Tracy by, among other things, failing to ensure that proper procedures were followed to safeguard and protect Professor Tracy's tenured employment and constitutional rights.

199.     The Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA, breached their fiduciary duty to Professor Tracy by denying Professor Tracy his right to union representation when, in November of 2015, the Defendant University and FAU Defendants again sought to wrongfully and unconstitutionally discipline Professor Tracy.

200.     The Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA, further breached their fiduciary duty in November of 2015 by advising and instructing Professor Tracy that he should submit "Outside Activities" forms for his personal blogging and constitutionally protected speech, despite this advisement and instruction directly contradicting the advisement and instruction Defendant Moats and other agents and representatives of the Defendants UFF and FEA rendered to Professor Tracy in 2013.

201.     Furthermore, the Union Defendants, including Defendant Zoeller, Defendant Moats and other agents and representatives of the Defendants UFF and FEA, breached their fiduciary duty

to Professor Tracy by failing to file a grievance requested by Professor Tracy, and by advising Professor Tracy and other union representatives that the unconstitutional disciplinary action threatened by the Defendant University was "not grievable".

202.    The Union Defendants, including Defendant Moats and other agents and representatives of the Defendants UFF and FEA, also breached their fiduciary failing to respond to the Notice of Termination issued by the Defendant University and FAU Defendants, as promised.

203.    Furthermore, the Union Defendants, including Defendant Moats and other agents and representatives of the Defendants UFF and FEA, breached their fiduciary duty to Professor Tracy by advising Professor Tracy that the unlawful disciplinary actions of the Defendant University and FAU Defendants were "valid" or otherwise lawful.

204.    Furthermore, the Union Defendants, including Defendant Moats and other agents and representatives of the Defendants UFF and FEA, breached their fiduciary duty to Professor Tracy by attempting to coerce Professor Tracy into resigning to avoid termination.

205.    Furthermore, the Union Defendants, including Defendant Moats and other agents and representatives of the Defendants UFF and FEA, breached their fiduciary duty to Professor Tracy by attempting to pressure Professor Tracy into accepting a meager severance offer made by the Defendant University, and to not file a lawsuit.

206.    As a result of the breach by the Union Defendants, Professor Tracy has suffered damages, including but not limited to monetary damages, lost income and benefits, the loss of a tenured position at the Defendant University, reputational damage, in addition to attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

1. That judgment be entered in favor of Professor Tracy and against all Defendants on each and every claim in this Complaint.
2. Declaratory relief declaring Florida Atlantic University's "Conflict of Interest/Outside Activities" policy, facially and as applied to Professor Tracy, is unconstitutional, and that Defendants violated Professor Tracy's rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;
3. That Professor Tracy be reinstated to his tenured employment at Florida Atlantic University, with full restoration of all benefits and lost wages.
4. Appropriate injunctive relief to which Professor Tracy is entitled, including but not limited to enjoining Defendants and their officers, agents, servants, employees, representatives, and all other persons, firms, or corporations in active concert of participation with them, from violating Professor Tracy's constitutional rights, including but not limited to his freedom of speech.
5. Compensatory damages in such amounts as is just and proper.
6. Punitive damages.
7. That the Court awards Professor Tracy's costs and disbursements for this lawsuit, including reasonable attorneys' fees as permitted by law.
8. Such other and further relief as this Court may deem just and proper.

Dated: April 25, 2016

Respectfully submitted,

/s/ Louis Leo IV
**Louis Leo IV, Esq.**
FL Bar No. 83837
louis@floridacivilrights.org
**Joel Medgebow, Esq.**
FL Bar No. 84483
joel@medgebowlaw.com
**FLORIDA CIVIL RIGHTS
COALITION, P.L.L.C. &
MEDGEBOW LAW, P.A.**
4171 W. Hillsboro Blvd. Suite 9
Coconut Creek, FL 33073
Telephone: (954) 478-4223
Fax: (954) 239-7771

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial in accordance with Fed. R. Civ. P. 38 and the

7th Amendment to the Constitution on any issue triable of right by jury.


DATED: April 25, 2016                                    Respectfully submitted,

                                                         /s/ Louis Leo IV
                                                         Louis Leo IV, Esq.

## Declaration Pursuant to 28 U.S.C. 1746

I, James Tracy, swear under the penalty of perjury under the law of the United States, that I am the Plaintiff in the within action; that I have read the foregoing Verified Complaint, and reviewed the attached exhibits. I swear under penalty of perjury under the laws of the United States and that the factual information set forth in the Verified Complaint is true and correct, and the attached exhibits are true and correct copies of what they are described to be in the Verified Complaint.

This 25th day of April, 2016

_____
James Tracy