# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

JAMES TRACY, )
)
Plaintiff, )
) Case No. 9:16-cv-80655-RLR-JMH
v. )
)
FLORIDA ATLANTIC UNIVERSITY )
BOARD OF TRUSTEES, a/k/a FLORIDA )
ATLANTIC UNIVERSITY, et al. )
)
)
Defendants. )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Louis Leo IV
Florida Bar No. 83837
Email: louis@floridacivilrights.org
Joel Medgebow
Florida Bar No. 84483
Email: joel@medgebowlaw.com
Matthew Benzion
Florida Bar No. 84024
Email: mab@benzionlaw.com
FLORIDA CIVIL RIGHTS COALITION, P.L.L.C.
Medgebow Law, P.A. & Matthew Benzion, P.A.
4171 W. Hillsboro Blvd., Suite 9
Coconut Creek, Florida 33073
Tel. (954) 478-4223
Fax (954) 239-7771

Richard J. Ovelmen
Florida Bar No. 284904
Email: rovelmen@carltonfields.com
Steven M. Blickensderfer
Florida Bar No. 092701
Email: sblickensderfer@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
100 SE Second Street, Suite 4200
Miami, Florida 33131
Tel: (305) 530-0050
Fax: (305) 530-0055

*Attorneys for Plaintiff James Tracy*

Pursuant to Federal Rule of Civil Procedure Rule 56(b), Plaintiff James Tracy submits this Motion for Partial Summary Judgment and Supporting Memorandum of Law.

## INTRODUCTION

Defendants fired Professor Tracy for his highly controversial blog posts about the Sandy Hook Elementary Massacre that may people found deeply offensive, even hateful. The record shows that Defendants and the public knew that was the basis for his termination. Rather than being honest and forthright about their motivations, Defendants constructed a pretext of "insubordination" for failing to timely report his blog on a conflict of interest form where there was no actual conflict to disclose.  No other faculty member was ever required to report their blogging or was ever discharged on these grounds.   The pretextual nature of Defendants' proclaimed reason for the termination is unrebuttable because they fired Tracy after he submitted the form, *which revealed no conflict*.   Under no circumstances does the First Amendment countenance a public university's firing a professor for speech that is unpopular or disagreeable, especially when the speech has nothing to do with the administration or functioning of the university itself.  But, as the undisputed facts show, that is precisely what occurred here.

As set forth herein, summary judgment should be granted on the following grounds: First, the overwhelming, unrebutted evidence shows that Tracy was fired in retaliation for his constitutionally protected speech, and Defendants' manufactured reason for firing Tracy does not create a genuine issue of material fact. Second, the Conflict of Interest/Outside Activities Policy (the "Policy") is an unlawful, content-based restriction of speech because it cannot be enforced without reference to the subject-matter of employees' speech to determine whether it contradicts Defendants' "public interests," and it is viewpoint discriminatory because it is enforced only against those faculty members with whom FAU disagrees. Third, the Policy is unconstitutionally vague on its face because reasonable people, including FAU's own faculty and administrators, do not understand what it prohibits, and it encourages discriminatory enforcement and facilitates censorship, as it did here.  As applied, it was selectively enforced against Professor Tracy. Finally, as a result of Defendants' unconstitutional conduct, Professor Tracy is entitled to reinstatement and damages.[1]

---

[1] Plaintiff is not moving for summary judgment on Counts II and VI.  Plaintiff further adopts and incorporates by reference the arguments set forth in his motions to strike Defendants' affirmative defenses [DE 119, 122].  The affirmative arguments made in this Motion otherwise overcome any remaining affirmative defenses on liability. All emphasis is added and quotation marks omitted unless otherwise noted.

## LEGAL STANDARD

Summary judgment should be granted if "there is no genuine dispute as to any material fact," and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Klayman v. City Pages*, 650 F. App'x 744, 749-50 (11th Cir. 2016). "To preclude summary judgment, the factual issue or dispute must be genuine—the evidence must be of such a quality that a reasonable jury could return a verdict for the nonmoving party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1307 (S.D. Fla. 2014).

## ARGUMENT

### I.     SUMMARY JUDGMENT MUST BE GRANTED BECAUSE TRACY WAS FIRED FOR EXERCISING HIS FIRST AMENDMENT RIGHT TO FREE SPEECH, AND THE OUTSIDE ACTIVITIES POLICY IS UNCONSTITUTIONAL.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).[2]  Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish–American Gay, Lesbian & Bisexual Grp. of Boston, Inc*., 515 U.S. 557, 574 (1995).

This fundamental rule has special force with regard to a public university, where "[t]he vigilant protection of constitutional freedoms," including academic freedom, "is nowhere more vital . . . ."  *Keyishian v. Bd. of Regents of the Univ. of the State of New York*, 385 U.S. 589, 603

---

[2] The Supreme Court has held that the following speech is protected by the First Amendment: *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (racially disparaging trademark); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (anti-homosexual hate speech near funeral); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55–56 (1988) (vulgar parody about minister losing virginity to his grandmother); *Bolger v. Youngs Drug Products Corp*., 463 U.S. 60, 65 (1983) (advertisements for contraceptives); *Carey v. Brown*, 447 U.S. 455, 462-463 (1980) (picketing in front of Mayor's home); *FCC v. Pacifica Foundation*, 438 U.S. 726, 745-746 (1978) (George Carlin's infamous "Seven Dirty Words You Can't Say On Television" routine); *Young v. Am. Mini Theatres, Inc*., 427 U.S. 50, 63-65, 67–68 (1976) (plurality opinion) (operation of adult movie theater); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (picketing high school); *Cohen v. California*, 403 U.S. 15, 16 (1971) ("Fuck the Draft"); *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) (protesting Vietnam war outside army recruiting station); *United States v. O'Brien*, 391 U.S. 367, 382 (1968) (burning Selective Service registration certificates); *Stromberg v. California*, 283 U.S. 359, 368–369 (1931) (displaying red flag as an emblem of opposition to organized government).

(1967).  "The essentiality of freedom in the community of American universities is almost self-evident. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250 (1957).

### A.    Tracy Is Entitled To Summary Judgment On His First Amendment Retaliation Claim (Counts I, V).

Consistent with the forgoing principles, a government employer may not retaliate against a public employee for speech protected by the First Amendment. *See Morgan v. Ford*, 6 F.3d 750, 753-54 (11th Cir. 1993); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). To succeed on a claim under § 1983 for First Amendment retaliation, a plaintiff must show: "[1] that his speech or act was constitutionally protected; [2] that the defendant's retaliatory conduct adversely affected the protected speech; and [3] that there is a casual connection between the retaliation and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).[3] Each of those elements are met here. Once established, the burden shifts to the defendant

---

[3] The "*Pickering*" test, as articulated in *Bryson*, which typically applies to public employer-employee cases in this Circuit does not apply here for at least two reasons. *See Beckwith v. City of Daytona*, 58 F.3d 1554, 1563 (11th Cir. 1995) ("(1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct.") (citing *Bryson,* 888 F.2d 1562).

First, Tracy's speech on Sandy Hook and mass casualty events had nothing to do with the university or its administration, and thus was a private individual's speech.  *See Connick v. Myers*, 461 U.S. 138, 149 (1983) (explaining purpose of "public concern" requirement in employment context); *Arrington v. Dickerson*, 915 F. Supp. 1516, 1523 (M.D. Ala. 1996) ("[T]he court finds the First Amendment *does not* allow a public official to infringe upon a private individual's speech, even if the speech concerns a purely private matter, thus rendering the [*Pickering*] balancing test inapplicable in the instant case").

Second, Defendants have not defended this case on the basis that Tracy was fired for his speech.  *See* [D.E. 107, at pp 73-76].  Consequently, Defendants have waived or should be estopped from now arguing that under *Bryson* or *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), their interests in the efficient operation of the university outweigh Tracy's interest in his speech. *See Acevedo-Delgado v. Rivera*, 292 F.3d 37, 45 (1st Cir. 2002) (*Pickering* instruction inapposite where defendant "denies having fired [plaintiff] for her refusal to contribute" [*i.e.*, the speech]); *Marshall v. Allen*, 984 F.2d 787, 797 n.8 (7th Cir. 1993) ("[T]he defendants' primary defense on the merits of this case appears to be that [plaintiff's] speech had nothing to do with his dismissal. In light of this, defendants have waived a *Pickering* analysis.").

to prove: [4] that it would have made the same adverse employment decision absent the speech. *See Morgan*, 6 F.3d at 754 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284-87 (1977)); *see also Ricciuti v. Gyzenis*, 832 F. Supp. 2d 147, 153 (D. Conn. 2011) ("the *Mt. Healthy* defense"). Defendants cannot genuinely make such a showing.

### 1.   Tracy's blogging was constitutionally protected speech.

There can be no dispute that the speech at issue is constitutionally protected. As a preliminary matter, Tracy was speaking in his capacity as a private citizen, not a public employee of the university. To determine whether an employee speaks as a private citizen requires analysis of the duties performed by the employee. *See Garcetti v. Ceballos*, 547 U.S. 410, 424-45 (2006). The critical question here "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). Indeed, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id.*

As a tenured professor in the School of Communications and Multimedia Studies, Tracy taught classes critical of the media, including a class called the "Culture of Conspiracy." *See* Plf's Statement of Material Facts "SOF" at ¶2.  Based on his knowledge and expertise in media studies, Tracy's controversial speech (discussed in greater detail below) consists of blog posts and web articles on the media coverage of mass-casualty events, such as Sandy Hook, and his perceived discrepancies in the media coverage surrounding them, as well as the government's alleged involvement. SOF ¶4. Tracy spoke on these topics on his own time, after school hours and on the weekends. *Id*. Thus, he clearly spoke on these matters as a private citizen, which Defendants have never disputed. In fact, Defendants conceded as much when they insisted that Tracy use a disclaimer on his blog to publically announce to the world that he was blogging in his private capacity "on a matter of public interest," and not in any official capacity or on behalf of FAU. SOF ¶8, 17.

Also, Tracy was speaking on a matter of public concern, as he was commenting on a news event that was the subject of mass-media coverage and critiquing the government. *See Connick v. Myers*, 461 U.S. 138, 146 (1983) (explaining that for speech to be a matter of "public concern," it must "relat[e] to any matter of political, social, or other concern to the community...."); *see also City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (observing that a

matter of "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"). Private citizens have a "well established" First Amendment right to criticize government policies. *See Bradley v. Computer Sci. Corp.*, 643 F.2d 1029, 1033 (4th Cir. 1981) ("public criticism of governmental policy, government operations, and government officials is at the very core of the constitutionally protected free speech area"); *Arrington v. Dickerson*, 915 F. Supp. 1516, 1526 (M.D. Ala. 1996) (stating this law is "well established"). And, to the extent his speech constituted political expression, such speech is afforded "the broadest protection . . . ." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995).

Other relevant factors are whether the employee's speech occurred in the workplace; whether the subject matter of the speech concerned the employee's job; and whether the speech was given to a limited audience or as part of a public dialogue. *See Abdur–Rahman v. Walker*, 567 F.3d 1278, 1282 (11th Cir. 2009). All of these factors weigh in favor of Tracy's speech relating to a matter of public concern. Tracy was not speaking on the internal administration of the education system at FAU. Nor does the speech "owe[] its existence" to Tracy's position as a tenured professor. *See Garcetti*, 547 U.S. at 421-22. The fact that Tracy was blogging to a larger audience on a publically available website further confirms that his speech was a matter of public concern. *See Deremo v. Watkins*, 939 F.2d 908, 911 n.3 (11th Cir. 1991) ("the employee's attempt at public communication is . . . a relevant factor in the public concern analysis"); *see also Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (doctor's blog posts that "add[ed] to the public debate" regarding medical treatment were not commercial speech).

### 2.    Tracy was terminated because of his speech, and FAU's purported reason for his firing is pretextual.

Tracy has also proven the remaining elements of his § 1983 claim: First, there is no question that Defendants' retaliatory conduct adversely affected the protected speech, as Tracy was fired from a tenured faculty position as a result of his blogging. *See Bennett*, 423 F.3d at 1252 ("In the employment context, the required adverse action in a retaliation claim is an 'adverse employment action.' "). Second, there is a causal connection, because Defendants were motivated to fire Tracy based on his speech: there was no other legitimate reason for his firing. Though Defendants argue that Tracy was fired because he did not timely submit a "Conflict of Interest/Outside Activities" form reporting his blogging activity, this reason is clearly pretextual.

The burden on a plaintiff to show that his protected conduct was a substantial factor in the adverse employment action against him is "not a heavy one." *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 (11th Cir. 2000) (addressing police officer who was terminated in part for exercise of speech rights). The factors a court must consider in assessing whether a public employee's speech substantially motivated his or her termination include: (1) whether the employment action closely followed the protected activity; (2) whether the defendant's asserted reasons are pretextual; (3) whether the defendant's asserted reason for its action has varied; and (4) circumstantial evidence of causation such as who initiated the employment action, evidence of management hostility to the speech, or an employer motive to retaliate. *Id*. at 1291 n.20. No one factor is outcome determinative, *see id*., but every factor is present here.

As described below, although Defendants have been monitoring Tracy's blog for several years, they fired him after controversy about his blog posts reignited in December 2015. Unrebutted record evidence, including admissions from Defendants themselves, prove that the asserted reason for the firing is pretextual; that Defendants' actions have varied (sometimes stating they fired him for failure to report his blog under the Policy, and at other times claiming that was not the reason); and Defendants have undeniably expressed hostility towards the speech.

Tracy began publishing blog posts about the Sandy Hook Elementary massacre in December 2012.  SOF ¶5. To say that his posts were provocative would be an understatement. Among the many posts he made on the subject, he wrote that the mass shooting did not take place in the way depicted by the government and mainstream media, and that the shooting did not take place at all. *Id*. He blogged that the victims were, in fact, not victims at Sandy Hook, and that their families were actors playing a role. *Id*. He suggested that the event was staged by the government in order to promote gun control. *Id*. The subject matter of Tracy's blog posts was so controversial that they garnered national attention and were widely reported by the press, including segments featuring Anderson Cooper on CNN that were watched by countless viewers. SOF ¶6.

Internal FAU communications at the beginning of 2013 reveal that following the bombardment of negative press on Tracy's blog posts and political opinions, high-level administrators began holding daily meetings for the express purpose of discussing whether the school could take disciplinary action against Tracy for his speech. SOF ¶¶7-8. A series of handwritten minutes created between January 8, 2013, and January 18, 2013, reveal that senior

FAU administrators—including then Vice Provost Defendant Alperin, then Dean of the College of Arts and Letters Defendant Coltman, Chief Press Officer Lisa Metcalf, Assistant Vice President for Communications and Marketing Scott Silverstein, and General Counsel Larry Glick—met with the express "objective" of "explor[ing] potential misconduct [for] blog" to justify terminating him. SOF ¶7.

The handwritten minutes reveal that the group was told expressly not to draft any emails on the subject so as to avoid discovery through the State's robust public records law. *Id*. They also reveal that the group's inquiry into Tracy's misconduct was caused by what the school viewed as the potential "impact" the negative press was having, and would continue to have, on the school. *Id*.

Remarkably, the handwritten minutes reveal that the school recognized that the public university is bound by "freedom of speech" and "acad[emic] freedom," but that they felt Tracy's continued tenure would be "reckless + irresponsible" and a "black eye on all faculty." SOF ¶8. Recognizing that "JT [is] not going to stop publishing" the group was told to "read his stuff" to "find winning metaphors" to get around the "1st Amendment." *Id*. The group next met on January 18, 2013, to brainstorm what "winning metaphors" they could conjure up to get around Tracy's "1st Amendment" rights. *Id*. Among the suggestions was to claim that Tracy's blog lacked a sufficient "disclaimer," even though it stated that he was not writing on behalf of FAU. *Id*. Another was to claim that the blog constituted a "conflict of interest" under Article 19 of the School's faculty. *Id*. The group adjourned with several tasks, including to find whether Tracy could be disciplined for failing to complete an "outside activity" form. *Id*.

On the very afternoon that FAU decided to pursue disciplining Tracy the first time (in 2013), Defendant Coltman directed Plaintiff to report his blogging to the School. SOF ¶13. Plaintiff objected to any obligation to report his personal blogging, citing his First Amendment right to freedom of speech and arguing that his blogging activities were not "reportable" activities under the Policy. *Id*. Shortly thereafter, Tracy received a disciplinary action letter from FAU, stating that the disclaimer on his blog was insufficient and his use of his FAU job title of "Associate Professor" was improper. SOF ¶14. The school subsequently received cease and desist letters from the American Association of University Professors (AAUP) and the Foundation for Individual Rights in Education (FIRE) concerning the discipline. SOF ¶16. FAU later told Tracy that the disciplinary action would be withdrawn if he agreed to change the

disclaimer on his blog and stop identifying himself as an "Associate Professor," which he did. SOF ¶17. Defendants never withdrew the disciplinary letter from Tracy's file. *Id.*

Moreover, while FAU administrators and faculty were still in complete confusion about what "outside activities" were reportable under the school's conflict of interest policy, Defendants continued to monitor Tracy's blog activity. SOF ¶¶19, 27-29. FAU administrators were clearly upset and angry at Tracy's speech. Some called him a "Nut job," while others called for his termination, saying: "tenure be damned" and "tenure is not immunity." SOF ¶37.

In the Fall of 2015, Defendants changed the Policy to require that professors check a box acknowledging that they know they have to submit an outside activity form. SOF ¶20. Defendants did not provide any instructions to clarify what activities must be reported or what would happen in the event of non-compliance. SOF ¶ 44.

On November 10, 2015, Defendant Coltman sent Tracy a Notice of Discipline for purportedly refusing to complete the newly-required acknowledgment. SOF ¶25. On November 22, 2015, Tracy responded that he had not received clarification on what the Policy requires, and expressed concerns about the Policy's infringement on the First Amendment. SOF ¶26. Meanwhile, at this time, Defendants were monitoring Tracy's blog and compiling news articles that were critical of him in the "JT media report." SOF ¶27. This shows that Defendants were continuing to scrutinize Tracy, in search of lawful grounds to fire him, while purporting to be merely concerned with his compliance with the Policy.

On December 10, 2015, the Sun-Sentinel published another article about Professor Tracy's speech, calling for his firing. SOF ¶29. This reignited complaints calling for Tracy's termination. *Id.* That same day, Defendants decided to fire Tracy. SOF ¶30. An email between Defendants Coltman and Alperin on that date shows that they were preparing the Notice of Termination letter for Tracy as of December 10, 2015. *Id.* However, on December 11, 2015, Dean Coltman emailed Tracy notifying him that he must submit the report by December 14, 2015, or he would be terminated. SOF ¶31. The fact that they had already drafted the Notice of Termination when they sent this email shows that it did not matter whether Tracy made the December 14, 2015 deadline or not: their decision to fire him had already been made. This highlights both the temporal proximity between the adverse employment action and controversy over Tracy's speech, and that Defendants' purported reason for firing Tracy was pretextual: the

8

explanation given in the Notice of Termination (failure to submit the report by the December 14, 2015 deadline) cannot be true, as by December 10, 2015, Defendants already wanted him out.

Not knowing that the decision had already been made, on December 15, 2016, Tracy reluctantly submitted a conflict of interest form reporting that he spent six hours per week on blogging activities and that he receives no income for such activities. *See* SOF ¶32. Despite turning in the forms, which revealed that Tracy had no "conflict" of interest in pursuing his personal blogging activity, FAU tendered the Notice of Termination to Tracy on December 16, 2017.  Defendants stated that Tracy was purportedly insubordinate because he filed the report one day late and even though they clearly reflected there was no conflict of interest. SOF ¶33. Almost immediately after terminating Tracy, the school's administrators sent rounds of emails and other communications to each other congratulating themselves for finally terminating him. SOF ¶¶37-38.

The unrebutted record is clear that Tracy's discipline, leading up to and including his termination, was substantially, if not exclusively, provoked by FAU's disagreement with his provocative public statements about the Sandy Hook massacre and not a failure to timely turn in a conflict of interest form. In fact, the School's Assistant Dean, Barclay Barrios, admitted this directly, telling a member of the school's faculty that was concerned that she too would be fired for failing to submit a Conflict of Interest/Outside Activities statement: "**And, for the record, Tracy was not fired because he didn't report things**." SOF ¶45. Likewise, on December 18, 2015, another FAU professor admitted to the press the reason the university fired Tracy, stating: "His termination both holds Tracy accountable for his despicable behavior and reduces pressure on elected officials to end tenure." SOF ¶34. Defendant Coltman approved this message ("my hero") and forwarded it to a colleague, apparently adopting it as her own.  SOF ¶35.

Thus, as FAU acknowledged on several occasions, the **record** is clear that Tracy was fired because he shared an unpopular opinion about a national tragedy. These admissions are dispositive proof in this Circuit that FAU's purported reason for terminating him was pretextual. *See Rainey v. Jackson  State Coll.*, 481 F. 2d 347, 350 (5th Cir. 1973) (holding college's reason for terminating employee was due to the elimination of that position was clearly pretextual based on trustee's admission).[4]

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit prior to October 1, 1981.

The pretextual character of FAU's supposed termination reason is made all the more clear by the fact that in over 30 years no other professor had ever been fired, let alone terminated, for failing to timely turn in or complete the form. In fact, earlier this year, in an apparent attempt to demonstrate that the school regularly disciplines professors for failing to turn in the form, FAU brought disciplinary action against a professor named Stephen Kajiura for failing to comply with the policy. SOF ¶47. By contrast, he only received a 5-day suspension without pay, a decision which was reversed by an arbitrator on the grounds that the Policy was unenforceable and vague. *Id*. Accordingly, Tracy is entitled to summary judgment on Count I.

**B.**    **FAU's Policy Impermissibly Targets Speech Based On Its Content And Does Not Survive Strict Scrutiny (Counts III, IV, V).**

FAU's Policy is an unconstitutional content-based restriction on free speech. The Policy is content-based because it: (1) draws distinctions based on the message a speaker conveys; (2) allows for viewpoint-based discrimination; and (3) gives university officials unbridled discretion to target speech that they subjectively believe conflicts with the school's unidentified "public interests," even before it is published. These issues render the Policy subject to strict scrutiny, requiring FAU to show that the policy serves a compelling state interest and is narrowly tailored to serve that interest, which it cannot do.

**1.**    **The Policy is a content-based restriction on free speech.**

The First Amendment prohibits laws and policies that censor disfavored speech based on "its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2226 (2015).[5] A content-based policy is subject to strict scrutiny and presumptively unconstitutional. *Id*.; *see also Constr, and Gen. Laborers' Local Union No 330 v. Town of Grand Chute*, 834 F.3d 745, 749 (7th Cir. 2016) ("content discrimination is almost always forbidden"). Defendants bear the burden of proving the Policy is constitutional. *See United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

A law is content-based if "'on its face' [it] draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. Facially content-neutral regulations will be considered content-based if they "cannot be 'justified without reference to the content of the regulated speech,' or were adopted by the government 'because of disagreement with the

---

[5] The Eleventh Circuit recently noted *Reed* broadens the test for determining whether a law is content based in *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1235 n.7 (11th Cir. 2017).

message [the speech] conveys.' " *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed*, 135 S. Ct. at 2228.

Here, the Policy is content-based because it draws distinctions based on the message the speaker conveys. Moreover, FAU applied it to Tracy's blogging as undefined "outside" "employment" or "professional activity" that purportedly conflicts with the interests of the University, whatever those interests may be (but apparently no longer include academic freedom or freedom of speech).[6] SOF ¶10. In turn, the only way to determine whether a speech activity must be reported is by reviewing the content of the speech to determine whether it conflicts with those "interests."

Defendant Alperin demonstrated how this works at her deposition, where she was asked about another blog that she had not previously seen belonging to a professor of Middle East studies. SOF ¶42 (specifically, Exh. H, Vol. II, pg 174-76). After she was shown a printout of the blog and asked whether it had to be reported under the Policy, she responded: "I don't know if this is part of his assignment. . . . It could be part of his assignment. . . . I mean, he's an expert on the Middle East. He's speaking on the Middle East. His work and lifelong learning is part of the University." *Id.* Thus, the university administrator charged with enforcing the Policy concedes that she would have to examine the content of speech to determine whether it conflicts with FAU's public interests and must be reported.

Applying the Policy to Tracy necessarily required Defendants to review his speech on Sandy Hook to determine whether it conflicted with the university's public interests. Such a Policy is clearly content based and demands strict scrutiny.

Moreover, the Policy allows for viewpoint discrimination because it can be (and was) used to silence speech with which Defendants disagreed. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant . . . . Viewpoint discrimination is thus an egregious form of

---

[6] The word "activity" clearly encompasses speech. *See Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (disapproving of interpretation that attempts to distinguish between "speech" and "conduct").

content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995). Here, Defendants used the Policy to discriminate against Tracy's viewpoint as evidenced by the fact that, although many professors have blogs or social media sites that they did not report, none of those professors have been disciplined. SOF ¶¶42, 46. In fact, FAU had never before disciplined an employee or faculty member for failing to submit an outside activities form, much less a tenured professor, and yet it fired Tracy shortly after revising the Policy in the fall of 2015, after controversy about his blog posts had reignited. SOF ¶¶ 27-29, 46. The unrebutted record in this case shows that Defendants vehemently disagreed with Professor Tracy's provocative viewpoints, had been monitoring his blog for years, and had been looking for a way to terminate him as a result of his speech since 2013.

Additionally, the Policy gave (and continues to give) FAU officials unbridled discretion to target speech they believe conflicts with the undefined "public interests" of the university. The Policy also allows for FAU administrators to demand speech for analysis and approval in advance of publication, much like a prior restraint.  None of this is permissible.  It has long been clear that granting "unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional."  *Atlanta Journal & Const. v. City of Atlanta Dept. of Aviation*, 322 F.3d 1298, 1311 (11th Cir. 2003); *see also Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted" (citations omitted)).

**2.      The Policy does not survive strict scrutiny.**

To rebut the presumption the Policy is invalid, Defendants must show the regulation is (1) necessary to serve a compelling state interest, and (2) narrowly tailored to achieve that end. *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1331 (M.D. Fla. 2011). Defendants cannot do so.

When strict scrutiny applies, courts must look beyond the entity's purported interests to determine the state's true interests. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *see also Reed*, 135 S. Ct. at 2228 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral."). Thus, despite what Defendants may contend is their interest in having this Policy, their actual

interest, evidently, is to restrict their employees' speech. This is not a legitimate state interest, much less a compelling one, as it is unconstitutional for a public institution to control its employees' private speech on matters of public concern. *See, e.g., Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011). It would not even pass the rational basis test. *See Playboy*, 529 U.S. at 818 ("It is rare that a regulation restricting speech because of its content will ever be permissible.").

Lastly, the Policy is not the least restrictive means as it is grossly overinclusive. A law or policy is overinclusive where it covers more speech than necessary to accomplish its goals. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991) (striking down as overinclusive a law that required an accused or convicted criminal's income from works describing crime to be deposited in an escrow account and made available to victims of the crime and criminal's creditors). The Policy is clearly not the least restrictive means, and cannot pass strict scrutiny as a matter of law, because the only other person disciplined under the policy was given a 5-day work suspension that was later reversed.  SOF ¶47.[7]

### C.    The "Conflict Of Interest/Outside Activities" Policy Is Unconstitutionally Vague On Its Face (Counts III, V).

A law or policy may be vague for either of two reasons: "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (Marcus, J., concurring).[8] "When speech is involved, rigorous adherence to [these] requirements is necessary to ensure that ambiguity does not chill protected speech." *Id*. at 1320; *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope … is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."); *Keyishian*, 385 U.S. at 604 ("The danger of that chilling effect . . . must be guarded against by

---

[7] For this same reason, the Policy is unconstitutionally overbroad. *See Fla. Ass'n of Prof. Lobbyists, Inc. v. Div. of Legis. Information Servs.*, 525 F.3d 1073, 1079 (11th Cir. 2008) ("A law is overbroad that does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech").

[8] Judge Marcus's separate opinion on vagueness was joined by a majority of the court and is binding precedent.

sensitive tools which clearly inform teachers what is being proscribed"). The Policy is vague for both reasons.

### 1.     Lack of reasonable notice.

This case is governed by *Wollschlaeger*. In *Wollschlaeger*, the Eleventh Circuit held that a provision of a Florida statute that regulated doctors' speech about firearm safety was unconstitutionally vague because it prohibited "unnecessarily harassing" behavior without defining the term, and it did not apply it according to common usage. 848 F.3d at 1319. Here too the following terms are undefined in the Policy, forcing employees to guess as to their meaning.

(1) "*Professional practice*": The Policy requires employees to provide their supervisors with a written description of any "reportable outside activity" they engage in. SOF ¶9. "Reportable Outside Activity" is defined as "any compensated or uncompensated professional practice, consulting, teaching or research, which is not part of the employee's assigned duties…." *Id*. Yet the Policy does not define "professional practice." *Id*. And, just as in *Wollschlaeger*, the Policy does not apply the term according to common usage, since common usage would be job-related activity, but here it may be "uncompensated." *See* 848 F.3d at 1320. The meaning of "professional practice" is even less clear than in *Wollschlaeger*, because it can encompass potentially any act that an employee engages in, whereas *Wollschlaeger* was limited to doctors' speech regarding firearms.  The FAU Policy contains no reference to blogging.

The form itself renders the term "professional practice" even less clear. It only contains a space for a "Description of Employment Activity," and does not include any space to fill out a non-employment activity. *See* SOF ¶9 (citing Exh. AD). Defendants admit that some employees refer to the Policy as the "Outside Employment" form (SOF ¶40), as did the chair of Professor Tracy's department (*Id.*), not realizing that it also encompasses uncompensated activities. As a result of this confusion over the scope of the term, reasonable professors are left guessing what activities to report. *See* SOF ¶¶21-22. For instance, at a September 4, 2015 FAU Faculty Senate Meeting, one professor said with regard to the reporting requirement:

> No one knows what that means. The deans don't know what this means. Faculty supervisors don't know what this means. And until there's some clarity about what outside activity has to be reported I would recommend, as a good piece of advice, that any new faculty member who asks their supervisor or their peer about what kind [of] outside activity they would engage in I would say do nothing because any outside activity exposes you to risk. And that risk includes discipline

up to dismissal from the university. This is serious, and no one knows what outside activity the university is targeting.

SOF ¶21 (quoting from Exh. AP, pg 5-6). Another professor asked in an email whether he should report public appearances if he receives an honorarium, showing he too was confused about the scope of the Policy. SOF ¶45 (citing Exh. AN). In fact, Defendants themselves do not even know how to apply it. *See* SOF ¶40.

(2) "*Public interests*": The Policy is supposed to prohibit conflicts of interest. SOF ¶10. The definition of "conflict of interest" includes: "any conflict between the private interests of the employee and the public interests of the University, the Board of Trustees, or the State of Florida…." *Id*. Critically, the Policy does not define what the "public interests" of the University, Board of Trustees, or State of Florida are, nor place any limits on what "public interests" include. Thus, professors "are left guessing" how to avoid violating this rule. *See Wollschlaeger*, 848 F.3d at 1326; *see also Gray v. Kohl*, 568 F. Supp. 2d 1378, 1388 (S.D. Fla. 2008) (holding statute unconstitutionally vague because the "term 'legitimate business' requires citizens to guess at the conduct that falls within the statute's ambit"). Moreover, it is entirely implausible that free speech blogging would be a conflict of interest to an institution that expressly promotes academic freedom.

(3) "*Full performance*": The definition of "conflict of interest" also includes "any activity which interferes with the full performance of the employee's professional or institutional responsibilities or obligations." SOF ¶10. Yet the Policy does not provide any parameters for how to measure "full performance" or "interference." Nor does it specify how many hours professors should be working, so it is difficult to determine how time-consuming an activity must be to constitute interference. Read literally, any activity (including hobbies, having a family, community involvement) can interfere with full performance of a professor's activities. Indeed, the forms reflect Tracy spent only a few hours per week of personal time on the blog.

In addition to these terms, the Policy is also vague because it does not define what the consequences are for failing to comply. Defendants Alperin and Coltman did not even know what sanctions to impose against Tracy. In a December 10, 2015 email from Coltman to Alperin, which attached a redlined version of the Notice of Termination letter to Professor Tracy drafted before the deadline to turn in the forms, Coltman wrote a question to Alperin asking: "DOES THIS MEAN THAT A REPRIMAND IS THE NEXT STEP, RATHER THAN TERMINATION?" because she did not know what disciplinary action could be taken. SOF ¶30.

15

This shows that Defendants have unfettered discretion to decide how to enforce the Policy, and that the consequences of violating it may be severe. In *Wollschlaeger*, lack of clarity on how to comply with the statute was particularly problematic because the penalties for violating it were extreme, including the revocation of medical licenses. 848 F.3d at 1319. Here too "wrong guesses [as to what is required] will yield severe consequences," including termination and loss of tenure. *Id.* Therefore, as in *Wollschlaeger*, the Policy is unconstitutionally vague.

2.      **Arbitrary and discriminatory enforcement**

The Policy is also vague because it authorizes arbitrary and discriminatory enforcement that clear facilitated the censorship here. *Id.* at 1319. There are minimal guidelines on how to apply the Policy: it does not explain what activities must be reported, when the report must be submitted, or what sanctions will be imposed if violated. As a result, Defendants are imposing the policy based on their subjective interpretations, rather than on objective criteria. SOF ¶40, 42. This raises the likelihood of arbitrary or discriminatory enforcement. *See Bankshot Billards, Inc. v. City of Ocala*, 692 F. Supp. 2d 1343,1353 (M.D. Fla. 2010) (finding that the lack of guidelines for enforcement of Ordinance rendered it unconstitutionally vague). Accordingly, the Policy is void for vagueness on its face.

**D.      The "Conflict Of Interest/Outside Activities" Policy Is Unconstitutionally Vague As Applied To Professor Tracy (Counts IV, V)**

The Policy is also vague as applied to Professor Tracy, because he did not have reasonable notice that he could be terminated for failing to timely comply with the Policy and because it was discriminatorily enforced against him based on his speech.

First, as stated, because several terms in the Policy are not defined, both Defendants and other professors have expressed confusion regarding the scope of the Policy. Professor Tracy received mixed directions on whether the Policy required him to report blogging (*see* SOF ¶ 16, Exh. CE), was not disciplined in 2013-14 or 2014-15 for failing to report his blogs, and other professors also did not understand the Policy. *See* SOF ¶21, Exh. AP, pg 5-6. As the Policy does not mention blogs, social media, or any other form of expression—and had not required reporting speech activity in the past—it did not give Professor Tracy fair notice that he was required to report his blog. *Balthazar v. Sup. Ct. of Mass.*, 573 F.2d 698, 702 (1st Cir. 1978) (finding statute vague as applied "[i]n light of the fact that the language of the statute at the time of petitioner's conduct had no well-defined, well understood and generally accepted meaning").

Second, the Policy was arbitrarily and discriminatorily applied to Professor Tracy. Prior to Professor Tracy's termination in January 2016, no tenured faculty members at FAU had ever been required to submit forms reporting uncompensated personal blogging. SOF ¶¶42-43. Defendants admit that over 20 other professors maintain blogs or other social media sites, but were not disciplined for failing to report that activity under the Policy. *See* SOF Ex. J ¶¶ 4-50. And, Professor Tracy actually complied more than those professors did, as he ultimately reported his blog, although Defendants claim it was untimely by one day. This selective enforcement of the Policy against Professor Tracy is impermissible. *See Goguen*, 415 U.S. at 578 (holding statute was void for vagueness as applied because its standards were so indefinite that it allowed the police, court, and jury to discriminatorily enforce it against *Goguen* based on his expressive conduct). The undisputed evidence shows that Defendants selectively enforced the Policy against Professor Tracy precisely for the purpose of chilling his protected speech, which is exactly what *Goguen* and *Wollschlaeger* caution against. *See id*.; 848 F.3d at 1320. Because ambiguities in the Policy enabled this arbitrary enforcement, the Policy is unconstitutionally vague.

## II.   PROFESSOR TRACY SHOULD BE REINSTATED AND AWARDED COMPENSATORY AND PUNITIVE DAMAGES.

Professor Tracy is entitled compensatory and punitive damages under § 1983. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307-08 (1986); *Smith v. Wade*, 461 U.S. 30, 35 (1983). Compensatory damages in § 1983 First Amendment cases "may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Id*. at 307-08; *see also Slicker v. Jackson*, 215 F. 3d 1225, 1231 (11th Cir. 2000) ("In addition to damages based on monetary loss or physical pain and suffering, under the law a § 1983 plaintiff also may be awarded compensatory damages based on demonstrated mental and emotional distress, impairment of reputation, and personal humiliation."). As a result of Defendants' unconstitutional acts, Tracy lost his job and lost tenure. Because he was purportedly terminated for "insubordination," and this was publicized in the media, his reputation was also ruined by Defendants, and now he is unable to find employment in his field. SOF ¶48. Accordingly, he is entitled to emotional and reputational damages, back pay, and either reinstatement—which is preferred—or front pay.

Reinstatement is awarded in First Amendment retaliation claims under § 1983. *See Haskins v. City of Boaz*, 822 F.2d 1014, 1015 (11th Cir. 1987). If reinstatement is not granted, front pay is awarded as an alternative. *See id*.; *McKinley v. Kaplan*, 177 F.3d 1253, 1258 n.3

(11th Cir. 1999) (holding plaintiff was entitled to seek different relief once reinstatement was no longer possible); *Belk v. City of Eldon*, 228 F.3d 872, 883 (8th Cir. 2000). Thus, Tracy is entitled to reinstatement; but, if he is not reinstated, he is owed front pay through retirement age. *See, e.g., Warren v. Cty. Comm'n of Lawrence Cty., Ala.*, 826 F. Supp. 2d 1299, 1319 (N.D. Ala. 2011) (awarding front pay until projected retirement age); *Picinich v. United Parcel Serv.*, 583 F. Supp. 2d 336, 342-43 (N.D.N.Y. 2008), *aff'd*, 318 F. App'x 34 (2d Cir. 2009) (same); *Mota v. Univ. of Texas Houston Health Scis. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001); *Thornton v. Kaplan,* 961 F.Supp. 1433, 1440 (D. Colo. 1996).

Professor Tracy is also entitled to punitive damages because of Defendants' "reckless indifference" to his First Amendment rights, as they blatantly and intentionally terminated him because they disagreed with his speech. *Smith*, 461 U.S. at 46. The Supreme Court has held that setting punitive damages at two, three, or four times the size of compensatory damages is likely to comport with due process. *See Philip Morris USA v. Williams*, 549 U.S. 346, 351 (2007).

It remains only to note that damages should be awarded without regard to Title VII's cap on compensatory damages, because that cap only applies in Title VII cases and this is a § 1983 case. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1284-85 (11th Cir. 2008) ("[I]n contrast to Title VII, 'Congress has not seen it fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII'") (citation omitted); *see also Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1349-50 (D.C. Cir. 1999) (holding Title VII damages cap imposed no limit on state statutory claim); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1064 (8th Cir. 1997) ("Because § 1981 was a basis for recovery, the Title VII cap on compensatory and punitive damages does not apply."). Thus, Tracy should be awarded the full amount of compensatory damages owed, as well as punitive damages for Defendants' reckless conduct and any declaratory or injunctive relief.

## CONCLUSION

For the forgoing reasons, the Court should grant partial summary judgment in Plaintiff's favor on liability with respect to Counts I, III, IV, V, and on the framework for damages applicable in this case.

Dated: August 21, 2017

/s/ RICHARD J. OVELMEN
Richard J. Ovelmen
Florida Bar No. 284904
Email:  rovelmen@carltonfields.com
Steven M. Blickensderfer
Florida Bar No. 092701
Email:  sblickensderfer@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
100 SE Second Street, Suite 4200
Miami, Florida 33131
Tel:    (305) 530-0050
Fax:    (305) 530-0055
*Co-Counsel for Plaintiff James Tracy*

And

Louis Leo IV
Florida Bar No. 83837
Email:  louis@floridacivilrights.org
Joel Medgebow
Florida Bar No. 84483
Email:  joel@medgebowlaw.com
Matthew Benzion
Florida Bar No. 84024
Email:  mab@benzionlaw.com
FLORIDA CIVIL RIGHTS COALITION, P.L.L.C.
Medgebow Law, P.A. & Matthew Benzion, P.A.
4171 W. Hillsboro Blvd., Suite 9
Coconut Creek, Flroida  33073
Tel.  (954) 478-4223
Fax  (954) 239-7771
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of August, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF to be served this day per the attached Service List.

/s/ *RICHARD J. OVELMEN*
Richard J. Ovelmen Esq.

## <u>SERVICE LIST</u>

Gerard J. Curely, Jr., Esq. (jcurley@gunster.com)
Keith E. Sonderling, Esq.
(ksonderling@gunster.com)
Holly Griffin, Esq. (hgriffin@gunster.com)
Roger W. Feicht, Esq. (rfeicht@gunster.com)
Gunster, Yoakley & Stewart, P.A.
777 South Flagler Dr. Suite 500 East
West Palm Beach, FL 33401

*Counsel for FAU Defendants*

Robert F. McKee, Esq. (yborlaw@gmail.com),
Robert F. McKee, P.A. & Melissa C. Mihok, P.A.
1718 E. Seventh Ave. Ste. 301
Tampa, FL 33605

*Counsel for Union Defendants*