UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 9:16-cv-80655-RLR


JAMES TRACY,

     Plaintiff,

vs.

FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES,
a/k/a FLORIDA ATLANTIC UNIVERSITY, et al.,

     Defendants.
_____/


VIDEOTAPED DEPOSITION OF CHRIS ROBE

APRIL 3, 2017
2:08 P.M. TO 4:03 P.M.

301 YAMATO ROAD
SUITE 1240
BOCA RATON, FLORIDA 33431


REPORTED BY:
JESSICA COOPER, FPR, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



```
 1                    APPEARANCES OF COUNSEL

 2    ON BEHALF OF THE PLAINTIFF:

 3         LOUIS LEO, ESQUIRE
           JOEL MEDGEBLOW, ESQUIRE
 4         MEDGEBOW LAW, P.A.
           4171 W HILLSBORO BLVD STE 9
 5         COCONUT CREEK, FL 33073
           954-478-4223
 6         JOEL@MEDGEBOWLAW.COM
           LOUIS@MEDGEBOWLAW.COM
 7
      ON BEHALF OF THE DEFENDANTS:
 8
           KATHERINE HEFFNER, ESQUIRE
 9         CAIR FLORIDA
           8076 N 56TH ST
10         TAMPA, FL 33617
           813-514-1414
11         KHEFFNER@CAIR.COM

12         SARA HUFF, ESQUIRE
           GUNSTER 200 S ORANGE AVE STE 1400
13         ORLANDO, FL 32801
           407-406-5246
14         SHUFF@GUNSTER.COM

15    ALSO PRESENT:

16         ANTHONY MAROUN, INTERN

17         JAMES TRACY, PLAINTIFF

18

19

20

21

22

23

24

25
```



```
1                    INDEX OF EXAMINATION

2    WITNESS: CHRIS ROBE
                                               PAGE
3    DIRECT EXAMINATION
          BY: MR. LEO                             5
4
     CROSS EXAMINATION
5         BY: KATHERINE HEFFNER                  112

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



877.291.3376
www.UCRinc.com

```
1              INDEX OF EXHIBITS

2   EXHIBIT           DESCRIPTION              PAGE

3   PR1      ARTICLE 19                         34

4   PR2      REPORT OF OUTSIDE EMPLOYMENT FORM  38

5   PR3      NOTICE OF DISCIPLINE               51

6   PR4      UFF-FAU EXECUTIVE COMMITTEE        53

7   PR5      MONITORING PLAN                    64

8   PR6      ARTICLE 5                          66

9   PR7      EMAIL                              70

10  PR8      EMAIL                              72

11  PR9      EMAIL                              72

12  PR10     EMAIL                              74

13  PR11     EMAIL                              79

14  PR12     EMAIL                              n/a

15  PR13     EMAIL                              n/a

16  PR14     EMAIL                              88

17  PR15     APPENDIX D REQUEST FOR REVIEW     103

18

19

20

21

22

23

24

25
```



877.291.3376
www.UCRinc.com

```
 1              VIDEOTAPED DEPOSITION OF CHRIS ROBE

 2                        APRIL 3, 2017

 3              THE COURT REPORTER:  Okay.  We're now on the

 4         video record.  Today's date is April 3rd, 2017 and

 5         the time is 2:08 p.m.  This is a video deposition

 6         of Chris Robe taken in the matter of James Tracy

 7         vs. Florida Atlantic University Board of Trustees,

 8         a/k/a Florida Atlantic University, et al.  Case

 9         Number 9:16-cv-80655-RLR.  We are located at 301

10         Yamato Road Suite 1240, Boca Raton, Florida 33431.

11         The Court Reporter is Jessica Cooper with the firm

12         Universal Court Reporting.  Would counsel please

13         introduce themselves for the record?

14              MR. LEO:  I am Louis Leo IV.  My co-counsel

15         Joel Medgebow is here, and we represent Professor

16         James Tracy.

17              MS. HEFFNER:  My name is Katherine Heffner.  I

18         represent UFF-FAU  and its affiliates.

19              MS. HUFF:  My name is Sara Huff and I

20         represent FAU, Defendants.

21    Thereupon:

22                        CHRIS ROBE,

23    was called as a witness, and after having been first

24    duly sworn, testified as follows:

25                    DIRECT EXAMINATION
```



```
 1    BY MR. LEO:

 2         Q    How are you doing today?

 3         A    All right.

 4         Q    All right.  Let's just start with introduction

 5    and some ground rules.

 6         A    Um-hum.

 7         Q    Have you given a deposition before?

 8         A    No, never, sir.

 9         Q    Okay.  It's very simple.  The Court Reporter

10    is trying to get everything that we say and record it.

11    So head nods, hand gestures, things like that aren't

12    going to be okay.  So, --

13         A    Okay.

14         Q    -- if you can respond verbally, "yes", "no",

15    "maybe", "I don't know", "I don't recall" as those are

16    appropriate responses.  If there is any questions I ask

17    you you're not sure about or unclear --

18         A    Um-hum.

19         Q    -- just let me know and I can rephrase.

20         A    Okay.

21         Q    Is there any drugs or alcohol or anything that

22    you're under the influence of right now?

23         A    No.

24         Q    Do you take any medications?

25         A    No.
```



1      **Q     Is there any reason why you won't be able to**
2      **testify truthfully?**
3      A     No.
4      **Q     And I always say this, there's no right or**
5      **wrong answers, there's only truthful answers.**
6      A     Right.
7      **Q     You're okay with that?**
8      A     Yes.
9      **Q     Has anybody made any threats to you in**
10     **connection with your testimony today?**
11     A     No.
12     **Q     Has anybody given you promises?**
13     A     No.
14     **Q     Have you spoken to anybody from any party, any**
15     **attorney's, under the table or outside of this room in**
16     **connection with your testimony?**
17     A     I called our UFF attorney just to get a sense
18     of what the deposition would be about because I've never
19     done one before.
20     **Q     Who did you speak to?**
21            THE WITNESS:  Kathleen, you say?
22            MS. HEFFNER:  Katherine.
23     A     Katherine, sorry.  Katherine.
24     **Q     (By Mr. Leo) Katherine, okay.**
25     A     Yeah.



1      Q    Okay.  And what did you guys talk about?

2      A    You know what a deposition is; I didn't do one

3   before.  So, she told me just tell the truth and --

4      Q    Okay.

5      A    Yeah, it's very brief, I've been travelling a

6   lot.

7      Q    Okay.  Did you speak to anybody else at the

8   University or United Faculty of Florida regarding your

9   testimony?

10     A    No.

11     Q    Did you talk to Bob Zoeller?

12     A    No, not really.

13     Q    Okay.  So, let's talk about your employment.

14  How long have you worked at FAU?

15     A    Thirteen years.

16     Q    Thirteen years?

17     A    Um-hum.

18     Q    And what's your title or --

19     A    Associate Professor .

20     Q    Associate Professor .  Are you tenured?

21     A    Yes.

22     Q    And how long have you been tenured?

23     A    Sine 2011.  So, however, six years I guess.

24     Q    Okay.  And how long have you been with United

25  Faculty of Florida, FAU?



```
 1        A    You mean as a member or --

 2        Q    Both.

 3        A    As a member, since 2005.  I became a faculty

 4   member in 2004 but it's contingent.  So, I didn't strike

 5   that.

 6        Q    Okay.

 7        A    You know, getting involved, it's not entirely

 8   clear but about three years in, about 2006, that'll be I

 9   guess 2006-2007.

10        Q    Is when you became an officer?

11        A    Well, I was an officer as a recruiter.

12        Q    Recruiter.

13        A    So, go around and talking to people, it's been

14   a while that you joined for any -- recruit members,

15   stuffs like that.

16        Q    Okay.  What other titles or positions have you

17   held at UFF-FAU ?

18        A    So, it's union president from 2011 to 2014 and

19   then I was on sabbatical for the year after.  So, I

20   wasn't doing anything.  And then when I came back as

21   membership chair which is in-charge of recruiting.

22        Q    Yeah, that's what I was asking you, whoever

23   the membership chair is.

24        A    Yeah, largely that kind of strategizing --

25        Q    When you say recruiting, are you talking about
```



1  recruiting faculty members from FAU?

2      A    Yes.

3      Q    So, how many faculty members at FAU are UFF

4  members?

5      A    It fluctuates as you could imagine.  Roughly

6  now it's about -- I can give you a percentage, it's

7  around 43%.  It breaks down like 300 -- I don't know.

8  330, something around there, low 300s.

9      Q    Over 300 members?

10      A    Yeah, because the -- it changes because the

11  Bargaining unit, the amount of faculty at the University

12  changes per year.  Some people are more hired, some

13  people let go.  It fluctuates over the summer as people

14  retire and what not.  So, it's always, you know, a kind

15  of a malleable number in terms of how many people belong

16  throughout the year.

17      Q    Okay.  And so, you were present in you said,

18  2011-2014 --

19      A    Right.

20      Q    -- tell me about your duties and

21  responsibilities as president.

22      A    Oh gosh, they're multifaceted, right.  I mean,

23  they run the gambit of, you know, everywhere from

24  bargaining the contract to having consultations with the

25  president and the provost which we have assigned every



1  semester, you know, sort of just identifying the main

2  issues a faculty have and how to advance them. So, when

3  I was president for example, you know, instructors were

4  not fulltime faculty had a pretty bad deal, they were

5  getting paid low and were not recognized. So, one of my

6  jobs was to create a promotional structure for them,

7  right. To give them more equity and raises with that.

8  As well as like paid apparently leave, that was another

9  thing when I was UFF president but we didn't have that

10 at the time. I mean, there is a lot, you know what I

11 mean?

12     **Q     Yeah.**

13     A    I can't really go over all the things the

14 president does because it's like real lot of minutia.

15     **Q     Sure.**

16     A    -- there but like you know, bargaining the

17 contract or at least overseeing that -- somewhat

18 overseeing grievances but not necessarily, you know, on

19 the fine details of that because you're delegating,

20 right. You have a lot of people around you.

21     **Q     Right.**

22     A    You know, trying to organize and get people to

23 join, you know, on top of that, addressing the major

24 issues that faculty have. Having conversations with the

25 admin, you know, during our forms that we have within



1   the contract itself to, you know, so we can at least

2   have some kind of dialog, you know, what they're

3   thinking and vice versa.  I don't know, I mean, that

4   seems to be -- there's other things but it seem that's

5   like the big --

6       **Q    How about dealing with the umbrella, the UFF,**

7   **the FEA entities?**

8       A    Right.

9       **Q    Is that part of your duties as a president?**

10      A    Yeah, I guess.  We have a -- I mean, that

11  really falls under the state president, to be honest,

12  whoever was doing that at the time.  Because --

13      **Q    You mean president of the UFF --**

14      A    Statewide.

15      **Q    Just UFF?**

16      A    Yeah.  So, you know, we're in-charge of the

17  chapters and there's "X" number of chapters depending on

18  the state University system.  And there is one person

19  who is in-charge of the presidency at the time. When I

20  was chapter president, it was Tom Oxter who was the

21  president of Tallahassee, now it's Jennifer Profit or

22  was.  Actually, there was just recently election, so

23  she's not any more.  So, they really coordinate those

24  things, they are the intermediary between.  But anyway,

25  we do have a state senate every semester, right, that we


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    -- all the chapters kind of convene and whomever usually

2    people who've been elected senators, which is another

3    kind of station we have at UFF have attend. Not all of

4    them, by any means, but some of them.  You know, the

5    point is to exchange change information between chapters

6    and what's going on.  So, for example when we came up

7    with the idea of a promotional structure for instructors

8    -- we have origionally learned FIU doing that first,

9    right.  They gave us the idea.  They went through it

10   first.  They gave us a sense of tips like what work,

11   what did not work, so on and so forth.  And same we have

12   breakout meetings of bargaining, to hear what like the

13   other chapters are bargaining at the other campuses to

14   compare, you know, and get a sense of what various

15   administrations are doing.  But I would, you know, the

16   chapter president is not in charge of that, right.  We

17   just go -- we're in- charge of bringing people, right,

18   trying to rally people up at our campus.

19        **Q     With respect to the bargaining and the -- so,**

20   **there's a bargaining agreement?**

21        A     Yes.

22        **Q     Right.  I'm holding what I think is your**

23   **bargaining agreement, right?**

24        A     Yes.

25        **Q     A 108-page document.**



```
 1        A    Right.

 2        Q    These agreements, did you participate in the

 3   bargaining for this one?

 4        A    No, I wasn't.

 5        Q    No?

 6        A    Yeah, that was --

 7        Q    It says 2012, 2015.

 8        A    Yeah, but it gets behind.  That's the thing.

 9   Or was is that one?  Well, I'm trying to think.  Is that

10   the most recent -- that's not the most --

11        Q    This is the one that I found on the website,

12   and it's says on here actually, "Ratified, June 27th."

13        A    Well, can I have a look at that?

14        Q    Yeah, sure.

15        A    Do you mind?  Because my name will be on here

16   if I -- just to be very honest.  I might have.  I

17   honestly, I don't know which contract I did.  So, I

18   don't want to say.

19        Q    It's not marked but this is Exhibit, I think

20   C?

21        A    I believe at the end they have the signatures.

22   I apologize.  It's a while, you know, I kind of blocked

23   this stuff.

24        Q    Trying to save paper, that's why we didn't

25   print them out, you know.
```



1    A    Yeah.  I'm sorry.  I'm just trying to find. I

2  know there is a part where there is a signature on here.

3  Is it -- do you all know?  Yeah, if you know you can

4  help me out.

5    Q    **You tell me, you probably know better than me.**

6    A    It's somewhere around here and usually the

7  chapter president does it.  I should say, even if it was

8  the one I was -- oh, here we go.  Let's see.  I think I

9  got it.  Yeah, so, I did it.  Okay.  I was on that.

10   Q    **That --**

11   A    Yes, I was the president.

12   Q    **Okay.**

13   A    I wasn't -- I should say, I wasn't directly on

14 the Bargaining team there because we had a really strong

15 one.  So, I delegated a lot.  My main intervention was I

16 would go to Pre-bargaining, meaning when our bargainers

17 would meet among ourselves, I would be there and kind of

18 just get a sense of hierarchy, like what do we want to

19 press for, what do we not want to press for.

20   Q    **Right.**

21   A    But I didn't really go to the bargainings

22 themselves because I have things to do.

23   Q    **Who drafted this agreement?**

24   A    What do you mean?

25   Q    **The 2012-2015 CBA, was this -- this was**



1  prepared by somebody, right?

2       A    Yeah I mean, it's based off the older

3  contracts.  So, revisions and amendments happen through

4  that.

5       Q    So, there's a previous contract that's been

6  amended into this one?

7       A    Correct.  And it's largely similar I mean,

8  with a couple of major except -- changes with it.

9       Q    Okay.  And with respect to your time as

10 president, you had said that it was Tom Oxter who was

11 the UFF president at the time?

12      A    Correct, yeah.

13      Q    How much dealings did you have with

14 Mr. Oxter --

15      A    None.

16      Q    None at all?

17      A    Yeah, none really.  I mean, yes, I'd see him

18 at the UFF senate and say hi.  But it really -- yeah,

19 it's funny.  I, you know, there's certain chapters that

20 get along with other ones, right, and we always consider

21 ourselves as more of the activist chapters, I would talk

22 to people who are more kind of like engage with  trying

23 to build up faculty and what not.

24      Q    You say activist, you go against the grain?

25      A    No, not that.  A sense of like this is owned



1   by faculty, we're not here just to represent you but we

2   want to create a faculty culture, right.  You know, just

3   kind of like to put it in more neutral terms, a kind of

4   community organizing kind of thing.  Like in other

5   words, going -- like for example, like just going out

6   door to door talking to faculty, not all chapters do

7   that.  So, in other words, that's really important to

8   find out their concerns, to find out their interest and

9   their issues.

10      Q    Did you talk to nonmembers do you mean?

11      A    Yeah, as well as members.  It depends on what

12  our thing was.  So, anyway like really on the ground

13  kind of organizing -- grassroots organizing, I'll put it

14  in activist terms --

15      Q    How is a membership changed over the years,

16  you said it was 43% roughly now?

17      A    Um-hum.

18      Q    How is that differed over the past, you know,

19  five years ago?

20      A    Well, when I started, it was low.  I mean Jim

21  remembers this to it was like 21%, 22% and I can say

22  precisely because we weren't doing the things we are

23  doing now, right, like on the ground organizing and what

24  not, we kind of atrophied.

25      Q    So, 2011 it was as low as --



877.291.3376
www.UCRinc.com

1        A    No, this is -- I'm talking -- this was like

2    2004.  So, '11 we were pretty, we were pretty much

3    stabilized like high 30s or mid 40s quite honestly.

4        **Q    When you were president, what was the**

5    **percentage?**

6        A    About that, 39, 42, something like that.

7        **Q    39%.  So, not too much --**

8        A    Different.

9        **Q    -- different than what it is now.**

10       A    Um-hum.

11       **Q    Going back to your time as president, do you**

12   **remember in 2013 when Professor  Tracy was first dealing**

13   **with the University's disciplinary actions?**

14       A    Right.  Yes.

15       **Q    What was your role in 2013 with respect to**

16   **that whole process the grievance and all that?**

17       A    Yeah, I should say 2013 was a crazy year.  We

18   had a lot of things going wrong at the University at

19   that time.  Our president at the time was trying to name

20   the stadium after a prison which got a lot of flak for

21   it.  She hit a student with a car.  I am just - let me

22   like put this all in context sort of like the disaster

23   that I was sort of dealing with at the time.

24       **Q    Wow.**

25       A    Deandre Poole had the Stomp on Jesus thing



877.291.3376
www.UCRinc.com

1   going on at that time and then Jim's thing happened. It

2   was like the perfect tsunami of a mess as a union

3   president you could want.  But, you know, honestly it's

4   funny thinking about it.  Jim's was -- it seems the most

5   easily handable.  This thing came up with him, you know,

6   the outside employment and, I don't know, it seemed like

7   -- it seemed just egregious, right, what the

8   administration was saying at the time that he couldn't

9   be doing the stuff on his website.  So, I really

10  delegated a lot of that to our main grievance person

11  Doug Broadfield at the time.  He's no longer here but I

12  think he's at UM, University of Miami.

13      Q      Right.

14      A      And Michael Moats I think handled that too.

15  So, I didn't -- honestly other than like telling them

16  about it and, you know, occasionally getting updates

17  from my grievance guy, Doug, you know it seemed under

18  wraps.  There was much more problematic stuff going on.

19  The Deandre Poole thing I was really much more involved

20  in because he was an instructor, because it dealt with

21  freedom is -- academic freedom and what not and we're

22  really waging a public campaign -- publicity campaign on

23  that.

24      Q      Um-hum.

25      A      So, a lot of my energy was going there, I



1  mean, being a union president too, you know, you have to

2  delegate and sort of hire guys where you need to

3  intervene more directly.  In Jim's case, you know, for

4  when I talked to Doug at the time I think Michael, I

5  mean it's a while.  So, I don't want to -- it seemed

6  handable.  It seemed easily --

7      **Q    He seemed like he was in good hands in 2013**

8  **from a union perspective.**

9      A    Yeah, I wasn't worried.

10     **Q    He was represented by Broadfield in a**

11 **grievance?**

12     A    Right.

13     **Q    And that was filed -- that was based on advise**

14 **that came from UFF?**

15     A    Yeah, I mean I assumed -- and once you get - -

16 you get into the weeds a little that I'm not totally

17 aware.  But I know Doug was talking with Michael Moats,

18 right.  And Michael Moats was sort of our point person

19 between the State and ourselves.

20     **Q    What is Moats' official title?**

21     A    I don't know.  You know, to be honest, I'm so

22 sorry.  I don't remember what it is.  I don't recall off

23 hand what Michael's --

24     **Q    Does Service Unit Director sounds --**

25     A    That's sounds about right, yeah.  I don't want



1   to just claim something that I don't remember. But

2   Michael was always kind of a point person.

3        **Q     Would you say that he acts in a supervisory**

4   **capacity or is he also directing and, you know, telling**

5   **the Chapter what to do?**

6        A     Yeah, he's supervisory.  We don't have to

7   listen to his advice if we choose not to and that's been

8   the way where it has been.  We always had service unit

9   directors, before him we had another guy name Bruce,

10  it'll come to me.  But there was another person before

11  him.  But UFF kind of prides itself on the autonomy of

12  the Chapter.  So, I mean of course you always get in

13  disagreements sometimes, right, with the state level and

14  what you're doing at the Chapter level but usually it's

15  advisory in terms of -- as a matter of fact it's always

16  been advisory.  I never had anybody tell me to do

17  anything when I was union president.  I also didn't have

18  much interaction with the state level. I often delegated

19  to other people and often we had our things under

20  control so to say as a corollary, but when we're dealing

21  with Deandre Poole -- Interesting enough I dealing with

22  that mostly myself.  I wasn't really even asking too --

23  I'm sure I called Michael some, you know, just to like

24  run by ideas.  Of saying, "Okay. This is what I'm

25  thinking." But he's like, "Good." Right, I mean I seemed



1  to be on top of it, so.

2      **Q     When Moats would advise to do something, did**

3  **you ever say, no?**

4      A    I'm sure.  I mean, I can't remember what, you

5  know what I mean?  But I know I've re-delegated him

6  before --

7      **Q     Just give me an example of something that**

8  **Moats would advise you to do and you wouldn't do it.**

9      A    Well, he wanted to come down once, and I feel

10 bad because Michael is a good guy, but he wanted to come

11 down -- but we all have our limits in our talents. So,

12 he wanted to come to our chapter and help recruit with

13 me.  And, you know, went out recruiting with him, and

14 quite honestly, he's not a great recruiter.  So, you

15 know, I sort of didn't say that to him but I said, you

16 know, you'd be more useful in bargaining helping us out

17 that way.  I talked to my other main recruiter too, he

18 kind of agreed.  So, that's one way where, you know, we

19 kind of like, he thought he was going to be intervening

20 in this part but we're like, you know, -- another thing

21 I can just say this wasn't so much Michael but this was

22 Tom Oxter, so I say when we meet once a semester for all

23 the UFF states senate, all the presidents meet together

24 with the -- so, all the chapter presidents meet together

25 with the state president.  I forgot how long, two hours



1  or something like that.  I think it's called the council

2  of presidents and, you know, we discuss things, major

3  issues.  So, I remember one they were asking the

4  chapters for about five grand.  I don't know what year,

5  quite honestly, some time when I was the president

6  obviously but I don't remember when.  But they were

7  asking for the state chapters for $5000 for some

8  communication campaign.  And I mean, I'm a communication

9  Professor , right.  So, it was very vague like what this

10 money was going to go to and how it was going to use, I

11 said like, no.  Right, we're not going to give you that

12 money because it just seems like throwing good money

13 after bad, right, they didn't have a god organization.

14 So, like things like that, you know.

15      Q    Yeah.

16      A    And whatever, they were all right with it. You

17 know what I mean, I was one of the few I think that

18 objected about it but some others did too.

19      Q    With respect to grievance filings, you said

20 that you delegate.

21      A    Um-hum.

22      Q    And when you were president, you delegated to

23 Broadfield.

24      A    Right.

25      Q    Moats acted in an advisory capacity for your



1   time when you were the president.

2       A    Um-hum.

3       Q    And to this day, he still is the advisory for

4   the chapter?

5       A    I believe so, yeah.  I believe so.

6       Q    Right.

7       A    He got sick for a bit.  So, he might not have

8   been for a little bit but --

9       Q    With respect to grievances, was there ever a

10  grievance advice that you disagreed with from Moats?

11      A    Yeah, I wasn't -- I don't know if it was

12  Moats.  We've had -- so, just to give you a sense of the

13  structure.  You know, first of all the UFF makes the

14  decision at the chapter level they're going to take up a

15  grievance or not, right.  More often than not they do,

16  right, just to be safe.  And it goes through a series of

17  steps, right.  So, you try to sometimes people try to

18  resolve it informally, you know, before it starts moving

19  along.  And quite honestly, you have to talk to the

20  grievance people about this.  So, I don't want to speak

21  outline but there is a step two -- Step 1 and then Step

22  2 --

23      Q    Um-hum.

24      A    -- that you go through it.  And then all

25  grievances are vetted through the state organization,



```
 1   right.
 2        Q    So, you submit the grievance to the state
 3   organization for approval?
 4        A    Yeah, ultimately if we're not getting it
 5   resolved at the local level in the earlier stages --
 6        Q    Informally.
 7        A    -- informally or even in the earlier stages I
 8   believe, right, because now we're talking about if it
 9   moves up, we're going to have to have an attorney or
10   something were are talking about more cost.  So, there
11   is a state board which I can't remember exactly, I feel
12   like it's CBC or something is the acronym but you can
13   look it up yourself, something like that.  I can't
14   recall, and they get vetted through that in terms of
15   feasibility, in terms of being a, you know, do we think
16   they're going to win this grievance, do we think they're
17   not going to win this grievance so on and so forth.
18        Q    Is there a cost associated with grievances?
19        A    It depends where it goes, you know, I mean,
20   how it's -- there could be, right.  But it depends, you
21   know, what attorneys are involved and what not.
22        Q    When would an attorney get involved from the
23   union side?
24        A    Later in the process.
25        Q    Like how later?
```



1      A    I mean, well, once again, I don't have to - to

2   be honest when I was the president I don't think we ever

3   had an attorney involved.  So, you know what I mean?  I

4   can only kind of --

5      Q    **You don't need an attorney, do you, to file a**

6   **grievance?**

7      A    No, not at all.  So, I don't think we ever

8   needed one quite honestly when I was president, never

9   got to that level.  So, I don't want to say exactly

10  when.

11     Q    **Okay.**

12     A    But it's definitely later in the process.

13     Q    **Before Professor  Tracy's 2015 dispute and**

14  **termination, had you ever heard of an attorney being**

15  **appointed by the union to represent a grievant or**

16  **somebody who was facing discipline?**

17     A    Yeah, I've heard of it before.

18     Q    **Okay.**

19     A    Can I just say one thought that I had in terms

20  of -- just going back to that thing?

21     Q    **Yeah.**

22     A    When we bring the grievances to the state

23  board, you know, they make a decision if it's feasible

24  or not, and there was one where they didn't think it was

25  feasible and they thought we were not going to win. It



```
 1   was through colleague who is now deceased, Lester Embry,
 2   who has had a bunch of stuff with the administration.
 3   So, you have a right to appeal that decision and we did
 4   do that then, you know, --
 5        Q    Decision from the state?
 6        A    Yeah, so, there is an appeal process, but I
 7   think we quite honestly lost it just like, you know,
 8   after we appealed it but nonetheless, we did do that.
 9        Q    But there's not a lot of time under the rules
10   of your agreement, right?
11        A    It depends though because there's often memos
12   of understanding that will go on, you know, between the
13   attorney and UFF of delaying time, right.
14        Q    Like an agreement to extend the time?
15        A    Yeah, usually it'll be a memo of understanding
16   that you'd have something there.  So, yes, you're right
17   according to the contract but the times will be
18   extended, depending on whatever circumstances are
19   arising itself.  I think I mean, once again, I can't
20   remember that in terms of how long it took to move up
21   the process there but I'm sure there were bunch of
22   extensions put in place.  Because the University
23   attorneys at the time, you know, were overextended
24   themselves, right?  They had their own dealings and --
25        Q    Um-hum.
```





```
 1        A    -- and I'll say particularly even in something
 2   like 2013 where they had, you know all these other
 3   groups kind of getting involved, the ACLU and what not
 4   with the name of the stadium that was like -- I know
 5   they were really -- it depends on the time, right?
 6        Q    Right.
 7        A    So, they might very possibly want a longer
 8   time period themselves on their own end.
 9        Q    Would there be a need from the -- or for the
10   UFF-FAU  chapter to bring an attorney in to file the
11   initial grievance for a member?
12        A    Meaning if a member --
13        Q    A Step 1 or a Step 2?
14        A    Not that I know of but once again, I'm just
15   basing this off my three years as being the president.
16   So, I don't want to like act like I know the
17   institutional history or has been, but not to my
18   knowledge.
19        Q    The reason I'm asking for example, Professor
20   Tracy -- Broadfield filed a grievance on behalf of the
21   Chapter for Professor  Tracy in 2013 --
22        A    Correct.
23        Q    -- that was settled, and then in 2015 when
24   University attempts to discipline Professor  Tracy again
25   in the same way --
```



```
 1      A    Right.

 2      Q    -- they bring in a lawyer.

 3      A    Okay.

 4      Q    Is that unusual to you?

 5      A    I mean I don't -- when did they brought the

 6 lawyer, early or -- I don't know the details quite

 7 honestly.

 8      Q    That's what I was trying to ask.

 9      A    Yeah, I don't know the details of that.  Like

10 I said, I don't know -- I don't feel like ours -- when

11 it was 2013 -- it didn't advance that far.  I feel like

12 we stopped it relatively early although I can't quote it

13 if it's Step 1 or Step 2 but it finally got, you know,--

14      Q    What's the difference between Step 1 and Step

15 2?

16      A    I don't know, I think -- once again, I rather

17 -- I don't know, right. Quite honestly.

18      Q    Okay.  If you don't know, it's fine.

19      A    Yeah, I don't really know.

20      Q    I don't want you to guess.

21      A    Yeah, then I will not.

22      Q    Going back to consultations, you said that you

23 participate in consultations?

24      A    Right.

25      Q    What is a consultation?
```



877.291.3376
www.UCRinc.com

1       A    What is?

2       Q    **Yeah, how does it work?**

3       A    Okay.  So, you -- you know, the union and the

4  administration set up a time, you know, to meet once a

5  semester to discuss whatever issues they have.  So, what

6  I would typically do when I was union president was talk

7  to our faculty, you know, see what major issues that

8  they had and invite people to the consultation who could

9  represent themselves.  I delegated a lot, that way, I do

10 not get along quite honestly with our old University

11 president.  I once tried to like deal with her and she--

12      Q    **Saunders?**

13      A    Yeah.  So, I could see really quickly this was

14 going to go nowhere if I was the main person interacting

15 because I just kind of set her back.  So, I learned

16 really quickly to delegate to other people, and which I

17 think is even more sound, right.  In other words have

18 the people in the room who represent their own issues,

19 speak for themselves.  That's what the union is about,

20 it's about creating a space for those people to speak

21 up.  So, you know, it varied.  When I first started

22 doing, I didn't know what I was doing. So, I had like 11

23 people come in, I was like which is way too much, you

24 know, I kind of tamed it down.

25      Q    **So, a lot of people came from the union?**



1    A    Yeah, union members or -- you don't have to be

2  executive committee to do that.

3    **Q    Okay.**

4    A    I would invite anybody who had a -- because we

5  would create task force on certain issues.  Say for

6  example, the instructor issue we had task force meaning

7  like studying the issue across the state.  Do other

8  universities do this type of promotional system, what

9  did they do?  They would do research on it and they will

10 talk back to the union.  And then I would have one of

11 those members on the task force go to a consultation,

12 right.  And in many ways what we -- people used the

13 consultation differently I should say, using presidents,

14 but the way I saw it was sort of anticipatory to

15 bargaining which would happen the next semester often.

16 So, they put on their radar.  Like some issues we want

17 to deal bargaining so not getting blindsided when we

18 bargain, right.

19    **Q    Right.**

20    A    In other words, we care about instructor's

21 promotions, we're going to be coming to you like about

22 this.  So, maybe we should do a research before we go

23 there itself.  So, it's you know, usually on their side

24 and it does change to -- when we were doing it was the

25 president, the provost and one of the counsels, right -



877.291.3376
www.UCRinc.com

1   - one of the University counsels and then it would

2   usually be -- and it varied.  It'd be me and depending

3   on what the issues were with other people -- and I

4   usually report on that every semester, when we did a

5   consultation, I would do a report to the faculty of like

6   what was discussed.

7        **Q    How would you report it?**

8        A    Through e-mail, you know, I would send a mass

9   e-mail to all bargaining unit members and I would also -

10  - I think I would post it on our website also, if I

11  recall.

12       **Q    On the UFF-FAU website?**

13       A    Yes.

14       **Q    And do you recall ever having a consultation**

15  **with the then president of FAU and the administration at**

16  **that time about the Outside Activity policy?**

17       A    No, we never brought -- we never did discuss

18  that.

19       **Q    What's your understanding of that Outside**

20  **Activity policy**

21       A    I have no idea, right.  That's a really big

22  policy.

23       **Q    How so?**

24       A    I mean, because it depends what they are

25  defining as outside activity since we never really



1    figured it out, right, in terms of -- you know, you hear

2    various things -- is it a paid outside activity? It is

3    like --

4         **Q    And for the record, we're talking about**

5    **Article 19, Conflict of Interest, Outside activity.**

6         A    No, it's a very vague thing and I wasn't

7    president when it really came to the forefront because I

8    think at the time when I was the president, really Jim's

9    case was the first time it came up in my presidency.

10   You know what I mean?  Like it was an issue I guess

11   before but I never heard about anything during my years

12   as a president of anyone being like -- well, actually

13   let me say one correction to that. Before Jim, actually

14   instructors were having issues. So, instructors are paid

15   very low at FAU, right, particularly in the humanities.

16   And a lot of them would supplement their incomes by

17   doing classes outside of the University.  So, right, to

18   sort of cutback on that, they were being held

19   accountable to the outside. It's coming back to me, they

20   were held accountable outside activity things. This may

21   have been a year before Jim or maybe a semester before,

22   I can't remember.

23        **Q    You said a year before, you mean before --**

24        A    An academic year before Jim's case happened or

25   a semester before.



1    **Q      Before 2013?**

2    A      '13, yeah.

3    **Q      Okay.**

4    A      Sorry, before 2013.  So, anyway, I remember as

5    union president talking to, I believe the Dean at the

6    time, Heather Coltman and saying something like, you

7    know, either pay these people a living wage, right, and

8    they won't do outside work or let them do outside work.

9    This is like unjust, right, in terms of what you're

10   doing.  So, and we lost that.  They kept holding

11   instructor's feet to the fire of signing out these

12   things and not giving them permission to teach

13   elsewhere.  So, that did come before but it was kind of

14   a different case than Jim's in terms of how they were

15   utilizing it.

16   **Q      Let me just -- I'm just showing you what's**

17   **been marked as PR1, Article 19.**

18           (Thereupon, Plaintiff's Exhibit PR1 was

19           entered into the record.)

20   **Q      (By Mr. Leo) Just for the record, is this the**

21   **policy you were talking about when you were referring to**

22   **the outside activities policy?**

23   A      Yeah, yes.

24   **Q      And does this refresh your recollection as to**

25   **what the policy says?**



1          A    I believe so.  I think they've -- since --

2    they've since revised this with the new contract that we

3    have, I think so, I believe it's --

4          Q    **You are saying a different contract than this**

5    **one?**

6          A    Yeah, I think there is a new one, isn't there?

7    I believe there is -- yeah.

8          Q    **You tell me.**

9          A    Yeah, there is.  I'm pretty sure.  Yeah, there

10   is new three-year contract out there.  So, --

11         Q    **And how is this policy changed?**

12         A    I don't remember.  That -- but I just vaguely

13   recall that there might've been -- then it was becoming

14   very central, right, in terms of the University we had a

15   senate which I know Jim had a copy of, and we listened

16   to or this came up a bunch of faculty were questioning

17   this outside activities.

18         Q    **September, 2015 senate faculty meeting?**

19         A    Yeah, I believe so because I was there at that

20   -- so, it was coming up.  So, I believe they were

21   negotiating the contract or something to get language in

22   there that would moderate it.  I could be wrong.  It

23   might -- anyway, you could look at -- it should be

24   online actually under our website.

25         Q    **With respect to the policy, you said it was**



1  **vague?**

2      A    Yes.

3      **Q    In what way?**

4      A    Well, what constitutes outside activity,

5  right?  That's sort of the vagaries.  We never got

6  anything -- and that's sort of what upset faculty, you

7  know, that senate meeting that you're talking about,

8  right, because it could be -- I mean there's some

9  legitimate thing.  I don't want to act like, you know,

10 it shouldn't necessarily exist, right, outside activity,

11 because you don't want somebody working a second job,

12 right, in addition to, you know, working at the

13 University.  Of course, that's usually never the case,

14 right, that somebody is doing that, but then it could be

15 these micro activities, we were like, you know, like

16 doing Twitter, you know, like doing Facebook; that seems

17 ridiculous and egregious to call that outside activity.

18     **Q    And you said it because the policy is not**

19 **geared towards uncompensated activity or isn't --**

20     A    I don't know, that's another kind of thing I'm

21 unclear about.  At first I thought it was about

22 compensated activity outside.  But then it seems more

23 about it could extend beyond that, you know, itself. And

24 I remember just in 2013 with Jim's, blog seemed to be,

25 you know, personally as the president of the union, a



1   ridiculous thing to call -- like so many people have

2   blogs, right, quite honestly outside of employment.  As

3   far as I know, Jim wasn't being paid for it or anything

4   like that.  So, you could hold many faculty accountable

5   if they have a blog and calling it outside activity.

6        **Q    Has the University ever sent any directives or**

7   **anything concerning the outside activity policy that**

8   **would tell faculty members, even administrators, that**

9   **their social media accounts or their blogs, their**

10  **personal online activities fall within the scope of the**

11  **outside activities policy, Article 19?**

12       A    Yeah, not to my knowledge.  There's never been

13  anything about that.  The only explicit moment I recall

14  particularly under my presidency was I believe the dean

15  did send out e-mail to the instructors, who had outside

16  jobs that this wouldn't be approved or something like

17  that.

18       **Q    Right.  But the policy, as you appear to**

19  **understand it, has always been geared towards commercial**

20  **activity?**

21       A    Well, like I said, I don't know exactly all

22  the time -- it was unevenly applied, that's all I know.

23  In other words, it sometimes seems it can be commercial

24  activity, it sometimes seems it could not be.  You know,

25  once again, I might not have been aware of all the ways



1    in which it has been applied, but it's never been

2    consistently applied, it's never been clearly made what

3    constitutes that activity, if you know what I mean,

4    right?

5        Q    Right.  Yeah, did you ever receive guidelines

6    on how to follow the policy?

7        A    No.

8        Q    Let me just give you -- it's another document.

9    It's called PR 2.

10       A    Okay.

11       Q    And for the record, I'm showing what's been

12   marked as PR2 for today.

13            (Thereupon, Plaintiff's Exhibit PR2 was

14            entered into the record.)

15       Q    (By Mr. Leo) Do you recognize this document?

16       A    You know what, I'll be honest, I've never seen

17   this document itself, the outside activity document.

18       Q    You've never seen this document before --

19       A    Yeah, honestly.

20       Q    -- today?

21       A    Yeah, until today, yeah.

22       Q    So, you've never filled this form out?

23       A    No.

24       Q    Let me just ask you.  Have you ever blogged?

25       A    I don't blog, but, you know, --



1    Q    How about do you have like a facebook page?

2    A    I do have a facebook page.

3    Q    Twitter?

4    A    Yes.

5    Q    MySpace?

6    A    Not anymore.

7    Q    Did you ever report any of those activities?

8    A    No.

9    Q    Did you ever fill out any paperwork?

10   A    No, I never, it's -- I never --

11   Q    Or anything other than this form, any kind of

12   paperwork or disclosure to the University to -- any

13   officials of the University?

14   A    No.

15   Q    Did you ever tell the University that you're

16   participating in online activities?

17   A    No.

18   Q    Are you concerned about the use of this policy

19   to target your online activity?

20   A    Yes.  I mean I was like - to the faculty that

21   September what, 2015 meeting you mentioned, the senate

22   meeting, just the vagueness of the policy and the way it

23   could be used discriminatory on faculty.  I think many

24   of us were, right, if you listen to the transcript of

25   it.



877.291.3376
www.UCRinc.com

1       Q      And in 2013, the University attempted to use

2   this policy to discipline Professor  Tracy?

3       A      Right.

4       Q      And the union defended him?

5       A      Yeah.

6       Q      And prevailed?

7       A      Um-hum.

8       Q      There was a settlement agreement that was

9   entered June 13th?

10      A      That was Doug and Michael who came up with

11  that, I don't remember exactly the details but --

12      Q      Yeah.  I just wanted to touch on it because I

13  have a question about --

14      A      Okay.

15      Q      -- the effect of the agreement --

16      A      Okay.

17      Q      -- to your knowledge, did the University

18  continue after 2013 and 2014 to try to use this policy

19  to require anybody, not just Professor  Tracy but

20  anybody at the University report their blogging or

21  social media activity?

22      A      Not to my knowledge, but who knows, right,

23  there's things always go on that you're unaware of.

24      Q      But if they had, wouldn't it something that

25  would have been brought to your attention since you guys



877.291.3376
www.UCRinc.com

1  were the grievance department for the University?

2          MS. HEFFNER:  Objection.  You can answer.

3      A    Okay.  Not necessarily.  You'll be surprised,

4  some people do not report to us when they should, you

5  know.

6      Q    (By Mr. Leo) You're talking about your own

7  members?

8      A    Just in general.  The faculty members or non-

9  members.  Like some people, I mean I often will speak to

10  faculty like you should've reported this to me back

11  whenever it happens.  So, I'm hesitant, right, because I

12  wish.  What you're saying I wish happened because that

13  would make us much more cognizant of what's going on at

14  the University and we want to be aware of that.  But

15  sometimes -- for multiple reasons of why they wont to

16  report.

17      Q    So, your understanding of the 2013 grievance

18  filed by UFF-FAU for Professor  Tracy and the settlement

19  was that the issue is resolved with respect to the

20  complaints about Professor  Tracy's blogging?

21      A    Correct.

22      Q    There would be no indication -- was there

23  indication after 2013-2014, for example, that they were

24  going to continue -- when I say "they", I'm referring to

25  FAU, --



877.291.3376
www.UCRinc.com

```
 1        A    No.

 2        Q    -- continue to require Professor  Tracy to

 3   submit these forms --

 4        A    No, not at the time.

 5        Q    And in 2013 FAU was giving Professor  Tracy a

 6   hard time seeking discipline because he hadn't submitted

 7   these forms for his blog, right?

 8             MS. HEFFNER:  Objection as to form.  You can

 9        answer.

10        A    Okay.  Can you ask that again?

11        Q    (By Mr. Leo) Yes.  FAU was giving Professor

12   Tracy a hard time, they were requiring him to submit his

13   blog to the University on these forms in 2013 --

14        A    Right.

15        Q    -- which was essential issue in this dispute,

16   that you recall?

17        A    Correct, right.

18        Q    In 2013, the settlement happens, 2014 you

19   never heard of any complaints about Professor  Tracy's

20   blogging?

21        A    Correct?

22        Q    Did you ever hear of FAU requiring or

23   directing anybody to submit outside-activity forms at

24   all?

25        A    Yes, because like I said, the instructors had
```



1    to do it, that's why I was aware of that.

2         Q    So, how about for online activity or speech?

3         A    I'm trying to think.  Not that I know of, but

4    I did -- well, this was later though.  So, it --

5    according to the years that you're doing, no, but I'll

6    just say later I did hear about, you know, somebody

7    doing an op-ed piece, an opinion-ed piece getting flak

8    for that as if this was an outside activity, which was

9    ridiculous.

10        Q    My understanding is that things changed when

11   President Kelly came into the mix.

12        A    Yes.

13        Q    Is -- would you agree with that sentiment?

14        A    Yes, with -- certainly.  I was on sabbatical

15   the year he actually came in fall for --

16        Q    When was that?

17        A    That was -- so, that was -- let me just, to be

18   honest to you, '14-'15 year I was on sabbatical. And

19   that's when Kelly came really onboard with FAU. So, I

20   was at a distance, you know, I never really -- I never

21   dealt with President Kelly like firsthand.  I dealt with

22   Kerry Perry when he was in interim provost.

23        Q    Before Kelly's emergence at the University,

24   had you ever heard of Perry or any other FAU

25   administrators sending threatening letters to faculty



877.291.3376
www.UCRinc.com

1    for their online activity?

2        A    No.

3        Q    And other than Professor  Tracy, do you know

4    of any other faculty members who have been targeted for

5    their online speech or activity?

6        A    Yeah, not to my knowledge.

7        Q    Would you agree that Professor  Tracy was

8    singled out by the University in this case?

9        A    Yeah.

10       Q    Going to fast forward to 2015, so September

11   there's this senate faculty meeting, you said you were

12   there?

13       A    I was there at that one, yeah.

14       Q    Professor  Lenz gave a speech about the

15   policy.

16       A    Correct.

17       Q    It's Article 19.  There were other faculty

18   members who also complained; would you agree that that

19   was well-received complaints?

20       A    Yeah, I would.

21       Q    By the faculty.

22       A    By the faculty at the senate for sure, yeah.

23       Q    Did any administrators during that meeting or

24   after that meeting agree with the faculty that the

25   policy was confusing, vague, it needed to be clarified?



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    A    Not to my knowledge, you know, but they might

2  have, but I wasn't privy.

3    **Q    There was changes that were to the policy.**

4    A    Yeah.

5    **Q    At some point you said?**

6    A    I think there might have been, right, in terms

7  of --

8    **Q    Was that after the senate faculty meeting?**

9    A    I don't recall, yeah.

10    **Q    Did you ever get a memorandum from Perry or**

11  **any other FAU administrator about the policy after that**

12  **meeting?**

13    A    You mean this is a faculty member or --

14    **Q    Right.  Was anything distributed?**

15    A    I don't know.  Honestly, I mean -- there were

16  a couple of issues going on there.  There was one about

17  the outside activity form, there was one about the

18  freedom of speech, right, also?  So, I can't recall if

19  we -- I feel like we did get some -- it might have been

20  about that.  It might have been a freedom of speech

21  thing.  So, I don't recall --

22    **Q    What do you recall about freedom of speech?**

23    A    Well, it was -- going off that example where

24  it really made a lot of faculty irate during that senate

25  was this notion to gain prior permission to doing



1   interviews with like the press or something, right,

2   which seemed outlandish and made us look unprofessional

3   and the University ridiculous, right? In other words, if

4   a reporter comes to you and you go, "Wait, I can't

5   answer that question, I need to ask permission from the

6   University itself," or the very fact you did an op-ed,

7   you need to somehow put in the op-ed that this does not

8   represent the University even though it's assumed and

9   the reporters -- the paper can always edit out that

10  stuff.  So, we had a couple of faculty who're getting

11  issues with that.  So, that was the main point of

12  contention then, right, that we were like this -- so, I

13  know we definitely got language put in the contract

14  later that said if a faculty member is not distinctly

15  saying that he or she is representing the University,

16  they are not.  So, in other words, we didn't have to

17  defend, say, we are not representing it, had to be -- we

18  didn't explicitly state that we were representing the

19  University, which struck me as --

20       **Q    The faculty doesn't have an affirmative duty**

21  **to tell whoever they're speaking to that oh, by the way,**

22  **I'm not speaking on behalf of the University when I'm**

23  **speaking?**

24       A    Correct.  Where it was assumed prior to that,

25  right, that memo or whatever --



1        Q    But it was in dispute in some instances as to

2   whether the disclosure was required?

3        A    Right.  Or even it could be possible, right.

4   In other words, when you an op-ed piece, the editors of

5   the paper are not obligated to keep all your words in

6   there.  So, even if you've written down that it could be

7   pulled out.

8        Q    Right.

9        A    And you should not be held accountable as a

10  faculty member for that.

11       Q    If you were given a directive by your

12  administration, Coltman, whoever, and they said

13  "Professor , I want you to submit this outside activity

14  form for your Twitter account", what would you do?

15       A    Well, I'll just say the thing that we've been

16  told by the union often, like I would do it and then

17  grieve it.  So, I would sign it and then I would grieve

18  the thing.

19       Q    Is this a directive from the union that came

20  from Zoeller?

21       A    No, no, this is way prior to that.  I mean

22  this is when I just began part of the union, so none of

23  us had been really -- I don't know where it came from,

24  to be honest.  It was perhaps the state level, but I

25  want to say it's Mike -- I don't know exactly but it was



```
 1   definitely higher up, but the notion was this; you know,
 2   you have to do basically what the administrators ask you
 3   unless it's threatening to your life or anybody else's.
 4   You do it, right, even if you totally disagree with it
 5   and then you file a grievance.  And the reason why we
 6   were told that is if you do not, then you could be in
 7   subordination for not doing it, right?
 8       Q    Right.
 9       A    So, it's like very much drummed into us to,
10   you know, --
11       Q    Would you be -- would it be insubordinate to
12   refuse to comply with an unlawful directive?
13       A    I -- sorry.  Say that again.
14       Q    I'll say that again.  Would it be considered
15   insubordination technically speaking --
16       A    Yeah --
17       Q    -- from the -- from either perspective, right?
18   Would it be insubordination to refuse to comply with an
19   unlawful directive?
20       A    I don't know.  I mean I'm not a lawyer.
21       Q    Obviously, the example, let's say one of the
22   administrators told you to do something illegal, would
23   you comply with the illegal directive and then grieve it
24   or would you refuse the directive?
25       A    I'd refuse the directive.
```



1      Q    Okay.  And you see where I'm going with this?

2      A    Um-hum.

3      Q    If for example the FAU administration told you

4  I want your Twitter on here for approval, would you

5  protest that, would you object to it?

6      A    I would still sign it but I would say

7  something when I did it, and I would tell them I'm

8  grieving it, you know.

9      Q    And what if they told you you couldn't do what

10  you were doing on Twitter or any other social media?

11      A    I don't know.  To be honest, I would talk to

12  the union and figure out what to do.  I wouldn't make

13  that decision myself.  You know what I mean?  Like --

14      Q    You'd rely upon the union --

15      A    Yeah, they know --

16      Q    -- for advice?

17      A    Right, exactly.  Yeah.

18      Q    If, for example, the University indicated that

19  you failed to report your Twitter account for however

20  many years you had that and that that was disciplinary

21  or could be disciplined and they were going to

22  discipline you, do you need to wait to file a grievance

23  or could you grieve right away?

24      A    Could you do that one more time --

25      Q    If your University said Professor  Robe, you



877.291.3376
www.UCRinc.com

1  **didn't turn in your Twitter form -- outside activity**

2  **form disclosing your Twitter for however many years and**

3  **now you're going to be disciplined for that, would that**

4  **be grievable?**

5      A    I think it's only grievable once they actually

6  send you the disciplinary letter, right?

7      **Q    Notice of discipline?**

8      A    I believe so, right?  I don't think a verbal -

9  - that's always tricky about grievances, there actually

10 has to be something done before you can grieve it, even

11 though you're anticipatory of it.

12     **Q    Right.**

13     A    So, we have that with people like going up for

14 promotion and tenure, it's pretty clear that their case

15 is not going to win, right.  We've heard through the

16 committee but you really have to wait till the provost

17 finally signs that last letter saying it's not -- then

18 we would file the grievance.  So, similar with that I

19 would think we would need actual -- a letter or

20 something that we could pinpoint a date, because that's

21 when the grievance process could start, I mean I think

22 it was 30 days you have after it.  And that's to the

23 best of my knowledge, once again I'm not a, you know, -

24 - not like you guys, attorneys, so, --

25     **Q    I have the example I want to use. All right,**



```
 1   I'm going to show you what's been -- I'm going to show

 2   you what's been marked as PR 3 for today.

 3              (Thereupon, Plaintiff's Exhibit PR3 was

 4              entered into the record.)

 5   A    Okay.

 6   Q    (By Mr. Leo) Do you recognize this document?

 7   A    Well, I haven't seen this document.  So, --

 8   Q    Before today --

 9   A    I -- Jim -- well, I might have seen it.  I

10   forgot Jim sent it to me or not.  I can't recall, but he

11   might have.

12   Q    All right.  Would this be grievable?

13   A    I don't --

14   Q    Okay.  Take a look and then --

15   A    Yeah.

16   Q    And then I'll ask.

17   A    Yeah -- no.  So, the key words here, this

18   "letter of reprimand", right?  This is a letter of

19   reprimand, so yes, you can grieve that.

20   Q    The minute that goes in the file?

21   A    Yeah.

22   Q    The file here.

23   A    Yeah, and it explicitly states a letter of --

24   I mean not necessarily immediately you have to confer

25   with the person -- I mean there's some delay perhaps
```



1  when a person gets it --

2      Q    That's my next question.  My next question is

3  how would a member of UFF-FAU  file a grievance when

4  they get a letter like this?

5      A    So, usually they contact the grievance person,

6  but like I said, we have numerous instances where people

7  wait too long, they don't realize there's a time period

8  on grievances and what not.  So, --

9      Q    What's the time period?

10     A    I believe 30 days.

11     Q    So, using PR3 as an example, this is November

12  10, 2015 notice of discipline.  When would the operative

13  date be or deadline to file the grievance?

14     A    To be honest, I don't remember whether it's

15  working days or not, so, I would need to look in the

16  contract there.  I don't want to give a date because I

17  don't remember --

18     Q    Well, --

19     A    You know what I mean --

20     Q    Without giving the exact date, is it 30 days

21  from the date of the --

22     A    Right, roughly.  It might be more somewhat but

23  don't remember if it's 20 days or not.

24     Q    Depending on when it's received --

25     A    Yeah, exactly.



1    Q    -- versus --

2    A    Well, depending on when it's received and what

3    days are counted.  I don't remember weekends are counted

4    or not, I can't recall, because like I said, I was never

5    a grievance person I should say, I never worked in

6    grievance.  So, I am the most murky about that other

7    than reading what's in the contract and my relationships

8    with Doug Broadfield at the time.

9    Q    Doug Broadfield was gone in 2015?

10   A    Yeah.

11   Q    Who replaced Doug Broadfield?

12   A    You'd have to ask Bob Zoeller.  You know, I

13   wasn't -- I mean I don't know the specificities of that,

14   because mind you, I was on sabbatical, right, here

15   after.  So, --

16   Q    Let me mark this PR4.

17   A    Like I said, I kind of -- you know, I had a

18   really busy three years.

19   Q    Exactly. Let me show you what's marked as PR4.

20        (Thereupon, Plaintiff's Exhibit PR4 was

21        entered into the record.)

22   A    Sure.

23   Q    It's from the UFF-FAU 's website.

24   A    Okay.

25   Q    Does this refresh your recollection perhaps as



877.291.3376
www.UCRinc.com

1  **to who replaced Doug Broadfield?**

2      A    Yeah, but I'll say I don't remember who of

3  these two, the progression of how it went, right?  Doug

4  sort of left suddenly.  We didn't get much advance

5  notice.  So, we were -- well, Bob was President by then

6  I should say.  So, I wasn't necessarily involved.  So, I

7  don't remember who immediately got in there, right?  I

8  don't think it was both of them at the same time. So,

9  you know what I mean, I don't want to say --

10      **Q    Would it be McGetchin?**

11      A    I don't know, yeah.

12      **Q    Okay.  Regarding the November 2015 notice of**

13  **discipline, Professor  Tracy's second round of**

14  **disciplinary action brought by FAU, what do you remember**

15  **about the -- after this notice was issued? What do you**

16  **remember happening within your chapter?**

17      A    Well, I mean like I said, I wasn't involved

18  with it directly.  I just remember it accelerating

19  really quickly, you know.

20      **Q    Were you -- did they communicate -- did any of**

21  **the grievance officers communicate with you about the**

22  **issue?**

23      A    No, we are just kind of broadly aware of it,

24  you know, some of the executive committee members talked

25  in general level like what's going on but never any kind



877.291.3376
www.UCRinc.com

1  of specificity.

2      Q    Did they ever e-mail you about what you

3  thought about the issues?

4      A    They might have because I was old chapter

5  president.  So, -- but it's -- at a very distance,

6  right, I always -- I think I caveated every time that I

7  was like -- it's a different thing being involved there,

8  being the chapter president, being the grievance person,

9  as I know from doing it myself as opposed to being from

10 the outside, the specificity of the details, right?  So,

11 at best I could only offer vague, you know what I mean,

12 like conceptions?

13     Q    So, you were operating in November 2015 more

14 in an advisory capacity?

15     A    Yeah, and I was a membership chair by then,

16 right?  So, that was my main thing I was looking at.

17     Q    Your concern was with membership and the

18 union?

19     A    Yeah, just getting more people to join and --

20     Q    Was the chapter or were you concerned that

21 Professor  Tracy's issues were going to affect

22 membership?

23     A    Well, not really.  I dealt with that in 2013

24 where it did, right?  So, I sort of saw the fall out of

25 that where we have --



1    **Q    Let's talk about that.  What was the fallout**

2    **with respect to the membership?**

3        A    Well, we had a couple of people resign, but we

4    talked to them why we were defending the case, right?

5    You know, it's a tricky issue because we wanted to

6    defend the right to do what he was doing outside

7    activity but we didn't necessarily want to defend what

8    he was saying, right?  So, there's this fine line, and

9    whatever.  So, members, you know, reacted negatively to

10   that, but our position was like you have to defend, this

11   can happen to any of us with it.  So, we really dealt

12   with -- it was quite honestly was much more a flashpoint

13   it seems, at least from a distance, right? Like when I

14   was President in 2013, it wasn't a lot quite honestly,

15   it wasn't a lot of faculty we're talking about here but

16   a few vocal minority.  2015 I didn't hear too much,

17   right, quite honestly as a membership guy.

18       **Q    So, in 2015, did anybody leave the union?**

19       A    Not to my -- well, I mean maybe but not to my

20   knowledge.  I didn't know anything.

21       **Q    Do you know of any member of UFF-FAU  who left**

22   **because of Professor  Tracy?**

23       A    Only in 2013.

24       **Q    But not in 2015?**

25       A    No, I'm not aware of that.



```
 1       Q    Were there any threats that they would leave
 2   or did anybody communicating had threat that they were
 3   going to do something because they disagreed with the
 4   union defending Professor  Tracy?
 5       A    Not to my knowledge.  Once again, I don't
 6   think that would come to me either, right?  I mean I'm
 7   not - it is usually the chapter president, right?  I
 8   mean he or she is the entry point, right?  I'm sort of a
 9   --
10       Q    Would the President, in this instance
11   President Zoeller, would he have a duty to represent and
12   defend Professor  Tracy in 2015?
13       A    Yeah, I mean I put it this way.  And this is
14   the way it's often kind of, you know, drummed into us in
15   that -- we had to defend the contract, right, whoever
16   the faculty member is, like we're not -- I don't want to
17   sound too impersonal but we're not really defending the
18   faculty member, right, we're defending the right of
19   whatever that case comes up.  So, with Deandre Poole, it
20   was the right to academic freedom, right, it wasn't
21   about Deandre.  With Jim in 2013, it was about the right
22   to do outside activity and, yeah, freedom of speech
23   outside the University even though -- obviously and
24   because going through a grievance personalizes it.
25       Q    Right.
```



1     A    But the way we try to have most clearly

2  evaluate anything it's like well, has the contract been

3  broken, does this jeopardize all faculty and that's --

4     **Q    There's more at stake.**

5     A    Yeah, right exactly.

6     **Q    And if you abandon one Professor  because you**

7  **disagree with what he says --**

8     A    Yeah.

9     **Q    You could be waiving everything --**

10    A    You can't personalize it, right.

11    **Q    Could you be waiving everybody's rights?**

12    A    Say it again.

13    **Q    I was saying if you don't defend one Professor**

14 **who's targeted for his speech, could you be waiving**

15 **everybody's rights?**

16    A    Right.  Even -- I put it in a different way,

17 you're jeopardizing the contract, right, itself, by

18 making it vulnerable.  But it's essentially it's the

19 same thing you were suggesting.

20    **Q    Can the contract be selectively enforced?**

21    A    Oh, of course.

22    **Q    By the union?**

23    A    Well, I mean -- well, no, no, the contract

24 needs to be enforced, you know, thoroughly, yes, of

25 course.  I'm just going to say on the other side it's



1  sort of select- --

2       Q    Right.   That's what I wanted to clarify that

3  the question --

4       A    Yeah, okay, from the union, yeah --

5       Q    I mean that's what the union is there for --

6       A    Right.

7       Q    -- to enforce the contract.

8       A    As best we can, though, I'll say.  You know,

9  to be honest, going back to the thing, like many times

10 people have violations on their rights that they don't

11 draw the attention of the union and we're unaware of

12 that.  So, that does jeopardizes and we -- if it passes

13 that 30-day period and or not, there's not much that we

14 can do.  So, I'm not acting like -- you know what I

15 mean?

16      Q    Right.

17      A    We're not cognizant of all the problems that

18 might be going on.

19      Q    I just want to ask, in November 2015, were you

20 involved in any discussions whether they were in person

21 or on the telephone or an e-mail with President Zoeller

22 and the grievance enforcement folks regarding the

23 grievability of this notice, referring to PR 3?

24      A    You mean asking if it was grievable?

25      Q    Yes.


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    A    No, I don't think we had the discussion about

2    that.

3         Q    Nobody asked you as former President, you

4    know, "Is this notice grievable?"

5         A    No, because it's clearly grievable.  You know,

6    to me I don't -- yeah, so, nobody had to ask for that.

7         Q    Right.  So, there's no excuse to not file a

8    grievance in response to this notice of discipline

9    within 30 days?  We're talking about the union's duties

10    and responsibilities.

11        A    Yeah, as long as the grievance wants to do

12    that -- I mean there's all these caveats of why you

13    might or might not file a grievance.  But if the

14    grievant wants you to file a grievance and -- yeah, I

15    don't --

16        Q    Do you remember if Professor  Tracy wanted the

17    union to file a grievance?

18        A    I would assume -- no, I don't recall.  I would

19    assume, but I don't know.

20        Q    Do you recall there being a collective

21    decision not to grieve?

22        A    No.

23        Q    Did President Zoeller, Michael Moats, Doug

24    McGetchin, did any of these individuals talk to you

25    about a collective decision they made not to grieve for



1   **Professor  Tracy?**

2       A    No.

3       **Q    And would you agree with me that assuming it's**

4   **30 days from November 10th that the grievance had to be**

5   **filed by December 10th, 2015 if -- assuming that the**

6   **deadline is in the operative date -- November 10th as a**

7   **start?**

8       A    Yeah.  If it's 30 days straight, like I said,

9   I was unclear before if it's 30 working days or not, but

10  yes, roughly around that.

11      **Q    So, if and when United Faculty of Florida FAU**

12  **did not file a grievance for Professor  by December**

13  **10th, they in a sense waived his right to file a**

14  **grievance with respect to this November 10th notice of**

15  **discipline?**

16      A    Well, let me say, though, I don't know if

17  there's any memo of understanding going on between them

18  in terms of -- you know what I mean --

19      **Q    Right.**

20      A    There might be caveats where it was extended

21  the date, so -- and I was not privy to any of that

22  conversation.  Like I said, I wasn't directly involved

23  with Professor  Tracy's grievance or what not.  So,

24  there might -- there are all these mitigating things

25  that can happen where -- because it does happen quite



1  often where the dates extended because of the memo of

2  understanding, you know, what not.

3       Q    Right.  But you're not aware of any memo of

4  understanding or --

5       A    Right.

6       Q    -- extension of time from the November 10

7  notice of discipline?

8       A    Right.

9       Q    But you said you're also not aware of a

10  decision not to grieve?

11       A    Right, exactly.

12       Q    If I -- and if you were made aware of a

13  decision that was made without Professor  Tracy's

14  knowledge not to file a grievance on his behalf, --

15       A    Right.

16       Q    -- what would your response be to that

17  decision?

18       A    Yeah, at least -- well, I would -- if I got

19  aware of it, I would like immediately oppose that.

20       Q    Would there be any recourse for Professor

21  Tracy or any grievant after the chapter failed to grieve

22  in the timely fashion?

23       A    I don't -- recourse, how, I don't --

24       Q    I'm asking if you know.

25       A    I don't know.



1      **Q      Have you ever heard of any kind of recourse**

2    **once the grievance window has been missed?**

3      A      No, I mean -- once again, when I was

4    President, you know, people threatened lawyers outside

5    when a date had been missed or -- I mean I'll say there

6    was a case where UFF-FAU  was representing a person who

7    didn't get tenure, right, and the portfolio clearly,

8    although we initially took up the grievance, right,

9    which we normally do when somebody doesn't get tenure,

10   when we look after the evidence the person doesn't

11   deserve tenure, so I remember having that -- and it got

12   denied I believe when we brought it up to the state

13   level thing and had a conversation with that person. And

14   that person did threaten, you know, getting a lawyer and

15   I said do what you have to do, I mean let's -- right,

16   it's your -- but objectively speaking, right, we cannot

17   win this thing, you're meeting the criteria that is --

18   for promotion and tenure, right?  It's nothing personal

19   but there had been no violation of the contract,

20   although I get it you're losing your job over this.

21   That's why I don't try to depersonalize it, right?  So,

22   that's a good example of where the person, you know,

23   wants you to grieve them but really there had been no

24   violation of the contract.

25      **Q      Are you aware of any decision at the state**



877.291.3376
www.UCRinc.com

1   **level at UFF or FEA not to grieve Professor  Tracy's**

2   **discipline?**

3        A    I'm not aware of that.

4        **Q    Do you know if anybody at United Faculty of**

5   **Florida, Zoeller, McGetchin held any meetings regarding**

6   **Professor  Tracy's discipline?**

7        A    Not to my knowledge.

8        **Q    Just going back to the outside activities**

9   **policy, I want to show you one more document.**

10       A    Okay.

11       **Q    Sorry to jump around here.  This is going to**

12   **be PR 5.**

13       A    Oh -- that's for you, right.

14       **Q    You want 5?**

15       A    No, you're right, 5, okay.

16       **Q    I'm going to show you what's marked as PR 5.**

17            (Thereupon, Plaintiff's Exhibit PR5 was

18            entered into the record.)

19       A    Okay.

20       **Q    Do you recognize this document?**

21       A    Let's see.  I definitely do not.

22       **Q    Okay.  That is the question.**

23       A    I don't recognize it.

24       **Q    So, you don't recognize that document?**

25       A    No.



```
 1        Q    Have you ever heard of a monitoring plan?

 2        A    Not to my knowledge.

 3        Q    By FAU or anybody?

 4        A    No.

 5        Q    So, you don't know what this document was used

 6   for?

 7        A    -- that document is, yeah.

 8        Q    Has anybody ever told you about being

 9   monitored or any --

10        A    For outside activity or conflict of interest?

11        Q    For anything; has any faculty member ever

12   complained, you know, "Chris, you're monitoring me"?

13        A    I have, I have actually but -- you know,

14   somebody claimed they were bugging his office years ago.

15        Q    Who was bugging --

16        A    The administration they claim. This is up

17   Jupiter -- I'd rather not say the person's name I feel,

18   you know, he's a good person, just kind of went off the

19   rails.

20        Q    Was this recently?

21        A    No, this is a while ago but just really got

22   paranoid and -- so, they were not bugging his office,

23   right, I should just be very clear.

24        Q    Did you guys do a sweep?

25        A    Yeah.
```



1       Q       Found out?

2       A       Yeah -- no, we didn't do a sweep but it's like

3    we're talking about FAU and they do not have the money

4    to monitor and bug people's offices, right, and

5    particularly this guy at the time.  So, --

6       Q       I'm going to show you one more document. This

7    is going to be for the record PR 6.

8               (Thereupon, Plaintiff's Exhibit PR6 was

9               entered into the record.)

10      A       Yeah.

11      Q       (By Mr. Leo) Do you recognize this policy?

12      A       I do.

13      Q       And what policy is this?

14      A       As it says here, Academic Freedom and

15   Responsibility.

16      Q       And if University policy was being used in a

17   way that violated Article 5, would that be grievable?

18      A       Yeah.

19      Q       For example, 5.2(d), what does that say?

20      A       Exercise constitutional rights without

21   institutional censorship or discipline.

22      Q       So, for example, with Professor  Tracy's

23   situation, would you agree that he was being censored by

24   the University?

25      A       Yeah, though I will say that with academic



1    freedom here it's usually referring with on the campus,

2    right?  There is also -- I don't know if this applies to

3    freedom of speech outside the campus, right, which I

4    think something somebody should have, right, it's a

5    constitutional right.  But I think this is more in

6    reference to anything on the campus itself.

7         **Q    Let's say that Professor  Tracy or any faculty**

8    **member was blogging from school.  So, he was on his**

9    **school computer and he's blogging on his own personal**

10   **blog, he's off the clock, so to speak, but he's still on**

11   **campus, would that fall within this protection 5.2d?**

12        A    That's tricky, that's tricky because

13   theoretically you're using University equipment which is

14   the office itself even if you're off -- yeah, I don't

15   know, to be honest, that's a hazy -- that's really where

16   the lawyer -- where I would differ to --

17        **Q    Would that be considered incidental use of the**

18   **equipment, though?**

19        A    I have no idea, I don't know.

20        **Q    I mean he's not destroying anything or --**

21   **assuming we're talking about using your computer to**

22   **transmit a message, right, would you see that as an**

23   **incidental use of the equipment?**

24        A    Like I said, I don't know that language, but

25   I'm just saying, as a union person, we're often told not



1    to do union business inside the University even when

2    we're off, you know, in terms of --

3        Q    Well, let's say you're using your computer to

4    tweet, your school computer.

5        A    Right.

6        Q    Would that be a use of the equipment that

7    would require recording of the speech?

8        A    I don't know about that but we're not supposed

9    to do that theoretically, right?  It's supposed to be

10   used for work, the equipment.

11       Q    Right, right.  Has anybody ever brought

12   Article 5.2d to your attention and said I want to file a

13   grievance because my rights had been violated?

14       A    You mean when I was President?

15       Q    At any time?

16       A    I mean I would say the Deandre Poole, I don't

17   want to say it's necessarily 5.2(d) but right, there was

18   clearly a violation of the academic freedom and

19   responsibility.  I don't remember exactly what we were

20   pinpointing at that time but definitely with his, you

21   know, use of an exercise on campus, the textbook

22   exercise, the University wanted to reprimand him for

23   doing that.  So, I'm sure on some level, right, we were

24   grieving that academic freedom and responsibility.

25       Q    Are you familiar with Mike Bud?



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
1         A    Yes.

2         Q    Who's Mike Bud?

3         A    He also does membership recruiting.

4         Q    So, he's another faculty member in FAU?

5         A    Well, he's an emeritus now.  So, he's retired,

6    he does like one class this semester but he still works

7    for the union.

8         Q    I see.  And he -- so, he serves in the

9    advisory capacity like you do?

10        A    Yeah, yeah, both are -- sort of our

11   responsibility, we tag teams, sort of recruiting and

12   membership stuff.

13        Q    And who's Meredith Mountford?

14        A    Well, she's just been elected UFF president,

15   she was I believe Vice President --

16        Q    She's now President?

17        A    Yes.

18        Q    This happened recently?

19        A    Yeah, there's an election.

20        Q    When did that happen?

21        A    End of March, I don't remember the exact date,

22   but it goes into effect -- well, there's a transition

23   but it goes into effect April 1st.

24        Q    And that's not a joke?

25        A    No, it's not a joke, right, exactly.
```



1       Q     Okay.  With respect to Professor  Mountford --

2   am I saying that right -- Mountford?

3       A     Yeah.

4       Q     Do you recall her involvement in discussions

5   particular via e-mail concerning Professor  Tracy's

6   dispute with the University in 2015?

7       A     Do I recall -- say it again.

8       Q     Do you recall her participation in e-mail

9   discussions amongst UFF-FAU --

10      A     I think so, she would probably be part of that

11  because she was part of that because she was part of the

12  executive committee.

13      Q     Did you ever talk to her about her concerns?

14      A     No.  Yeah, she wasn't very present often,

15  she's was in education --

16      Q     Did she ever convey to you that you can recall

17  that she was being excluded from the discussions that

18  Zoeller and McGetchin and others were having?

19      A     I have no idea.  I have never -- yeah, I never

20  recall her saying that.

21      Q     Let me show you what's been marked as PR7 --

22            (Thereupon, Plaintiff's Exhibit PR7 was

23            entered into the record.)

24      A     Okay.

25      Q     (By Mr. Leo) -- for today.  Why don't you just



```
 1    read through it and --
 2        A    The whole thing?
 3        Q    Yeah, just read through it and let me know
 4    when you have a chance to read the whole exchange.
 5        A    Okay.  Okay, yeah.
 6        Q    Does this refresh your recollection?
 7        A    Sure, yeah.
 8        Q    So, you were included on this exchange?
 9        A    Yeah, I don't recall, though, exactly what,
10    you know, she was being left out of -- or not.
11        Q    When she says Chris, she's referring to you?
12        A    Um-hum.
13        Q    Okay.
14        A    Because I must -- I did -- you know, I think I
15    said something like this definition of outside activity
16    is very broad.  You know what I mean?
17        Q    I think I have your message.
18        A    Yeah.  Because I think I gave a series of --
19    once again, this was just sort of general --
20        Q    Let me --
21        A    -- comments I made.
22        Q    I'm going to also mark this one -- sorry, we
23    have a lot of e-mails here.
24        A    Yeah, it's all right.
25        Q    I think it's a little difficult to find the
```



```
 1   right one.  PR --

 2        A    It's hard to recollect somewhat because it's -

 3   - there were so much going on at this time too.

 4        Q    Let me show you what's been marked as PR 8.

 5             (Thereupon, Plaintiff's Exhibit PR8 was

 6             entered into the record.)

 7        A    Okay.

 8        Q    (By Mr. Leo) Let me know if that's the message

 9   you were referring to.  And then while you're doing

10   that, I'm also going to mark the record, I'm going to

11   mark another message, PR 9.

12             (Thereupon, Plaintiff's Exhibit PR9 was

13             entered into the record.)

14        A    Right.

15        Q    (By Mr. Leo) I'm going to show you what's also

16   been marked here as PR 9.

17        A    Okay.

18        Q    And just for the record, PR 8, that's your

19   message?

20        A    Right.

21        Q    Your e-mail was robe --

22        A    robe, yeah, robe.

23        Q    All right.

24        A    Right.  Okay, yeah.

25        Q    Just I just wanted to ask you if these
```



1    communications were the first communications that you

2    were included on with respect to Professor  Tracy's

3    issues.

4         A    As far as I can recall, you know.

5         Q    Okay.  And you notice that date on one e-mail

6    is December 13th after the window to file a grievance.

7         A    Okay.

8         Q    Another one, PR 9, that's dated December 17th.

9         A    Okay.

10        Q    That's actually after the notice of

11   termination has been issued by the FAU.  So, is it safe

12   to say that the first time Zoeller and the grievance

13   chairs and those who are involved in the grievance

14   decision-making process were actually talking about or

15   communicating with you and other UFF members about

16   filing a grievance?

17        A    I don't know to be honest, I can't recall.  I

18   mean obviously these are the times when I was responding

19   back because I -- you know, in some ways I don't -- I do

20   membership stuff, so I don't want to get too involved

21   with -- in confusing the issue.  So, I might have been

22   copied on other things quite honestly before but I don't

23   recall responding --

24        Q    Was Professor  Tracy included on any of these

25   communications to your knowledge?



```
 1        A    I don't recall that either.

 2        Q    Was there ever a directive by President

 3   Zoeller not to talk to Professor  Tracy?

 4        A    No.

 5        Q    -- about his grievance or about his issues?

 6        A    No.  Not to me, not to me.

 7        Q    Let me show you what's been marked -- we're on

 8   10?

 9             (Thereupon, Plaintiff's Exhibit PR10 was

10             entered into the record.)

11        A    Um-hum.  Okay.

12        Q    (By Mr. Leo) Just better read that one too.

13        A    The top or the whole thing?

14        Q    The whole thing.  Let me know when you're

15   done, because I have a question about this e-mail.

16        A    Okay.

17        Q    The e-mail in the bottom, this is from Mike

18   Bud?

19        A    Right.

20        Q    That's his e-mail, mbud44@gmail?

21        A    Yes.

22        Q    He write, "Hi, Bob, Doug and Chris, -- so, he

23   wrote you on this exchange?

24        A    Yeah.

25        Q    The first e-mail at the top there, at least
```



1    first with respect to the order on this page.

2        A    Right.

3        Q    Or the timestamp you can see is the bottom e-

4    mail came first, 132 a.m.

5        A    Yes.

6        Q    Were you included on both of these e-mails or

7    were you only included on Mike Bud's e-mails?

8        A    I don't recall, to be honest.  I don't know, I

9    don't remember, yeah.

10       Q    You know I ask because in the 5:00 a.m.

11            response from Zoeller, right, zdoug2014?

12       A    Um-hum.

13       Q    He wrote Mike and he didn't include --

14       A    Right, I know.

15       Q    -- you in his addressing --

16       A    Yeah, that's why I'm not clear if I was

17   included in that or not.

18       Q    Does this refresh your recollection as to

19   whether a collective decision was made regarding

20   Professor  Tracy's grievability?

21       A    Yeah -- no, like I said, I wasn't privy to

22   that in terms of --

23       Q    Well, on December 2nd, Mike Bud writes to you

24   and he says, "Bob, when you say the situation is not

25   grievable, are you saying that Doug and Michael Moats do



1  **not think that you can make a case the CBA has been**

2  **violated here?**

3       A    Right.

4       **Q    After you got this message, do you recall**

5  **having discussions with any of these individuals?**

6       A    No, no, not immediately, afterwards.  But I

7  think that question -- yeah, at leaves it open, I don't

8  know if there was or not, right?

9       **Q    What's SPE?**

10      A    It's post-tenure review but it goes by

11  Sustained Performance Evaluation.

12      **Q    When he says, "I bring this up because the**

13  **dean and the admin may go after him further and try to**

14  **fire a tenured faculty member regardless of what happens**

15  **with the SPE, are we okay with that?", were you okay**

16  **with that?**

17      A    I bring this up -- no, no, obviously.  I just

18  -- SPE was being created to try to like get rid of

19  tenured people -- well, I shouldn't -- the way it was

20  written was problematic originally in terms of it could

21  jeopardize someone who had tenure --

22      **Q    So, these e-mails are authentic?**

23      A    Yeah, this one I definitely know.  I'm not

24  entirely certain I read that one above.  It could have

25  been on there but I don't recall.  As you know, people



1  with e-mails, it's sporadic, they copy everybody or if

2  they don't, so I don't want to act like I was

3  necessarily on --

4        Q    Oh, I know very well --

5        A    Yeah.

6        Q    I just want to ask if you recall actually

7  reading these e-mails --

8        A    I recall this one.  Obviously I recall the

9  ones I wrote, right.

10       Q    So, all the ones you have so far, you recall

11 actually being --

12       A    These I do.  PR 7, I don't know exactly, you

13 know, how much -- obviously the last one I must have

14 been on because there's -- saying she's responding me

15 Chris.  But the first two on that PR 7 I'm not entirely

16 certain if I was included on those or not.

17       Q    Does the exchange that includes Professor ,

18 I'm not sure how to say it again, Mountford, does that

19 refresh your recollection as to whether she was

20 complaining at the time about being excluded?

21       A    Yeah, but I don't know excluded from what.  In

22 other words, if it was like the e-mail exchange or if

23 they -- well, I don't want to assume but I don't know

24 from what, yeah.

25       Q    Well, my next question really is with respect



1    to the grievance process, you talked earlier about

2    delegating and how certain people are involved in

3    grievances, others aren't, --

4        A    Yeah.

5        Q    Would Professor  Mountford, would she be one

6    of the people that should be included or involved in the

7    grievance process?

8        A    Often not, yeah, it's often just the President

9    of the chapter, the grievance people, right, whoever

10   represent the grievance people and often a

11   representative from the state that would help mediate

12   it.  We have monthly executive committees were we're

13   updated with grievances.  We don't necessarily use

14   people's names but we'll keep people informed what's

15   going on.  But I don't -- when I was President, I don't

16   -- and to be honest, I don't remember who the Vice

17   President was, which should say something, was not privy

18   to grievance stuff.

19       Q    Okay.

20       A    Yeah, I was mainly --

21       Q    I mean when she -- when Professor  Mountford

22   responds and says, "I want to be included in this", do

23   you think she had a right to be?

24       A    It depends.  Like -- I mean you have all these

25   factors going on.  Like one, if it's a matter of trying



```
 1   to address something timely, right -- sometimes things
 2   move too quickly forward to update everybody in a timely
 3   fashion itself.  So, you don't want to jeopardize a
 4   person you're representing, you know, in the grievance
 5   to just inform other people, right?  At the same time,
 6   of course, you want to keep, you know, your other
 7   officers as informed as you can if need be, right?
 8        Q    Did anybody ever tell you that you were not
 9   helping Professor  Tracy or were a problem in anyway?
10        A    That I was?
11        Q    Yeah.
12        A    No.
13        Q    We'll come back to that, this one.  I will
14   have you mark this other one I want to ask you about.
15   I'm going to show you what's been marked as PR 11.
16             (Thereupon, Plaintiff's Exhibit PR11 was
17             entered into the record.)
18        A    Okay.
19        Q    You can again -- and let me know once you got
20   a chance to --
21        A    Okay.  Yeah.  And the dates -- Okay.
22        Q    So, it looks to me like you had a problem with
23   the he was terminated, Professor  Tracy?
24        A    Right, yeah.
25        Q    And the University's either contradicting or
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1   inconsistent notices?

2       A    Right, it was unclear.

3       Q    Is this the first time you expressed those

4   concerns in this e-mail?

5       A    Well, I don't know.  I might have verbally

6   said something before but I don't recall.

7       Q    This is dated January 5th, 2016, shortly

8   before his termination came to effect.  Did anybody

9   respond to you regarding your concerns on this e-mail?

10      A    I don't know.  Once again, I don't recall.  I

11  would think so, right, I would think so but I don't --

12      Q    Do you remember, for example, President

13  Zoeller saying "thank you, we're on it"?

14      A    Oh, I don't know -- yeah, I don't remember, I

15  don't recall.

16      Q    I know there's also Marshall Ogletree is

17  included on this e-mail as well as Michael Moats.

18      A    Okay.

19      Q    Did either of those individuals from UFF and

20  FEA, did they contact you or respond to this message?

21      A    No.  I mean like they didn't contact me.  Once

22  again, I don't recall if anybody responded to this

23  message or not, if they copied on it.  Yeah, someone --

24  I hope they would have if I wrote something like this

25  but --



1      Q     And correct me if I'm wrong, it looks to me

2   like you were trying to help Professor  Tracy --

3      A     Right, yeah.

4      Q     -- especially with these communications, given

5   your insight and experience.

6      A     I'll just say it was difficult because it was

7   sort of different than 2013 than this time, but, you

8   know, just sort of at a distance, you know, what I was

9   seeing sort of the avenues they might have wanted to

10  consider.

11     Q     Would you say that Mike Bud was also trying to

12  help Professor  Tracy at this time?

13     A     Definitely.

14     Q     I am going to show you another e-mail.  We're

15  12 --

16     A     I mean I should say two just like these -- I

17  think we're all trying to like -- you know, whenever

18  these e-mails are exchanged, like trying to collectively

19  speak to one another about like what's the best avenue.

20  I don't --

21     Q     Right.

22     A     So, I don't feel --

23     Q     And I'm showing you, this is an e-mail dated

24  December 17th 2015 from Mike Bud, looks like he's

25  responding to you.



```
1        A     Sure.

2        Q     Go ahead and just read that and let me know

3    if --

4        A     I mean him and I are very like-minded, quite

5    honestly, if you can tell from these e-mails and stuff

6    in terms of our -- not identical, but I yeah think --

7    yeah, okay.

8        Q     Was that e-mail sent to you?

9        A     I believe so, I believe so.

10       Q     Okay.  And do you know if any of Mike Bud's

11   concerns or input was acknowledged or received by

12   President Zoeller or any other grievance enforcement --

13       A     Once again, I don't know about e-mail, but --

14   so one, Mike and I share the same -- we're part of the

15   same school.  So, we talk often.  So, I'm sure we talked

16   about this too.  But, you know, I would think, because

17   we have happy hours, whenever they were, that this

18   probably would have come up some time or other. You

19   know, just --

20       Q     Okay.  This is an e-mail dated the 17th after

21   the notice of termination, but let me show you another

22   one; this is PR 13.

23       A     Jeez!

24       Q     Yeah, it's a lot of e-mails.

25       A     Okay.
```



1    Q    Were you copied on both of these e-mails?

2    A    I think so; they sound familiar.

3    Q    Okay.

4    A    Yeah.

5    Q    Does this refresh your recollection as to

6    whether President Zoeller issued a directive not to

7    communicate with Professor  Tracy regarding these

8    discussions?

9    A    With -- these discussion on here you mean?

10   Q    We'll just refer -- I'm just referring to this

11   first message -- well, it's first from the top.

12   A    Oh, I see.  Actually I didn't see that.

13   Everyone --

14   Q    It appears to be a response to the December

15   2nd message, the way the thread was produced at least to

16   us.

17   A    Right.

18   Q    It says here, "Thanks, Mike. Everyone please

19   understand that these e-mail communications are

20   sensitive --

21   A    Oh, yeah.

22   Q    -- and for this group only.  They should not

23   be discussed with anyone and that includes Jim."

24   A    Right.

25   Q    Does this refresh your recollection as to



877.291.3376
www.UCRinc.com

1  **whether President Zoeller had issued a directive not to**

2  **communicate with Professor  Tracy on this matter?**

3      A    Yeah, well, I think it's referring to the e-

4  mails itself because I did talk to Jim, you know, about

5  this stuff, regardless.

6      **Q    Even though President Zoeller told you not to**

7  **discuss it with him?**

8      A    Yeah.  Listen, Jim's my friend, right?  So,

9  you know, -- let's see, I wasn't going to the details of

10 these particular messages but more generally like what

11 his case was.  So, I -- listen, I interpreted that as

12 'these e-mails we shouldn't be forwarding or what not,

13 or discussing it explicitly with Jim'.  I didn't get the

14 sense that, you know, we shouldn't talk to Jim at all or

15 -- I mean -- Bob Zoeller knew like myself Shane Eason,

16 Mike Bud are friends with Jim.  So, you know, inevitably

17 when we see him, it'll be really awkward not to talk

18 about what's going on.

19     **Q    Right.  Do you think it was odd for President**

20 **Zoeller to be directing grievance folks or those who are**

21 **acting in advisor capacity not to speak to a grievant**

22 **about his own grievance or his issues?**

23     A    Yeah, I mean the thing is with this, I don't

24 know he mean -- like I said, I'm assuming it's a chain -

25 - this internal chain, right, in terms of going on.  I



1  would always assume Bob and Mike and whoever else was

2  grieving at the time would be the main foray in terms of

3  discussing it.  In other words, you don't want too many

4  people giving conflicting ideas of what's going on.  So,

5  I would always respect them being at the forefront of

6  representing it.  Similarly when I was a President of

7  the UFF, I would want my grievance chair to be the first

8  person to talk to the grievant and myself and I would

9  not want a bunch of other people kind of chiming in.

10  You know what I mean, that conflicting information?

11  That's just going to make it more difficult to actually

12  organize the case itself.

13      **Q    But shouldn't the grievant, or Professor Tracy**

14  **in this example, shouldn't he be participating in his**

15  **defense?**

16      A    Well, he is though in other ways, right?  I

17  assume this was just information or questioning among

18  the people on the EC and other people that had been

19  involved like myself, Bob, myself who'd been President

20  in the past.  So, I don't think it excludes that, right?

21  In other words, there is --

22      **Q    Yeah, well, my next question was.  as**

23  **President, when you were President of UFF-FAU , did you**

24  **ever give a directive to any of the other members not to**

25  **communicate with one another particularly with respect**



1  to a grievance?

2      A    Well, I mean did give -- certainly grievances

3  are, you know, -- I mean I gave directives of like we

4  can't give grievants' names if they're not involved.  I

5  mean there has to be a certain amount of privacy, right?

6      Q    Right.  You're talking other people?

7      A    Yeah, other people -- and I'll say we -- I

8  didn't operate as much as e-mail, I more met up with my

9  -- because I was on campus more, you know, talking more

10  directly with the grievance people and what not, but

11  it's -- I don't think I never had to because -- like

12  there wasn't that much -- no, I don't remember saying

13  that, right?  But in some ways, I didn't have to, it

14  didn't seem like -- it was mostly a more contained group

15  I think that I dealt with then -- than Bob wanted more,

16  you know, people just shooting ideas out.

17      Q    Do you think that Zoeller was trying to keep

18  certain information from Professor  Tracy?

19      A    I can't make that judgment.  I don't know what

20  his motives are in terms of -- you know --

21      Q    Do you know if Zoeller had a problem with

22  Professor  Tracy?

23      A    What do you mean a problem?

24      Q    A problem with something Professor  Tracy had

25  done, like for example, his blog.



1      A    Well, I don't -- I mean, he might have -- like

2   I said, I always divest the person from -- I mean you

3   don't have to like the people you're grieving, right?

4   You don't have to like people you're representing.

5      Q    Right.

6      A    So, --

7      Q    But did Zoeller feel the same way as you do?

8      A    I think so, yeah.  I mean I think he's tried

9   to divest himself from the thing that he's representing.

10  I remember him, you know, wanting the lawyer whoever it

11  was at that time to take over, have autonomy.

12     Q    At what point did you learn that Zoeller or

13  UFF had brought in outside counsel?

14     A    Oh, I don't remember.  You know, I mean I

15  wasn't that inside with it to know when they actually

16  brought an outside counsel and stuff.  I can't even

17  recall exactly who it was, but I heard it was a good

18  attorney.

19     Q    Did Zoeller or Moats or anybody at UFF ever

20  tell you to back off --

21     A    No.

22     Q    -- in your input?

23     A    No.

24     Q    All right.  Let me show you PR 14.

25          (Thereupon, Plaintiff's Exhibit 14 was entered



```
 1              into the record.)

 2      A    I am a pretty forward person.

 3      Q    (By Mr. Leo) Are you laughing at what you

 4  read?

 5      A    Yeah, I mean -- I don't know -- okay.  So,

 6  yeah -- I mean obviously he kept that secret with Bob.

 7      Q    Right.  You're not included in this --

 8      A    No, clearly not.

 9      Q    But does this refresh your recollection as to

10  whether Moats had a problem with something you had said?

11      A    I don't know, yeah, I don't know what exactly

12  what he's referring to, to be honest, but --

13      Q    Yeah, and what could he mean by, 'you're not

14  helping' --

15      A    I don't know.  Yeah.  I don't know.

16      Q    Or hurting the case.

17      A    Yeah, I don't know that either.

18      Q    What is -- what could that mean for --

19      A    I have no idea.

20      Q    I'm just --

21      A    He's obviously never vocalizes with me.

22      Q    Right.  Well, I'm just asking you based on

23  your experience, in your opinion, how could you giving

24  input to Michael Moats or Bob Zoeller or anybody at UFF,

25  how could that hurt Professor  Tracy or his case?
```



1      A     Like I said, I don't know and it's funny.  I

2  mean, I'll say this was never -- in some ways it has

3  never made privy to me.  So, I never -- Michael, you

4  know, never told me this himself nor Bob never related

5  it.  So, since it was never articulated, I have no idea.

6      Q     **My understanding, I've looked at this link --**

7      A     Um-hum.

8      Q     **-- in my understanding after reading some of**

9  **the other e-mails and without getting into nitty gritty**

10 **my understanding is that there was misreporting in**

11 **December of 2015 regarding a comment you had made in**

12 **2013.**

13     A     Yeah, that's true.

14     Q     **Does that refresh your recollection as to --**

15     A     I don't know what comment I made, I don't

16 recall that.

17     Q     **But you remember anybody at UFF telling you**

18 **not to talk to the media?**

19     A     No.

20     Q     **Or not to give a statement?**

21     A     No, but I wouldn't have done it to be honest.

22 I think it's really important that the president of the

23 chapter, whoever that is be the main person of contact.

24 So, --

25     Q     **How about press contacting -- general press or**



1  **giving information from the UFF-FAU , is Zoeller that**

2  **guy, is he the point man?**

3      A    He should be, yeah. I mean I'll say Mike Bud

4  and myself are also communication people, so we try to

5  vet, you know, or help out Bob in terms of what he's you

6  know, just for -- finesse it for the press, present it

7  well because we have more experience doing that.

8      **Q    Were you ever included in any PR discussion or**

9  **press release traps or anything like that?**

10     A    I don't believe he did any, right.  I don't

11 think -- it was a tricky case.  I'll be honest.  Going

12 back to 2013 when I was president, you know, it was a

13 mixed bag if we wanted to go to the press or not because

14 on one level it was a deeply unpopular case, right, with

15 what Jim was saying.  So, I didn't think we were going

16 to win much popular support that way.  At the same time

17 we were like, you know, this is -- that time was a First

18 Amendment issue.  But I felt like the negative publicity

19 would outweigh that.  So, we didn't really go to public.

20 We try to work through the grievance process.  And I

21 assume -- I don't think Bob mentioned anything or myself

22 what about like doing any kind of PR campaign because we

23 thought it'd be better not making it, you know, it's

24 just not a popular --

25     **Q    Just to comment on a question about something**



1   **you just said, when you're speaking of the 2013 issue**

2   **with Professor  Tracy and his blog -- you characterize**

3   **it as a First Amendment issue, would you characterize**

4   **the 2015 issue differently?**

5       A    Yeah, it's a -- the way in which the

6   University is going at it, you know, it just seems more

7   complicated, right?  The 2013 was really easy in terms

8   of it's clearly outside activity, clearly, we weren't

9   addressing with things on campus and that the 2015 was

10  more murky, right?  And that there is a blog going on

11  but there was equipment being used in the University,

12  you know what I mean.  Like so, I wasn't clear and I

13  think I said this sort of one of my e-mails of like, is

14  the first amendment or it's academic freedom, it's both,

15  we really need to kind of clarify that because there is

16  different types of arguments we need to make for that.

17  As well as they're trying this technicality right on top

18  of it of insubordination which always struck me as sort

19  as the Achilles heel of the case and that's -- because

20  like I said it was drummed into me before, you know if

21  you don't sign this they can get you for

22  insubordinations.  So, I felt like we were letting, you

23  know, something in there with not doing it.  I would've

24  sign the paperwork, sort of then file the grievance then

25  you could've dealt with all these other issues.



1      Q    When you said it was murky, who was murking

2    the water here, if we're going to use that --

3      A    Well, I mean I think it's just general.  I

4    didn't talk to Jim as much obviously because I wasn't

5    union president.  So, I didn't sort out those issues.

6    But was entirely clear in terms of the defense like I

7    said, I remember once seeing Jim, you know, on campus

8    prior to everything happening like in the fall and

9    seeing him having equipment in his office and saying

10   something I don't know if it was a great idea.  Because

11   like I said, I thought to be much safer if you just kept

12   everything --

13     Q    What equipment did he --

14     A    Well, it was like recording equipment and, you

15   know, he's doing interviews in his office and it was

16   like, I thought it's be better just to do it outside the

17   University rather than -- because we didn't deal with

18   that part of it, right?  We didn't deal with the

19   academic freedom side.

20     Q    He -- Professor  Tracy had brought his own

21   equipment to the recording?

22     A    Yeah, I believe so.

23     Q    Okay.

24     A    Yeah.  So, like I said this was an added thing

25   that I had to deal with the first time -- and like I



877.291.3376
www.UCRinc.com

1  said, they -- the University was being smarter about it,

2  you know, in their own.  In other words, if they weren't

3  going directly at the freedom of speech but they were

4  trying to use this technicality.

5      Q    Right, could you agree that they were trying

6  to find ways around the first amendment?

7      A    Yeah, I mean it seems that way, right.  It

8  appears that -- once again, I can't guess what they were

9  doing but it does seem they were trying to use the

10  technicality there.  So, there were whole hosted things

11  that made it sort of different then when we -- we had a

12  much more easier case when I first had to deal with --

13      Q    But that -- nonetheless Professor  Tracy, UFF-

14  FAU  could've filed a grievance alleging that 5.2(d) had

15  been violated with respect to the discipline November of

16  2015.

17      A    Right.

18      Q    And after he was -- notice of termination on

19  the same grounds that it can't be misconduct because --

20  or insubordination because you're violating 5.2(d) by

21  targeting my speech.

22      A    Say that again?

23      Q    Sorry.  I was saying -- I'll try to simplify.

24      A    Yeah.

25      Q    Professor  Tracy and UFF-FAU  could've grieved



1  the Notice of Discipline in November under 5.2(d) of the

2  Collective Bargaining Agreement saying, "FAU, this

3  discipline is censorship this is targeting my

4  constitution and protected activity, everything that

5  comes from this falls within a violation of 5.2(d) and

6  they're just using Article 19 to, you know, find the in

7  around, you know, to avoid the first amendment issues".

8      A    This is where it get's tricky, right?  Because

9  in some ways, you know, I would agree it's implicit

10 there.  But the question whether it's explicitly being

11 violated.  In this way, I would differ to Bob and

12 whoever was grieving, right.  This is where I'm saying

13 it's kind of getting murky because, you know, if you

14 don't fill out that paperwork and they are trying to get

15 you on insubordination, is that trump the argument

16 you're trying to make on the academic freedom of speech

17 itself, right?  That I don't know.  That was the thing

18 because they we're directly addressing what you're

19 saying --

20     Q    Right, or there was no grievance filed with

21 respect to the November 2015 notice.  So, now,

22 insubordinations in play because you never agree the

23 directive, right?

24     A    Right.

25     Q    So, it was like a trap.



877.291.3376
www.UCRinc.com

```
 1        A    Right.  Once again, I don't know all the

 2   technicalities of that but it's like -- that's -- I

 3   don't know, and that's why I sort of have a distance of

 4   what exactly the grievance should constitute.  Should it

 5   be the, you know, I don't know if Jim made himself

 6   vulnerable by not filling out the paperwork and also

 7   this allowed insubordination to take root.

 8        Q    Well, he filled out the paperwork though,

 9   didn't he?

10        A    I think so, I believe so eventually.  And --

11        Q    He was fired shortly thereafter.

12        A    Right.  Yeah, and I know it was definitely

13   accelerated after because we met once before he was

14   fired I believe.

15        Q    You met with Professor  Tracy?

16        A    Jim -- James Tracy, yeah.  And then -- because

17   I remember being concerned which -- about it.

18        Q    Are you still concern?

19        A    Yeah, of course.  I mean, like I said, other

20   than being a friend, I mean, I don't like faculty

21   getting fired for not filling out paperwork, right?

22   That's not a good precedent.

23        Q    And what about tenure?

24        A    Right, exactly.  Yeah, but I would say any

25   faculty in addition to tenure, no faculty member should
```



```
 1   be fire for not filling out a piece of paperwork.
 2       Q    Did anybody convey to you that Professor Tracy
 3   was in argument against tenure?
 4       A    I'm sure, I'm sure somebody brought that up.
 5       Q    Who said that to you?
 6       A    Once again, I don't -- you know, who know.  I
 7   mean, it could've been multiple people who --
 8       Q    Okay.  Let me narrow the question then.
 9       A    Yeah.
10       Q    Did anybody in the administration tell you
11   that Professor Tracy was the -- example, the one man
12   argument against tenure?
13       A    In the administration?
14       Q    Right.
15       A    Not that I know of, yeah.
16       Q    Any representative of the University?
17       A    I wouldn't been privy to that, I mean, I could
18   think of faculty saying that.  I don't -- not
19   specifically but I'm sure I've heard it before but I
20   don't know administrator I think would.
21       Q    Did Zoeller ever say that?
22       A    I don't know, I can't recall but he might've.
23       Q    Possible?
24       A    Yeah.
25       Q    Did Michael Moats ever say anything about
```



1  that?

2      A    Once again, I can't -- I can't -- I don't

3  remember exactly.  I do recall hearing that but I don't

4  want to say.

5      Q    **Did you ever -- did you have any communication**

6  **with FAU counsel, Larry Glick?**

7      A    No.

8      Q    **Never?**

9      A    Never, no.

10     Q    **What about before this ordeal, the 2015**

11 **dispute -- in 2013 when you were president, did you have**

12 **any dealings with Larry Glick?**

13     A    No, I believe Michael Moats did at the time

14 but --

15     Q    **In what way?**

16     A    I don't know, in terms of you meet with the

17 other counsel on the other side, discussed what's going

18 on and, you know, figure out where you're each at. I

19 mean you have to constantly have some kind of

20 interaction.

21     Q    **So, Moats served in representative capacity on**

22 **top of his advisory capacity?**

23     A    Yeah, it might've been him and Doug Broadfield

24 together who might-- once again, I can't recall that

25 because once again I delegated that stuff to those guys



1   and they were pretty competent.

2       **Q    Okay.  Does Moats or whoever is serving in**

3   **this mediary capacity or intermediary capacity, do they**

4   **regularly have communications with FAU's counsel?**

5       A    Well, it's only of an issue we're bringing up

6   and we, you know, and we want him to be one of our

7   people there.  He has more experience, right?  In many

8   ways why we would have Michael in that place because

9   he's work on conference a lot longer, he's done

10  grievances a lot longer than us.  So, he had a certain

11  expertise that we would have there and either, we have

12  our own people there with him or he would report

13  directly back to us to what was going on.

14      **Q    And Michael Moats, he directed Professor Tracy**

15  **or advised Professor Tracy ion 2013 not to submit his**

16  **blog on the outside activities form?**

17      A    Right.

18      **Q    You're aware of that?**

19      A    I am.  I remember that, yeah.

20      **Q    Did he give you any reasoning for that?**

21      A    You know, and once again like I said there's a

22  lot of other things going on.  So, as far as I'm

23  concerned if you can get the thing resolved.  I don't

24  really care the reasoning behind it.

25      **Q    Right.**



1      A    It was a win on my side.  So, like I said, I

2   don't think he needed to give me anything.

3      Q    Did the advisement of Michael Moats in 2013 --

4   particularly the advisement not to fill out the form for

5   the blog, did that come up again in 2015 if you

6   remember?

7      A    I don't remember.  I would think it had to but

8   maybe Jim -- yeah, I don't know.  I mean, I think it

9   did.  But once again, I'm not entirely certain who

10  brought it up.

11     Q    And just to be clear, your testimony was that

12  if it was you or you testified that you would fill out

13  the form --

14     A    Right.

15     Q    -- and then grieve it.

16     A    Um-hum.

17     Q    But that's not the only way that you can

18  grieve, right?

19     A    What do you mean?

20     Q    For example, in 2013 Professor Tracy didn't

21  fill out the forms and grieve.

22     A    Yeah, because the grievance is dependent upon

23  the letter of reprimand.

24     Q    Right.

25     A    It's not dependent upon you necessarily



1  filling it out, the only thing is you make yourself

2  vulnerable not filling out the form, right?  Somehow,

3  Michael Moats at that time got around that but the

4  difficulty is with every new administration, they create

5  their own new policies, right?

6      **Q     Right.**

7      A     So, they're not under any obligation to follow

8  the older policy itself.  We've all been victims of this

9  in terms of faculty like an older policy that used to

10  stand and then when an administration takes over its

11  somehow not followed.

12      **Q     In 2015 in September, Professor Lenz gave a**

13  **pretty passionate speech of the fear and uncertainty**

14  **that was felt by faculty members of the University.**

15      A     Um-hum.

16      **Q     Did you feel that same fear and uncertainty?**

17      A     I mean, no, quite honestly.  But, yes, if

18  you're vulnerable, you know, for sure.  I mean, were

19  tenure people and we're pretty articulate and to be

20  quite honest, if you're union member out front there's

21  not really too much to worry about.  But definitely, you

22  know, instructors and assistant professors.

23      **Q     And earlier you testified that the outside**

24  **activities forms, you've never submitted one.**

25      A     No.



1      Q    Do you have any fear or uncertainty that this

2  form not being submitted for any of your outside

3  activities could be the basis for discipline

4  termination?

5      A    Yeah, of course I would -- yeah, I'd be

6  concern for it but like said, I believe we could fight

7  it.

8      Q    After today, are you going to fill out these

9  forms for your online activities?

10     A    No.

11     Q    And you're not worried that FAU could send you

12 a threatening letter or notice?

13     A    They could, yeah.  I don't know, I'm just not

14 that kind of a person.  Other people have, right? Other

15 people have been overprotective of like just filling out

16 anything that they could sign it for.  But --

17     Q    Did Professor  Tracy's termination set

18 precedent for the University's use of this policy?

19     A    Yeah, definitely.  I think so.  That's

20 disturbing.

21     Q    And could the University go through all of the

22 outside activities of their faculty members, look for

23 social media, Twitter, Facebook and what not and then

24 just start firing tenured faculty members for never

25 reporting it?



1      A    Yeah, at least tempting to, right?  I mean I

2   would say that's the difference of having a union or

3   not, right.  In other words, but they could set on on

4   that route for sure and it's about precedent, that's --

5      **Q    Is the failure of United Faculty of Florida to**

6   **grieve for Professor Tracy is that precedent setting?**

7   **And for example, now, if you were targeted or any other**

8   **faculty member was targeted, could you be disciplined**

9   **and terminated without any recourse since Professor**

10  **Tracy didn't grieve and there was no chapter grievance**

11  **filed --**

12     A    But --

13          MS. HEFFNER:  Objection as to form.

14     **Q    (By Mr. Leo) -- with respect to this issue.**

15          MS. HEFFNER:  you can answer.

16     A    I mean, I wasn't -- I thought they were

17  originally grieving, right.  I thought they originally

18  were -- did start grieving, in Tracy's case.

19     **Q    (By Mr. Leo) Is that what you were told?**

20     A    I just assumed it quite honestly because I

21  thought that grievance people were on it.  So, I wasn't

22  aware if they weren't -- I mean, we did get -- I don't -

23  - I guess I don't know how you're interpreting them not

24  grieving it.  They got counsel, they had a lawyer -

25          -



```
 1        Q    Right.  But no grievance was ever filed on

 2   behalf of Professor Tracy --

 3        A    All right, well, I don't know about that,

 4   right.

 5        Q    Let me just -- I'm going to show you one more.

 6   I think we can take a quick break and I think we can be

 7   done.

 8        A    Yeah, because like I said, I wasn't privy

 9   right, to the --

10             (Thereupon, a short discussion was held off

11             record.)

12             (Deposition resumed.)

13        Q    (By Mr. Leo) I'm going to show you what's been

14   marked as PR 15 since we're talking about grievances.

15             (Thereupon, Plaintiff's Exhibit PR 15 was

16             entered into the record.)

17        Q    (By Mr. Leo) Are you familiar with this

18   grievance?

19        A    No.  So, this was a chapter grievance, got it.

20   No, I', not but --

21        Q    Are you familiar with -- you're not familiar

22   with this?

23        A    Yeah, I haven't read it, to be honest, but I

24   do recall them bringing it up, yeah.

25        Q    You recall who, Zoeller?
```



```
 1       A    I believe so.  We're discussing it during a
 2  executive committee meeting.
 3       Q    So, -- and according to the stamp at the
 4  bottom here, looks like it was filed in April of last
 5  year --
 6       A    Okay.
 7       Q    -- after Professor Tracy's termination.
 8       A    Right.
 9       Q    This grievance is -- are these from an
10  outsider looking in perspective, it's narrowed to very
11  particular change in the policy language.
12       A    I mean, I'm not -- I didn't know the
13  particular language in this, yeah.
14       Q    I just noticed it had no reference to freedom
15  of speech, Article 5.2, you know, nothing about
16  constitutionally protected activities being targeted by
17  the University.
18       A    Right.
19       Q    So, my question is whether you were aware that
20  the grievance that was filed did not include those
21  issues?
22       A    Yeah, I wasn't aware of that but at the same
23  time -- once again, it gets tricky because this outside
24  activity thing -- although it has implications to what
25  you're saying, in some way you don't want to get hung up
```



1    on all that, you want to get more into technicalities at

2    there are going to get into.

3         Q     Right.

4         A     I'm not necessarily disturbed by that, you

5    know, but I wasn't aware of the language they did or

6    didn't use with it.

7         Q     And I notice with this filing that this is not

8    filed by an outside attorney --

9         A     Right.

10        Q     -- it looks to be filed by Zoeller and

11   McGetchin.

12        A     Um-hum, on behalf of the chapter.

13        Q     On behalf of the chapter, right?

14        A     Yeah.

15        Q     Did you have any involvement in this

16   grievance?

17        A     No.

18        Q     Did they ask you for your input?

19        A     I don't believe so.

20        Q     Do you think it's missing anything?

21        A     I have no idea, you know, what I mean?  Like I

22   said, I don't know enough about it to even make that

23   comment.

24        Q     Going back to the complaints in September of

25   2015, at that meeting you hear these complaints from



1    faculty members, does the clock start running on filing

2    a grievance?

3         A    No.

4         Q    Even though there's been threatening letters

5    and what --

6         A    Well, it depends on the particular cases

7    you're talking about, yeah.  Right, yes, there's been -

8    - well, it was complicated.  It really -- I don't know

9    if you want to get into details but it was like --

10        Q    Yeah.

11        A    -- they gave letters of warning of discipline.

12   So, they weren't letters of discipline.

13        Q    Notice of notice of possibly could be

14   discipline?

15        A    I mean, yeah.  So, obviously the union takes a

16   conservative view of it like these are letters of

17   discipline in spite of what their -- I don't remember to

18   be honest, this is really in the weeds, even beyond me,

19   right, so the main -- I was at least privy to that

20   problem, right.  There was language in the letters that

21   sort of distanced it from being a letter of reprimand,

22   but it was implicitly did it.  So, I don't know the

23   specificity of like Doug McGetchin and Tim Lenz with

24   that kind of --

25        Q    Let me distinguish between chapter grievance



877.291.3376
www.UCRinc.com

1  and an individual grievance or FAU faculty member

2  grieving, is there a difference between chapter

3  grievance and individual grievance?

4      A   Well, usually the sense of a chapter grievance

5  would be more broadly applied than necessarily an

6  individual one.  I mean, they all jeopardized the

7  contract to some letter.  For example, you know, when I

8  defended Deandre Poole, although it wasn't a chapter --

9  well, first of all if there is not -- if the grievant

10 doesn't want to grieve it, right, the Chapter might do

11 it anyway because it would set --

12     Q   Precedent?

13     A   Right, but we never have that happen when I

14 was president.  So, Deandre Poole's example is a good

15 one, it's clearly about -- was about academic freedom

16 but he wanted to individually pursue it so it had the

17 implication anyway.

18     Q   So, in September of 2015 -- I think it was

19 September 4th was when this meeting was --

20     A   Yeah.

21     Q   Is there a clock running on filing as chapter

22 grievance on --

23     A   I don't know, yeah.

24     Q   On use of the policy as a --

25     A   That's tricky.  I don't know because I think



1   it depends on the whole set when the individual people

2   got those letters themselves, right?

3        Q    That's the operative --

4        Q    Yeah, window.  I think it's usually that.  I

5   don't think you could ever a senate, right, to do that

6   because there's -- although even administration might

7   say things, right, that are problems I can -- actually

8   enforce it that's usually when the grievance would

9   happen.

10       Q    Right.

11       A    And I know people did have letters prior to

12   that.  So, I would say at least some.

13       Q    In the meeting I recall there was talk of

14   referring the complaints or the issue that was being

15   discussed as Outside Activities policy to an Academic

16   Freedom and Due Process Committee.

17       A    That's right.

18       Q    Was a committee ever formed?

19       A    I think there was one existed already because

20   I helped form that a long time ago with the Deandre

21   Poole thing, right, back in 2013.

22       Q    So, did this -- did these complaints since

23   September, 2015 get referred to committee?

24       A    I don't know because I'm not part of the -- I

25   don't think I was part of the senate then.  So, I know



1    some people wanted it but I don't know whatever

2    happened.

3        Q    Who was in-charge of making that decision?

4        A    The senate president.

5        Q    Christopher Beetle?

6        A    Right.

7        Q    In my recollection of the audio recording is

8    that he shot that down.

9        A    Once again, I don't recall -- I mean, you

10   might be right but I don't recall that specificity of

11   that.

12       Q    But he tabled it.

13       A    Yeah, maybe that's it.

14       Q    But that's the way they described it and the

15   basis he gave was because he didn't know enough about

16   it.

17       A    Okay.

18       Q    To your knowledge, was those issues ever

19   raised again in senate faculty meetings?

20       A    I don't know because I didn't regularly attend

21   and I don't know if the academic due process and freedom

22   committee brought it up themselves to, right, they're a

23   standing committee in addition.

24       Q    They're not a committee within UFF-FAU ?

25       A    No.



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1       Q     So, they're like stand alone or --

2       A     Yeah, they're like ad hoc or -- I don't know

3    ad hoc but they're committee of -- subcommittee of the

4    faculty senate.

5       Q     Can they grieve?

6       A     Well, yeah, any faculty member can grieve, I

7    guess.

8       Q     Okay.  So, any faculty member can grieve

9    outside of UFF?

10      A     What do you mean?

11      Q     Does UFF have the exclusive right to file a

12   grievance?

13      A     No.

14      Q     So, none UFF member could file their own

15   grievance --

16      A     Sure.

17      Q     -- would it be on the similar form like this?

18      A     I don't know.  I doubt it actually but -- I

19   don't know.

20      Q     Are there different forms that are used?

21      A     I don't know.  You know what, I don't know

22   because like I said I only know UFF.

23      Q     Okay.  Now, Professor Tracy could've grieved

24   on his own in 2015, right?

25      A     Um-hum.



1      Q    Are you aware of Professor Tracy's attempt to

2   leave UFF?

3      A    Only through e-mails, you know, I think you

4   have that one about Mike Bud about, so I think that's

5   where I learned about it, quite honestly.

6      Q    And they convinced Professor Tracy to stay?

7      A    Right.

8      Q    Are you aware of who was in involved in --

9      A    I don't.

10     Q    -- keeping Professor  Tracy in UFF-FAU ?

11     A    I don't know, right.

12     Q    And I just want to ask generally about your

13   experience in dealing with complaints from faculty

14   members --

15     A    Um-hum.

16     Q    -- are you aware of any other faculty member

17   other than Professor Tracy who has been disciplined for

18   not disclosing their social media or online speech to

19   the University?

20     A    Like I said, not that I'm aware of.  It

21   doesn't mean necessarily it didn't happen but it was not

22   brought to our attention.

23     Q    Okay.

24     A    Yeah.

25     Q    Just a quick break, few minutes.



```
 1              (Thereupon, a short discussion was held off

 2              record.)

 3              (Deposition resumed.)

 4              MR. LEO:  I think we're good.  Do you want to

 5         follow up?

 6                           CROSS EXAMINATION

 7    BY MS. HEFFNER:

 8         Q    Yeah.  Do you have any personal knowledge of a

 9    plan or conspiracy to terminate James Tracy between UFF

10    and the University?

11         A    No.

12              MS. HEFFNER:  Okay.  That's it.

13              THE COURT REPORTER:  Done?

14              MR. LEO:  Yeah.

15              THE COURT REPORTER:  Okay.  You have the

16         option to read this if it's -- or waive it.

17              THE WITNESS:  Yeah, waive it.

18              (Deposition concluded at 4:03 p.m.)

19              (Reading and signing of the deposition by the

20              witness has been waived.)

21

22

23

24

25
```



```
 1              CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF PALM BEACH

 4

 5         I, JESSICA COOPER, Court Reporter and Notary

 6    Public for the State of Florida, do hereby certify that

 7    I was authorized to and did digitally report and

 8    transcribe the foregoing proceedings, and that the

 9    transcript is a true and complete record of my digital

10    notes.

11

12         I further certify that I am not a relative,

13    employee, attorney or counsel of any of the parties,

14    nor am I a relative or employee any of the parties'

15    attorney or counsel connected with the action, nor am I

16    financially interested in the action.

17    Witness my hand and official seal this 18TH day of

18    APRIL, 2017.

19

20

21
      _____
22    JESSICA COOPER, FPR, COURT REPORTER
      NOTARY PUBLIC, STATE OF FLORIDA
23    Commission No.:  FF 943563
      Commission Exp:  12/15/19
24

25
```



877.291.3376
www.UCRinc.com

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA

 3   COUNTY OF PALM BEACH

 4

 5       I, JESSICA COOPER, the undersigned authority,

 6   certify that CHRIS ROBE personally appeared before me

 7   and was duly sworn.

 8
     Witness my hand and official seal this 3RD day of
 9
     APRIL, 2017.
10

11

12

13
     _____
14   JESSICA COOPER, FPR, COURT REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
15   Commission No.:  FF 943563
     Commission Exp:  12/15/19
16

17

18

19

20

21

22

23

24

25
```



**$**

**$5000** 23:7

---

**1**

**1** 24:21 28:13 29:13,14

**10** 52:12 62:6 74:8

**103** 4:17

**108-page** 13:25

**10th** 61:4,5,6,13,14

**11** 18:2 30:22 79:15

**112** 3:5

**12** 81:15

**12/15/19** 113:23 114:15

**1240** 1:18 5:10

**13** 34:2 82:22

**132** 75:4

**13th** 40:9 73:6

**14** 87:24,25

**1400** 2:12

**14-'15** 43:18

**15** 103:14,15

**17th** 73:8 81:24 82:20

**18TH** 113:17

**19** 4:3 33:5 34:17 37:11 44:17 94:6

**1st** 69:23

---

**2**

**2** 24:22 28:13 29:13,15 38:9

**2:08** 1:16 5:5

**20** 52:23

**200** 2:12

**2004** 9:4 18:2

**2005** 9:3

**2006** 9:8

**2006-2007** 9:9

**2011** 8:23 9:18 17:25

**2011-2014** 10:18

**2012** 14:7

**2012-2015** 15:25

**2013** 18:12,15,17 20:7 28:2,21 29:11 34:1,4 36:24 40:1,18 41:17 42:5,13,18 55:23 56:14,23 57:21 81:7 89:12 90:12 91:1,7 97:11 98:15 99:3,20 108:21

**2013-2014** 41:23

**2014** 9:18 40:18 42:18

**2015** 14:7 26:13 28:23 35:18 39:21 44:10 52:12 53:9 54:12 55:13 56:16,18,24 57:12 59:19 61:5 70:6 81:24 89:11 91:4,9 93:16 94:21 97:10 99:5 100:12 105:25 107:18 108:23 110:24

**2016** 80:7

**2017** 1:16 5:2,4 113:18 114:9

**21%** 17:21

**22%** 17:21

**27th** 14:12

**2nd** 75:23 83:15

---

**3**

**3** 1:16 5:2 51:2 59:23

**30** 50:22 52:10,20 60:9 61:4,8,9

**300** 10:7,9

**300s** 10:8

**301** 1:17 5:9

**30-day** 59:13

**30s** 18:3

**32801** 2:13

**330** 10:8

**33073** 2:5

**33431** 1:18 5:10

**33617** 2:10

**34** 4:3

**38** 4:4

**39** 18:6

**39%** 18:7

**3rd** 5:4 114:8

---

**4**

**4:03** 1:16 112:18

**407-406-5246** 2:13

**40s** 18:3

**4171** 2:4

**42** 18:6

**43%** 10:7 17:16

**4th** 107:19

---

**5**

**5** 3:3 4:8 64:12,14,15,16 66:17

**5.2** 104:15

**5.2(d** 66:19 68:17

93:14,20 94:1,5

**5.2d** 67:11 68:12

**5:00** 75:10

**51** 4:5

**53** 4:6

**56TH** 2:9

**5th** 80:7

---

**6**

**6** 66:7

**64** 4:7

**66** 4:8

---

**7**

**7** 77:12,15

**70** 4:9

**72** 4:10,11

**74** 4:12

**79** 4:13

---

**8**

**8** 72:4,18

**8076** 2:9

**813-514-1414** 2:10

**88** 4:16

---

**9**

**9** 2:4 72:11,16 73:8

**9:16-cv-80655-RLR** 1:3 5:9

**943563** 113:23 114:15

**954-478-4223** 2:5

---

**A**

**a.m** 75:4,10

**a/k/a** 1:8 5:8

**abandon** 58:6



**able** 7:1

**academic** 19:21 33:24 57:20 66:14,25 68:18,24 91:14 92:19 94:16 107:15 108:15 109:21

**accelerated** 95:13

**accelerating** 54:18

**according** 27:17 43:5 104:3

**account** 47:14 49:19

**accountable** 33:19,20 37:4 47:9

**accounts** 37:9

**Achilles** 91:19

**acknowledged** 82:11

**ACLU** 28:3

**acronym** 25:12

**across** 31:7

**act** 28:16 36:9 77:2

**acted** 23:25

**acting** 59:14 84:21

**action** 54:14 113:14,15

**actions** 18:13

**activist** 16:21,24 17:14

**activities** 34:22 35:17 36:15 37:10,11 39:7,16 64:8 98:16 100:24 101:3,9,22 104:16 108:15

**activity** 32:16,20,25 33:2,5,20 36:4,10,17,19,22

37:5,7,20,24 38:3,17 39:19 40:21 43:2,8 44:1,5 45:17 47:13 50:1 56:7 57:22 65:10 71:15 91:8 94:4 104:24

**acts** 21:3

**actual** 50:19

**actually** 12:22 14:12 33:12,13 35:24 43:15 50:5,9 65:13 73:10,14 77:6,11 83:12 85:11 87:15 108:7 110:18

**ad** 110:2,3

**added** 92:24

**addition** 36:12 95:25 109:23

**address** 79:1

**addressing** 11:23 75:15 91:9 94:18

**admin** 11:25 76:13

**administration** 19:8 27:2 30:4 32:15 47:12 49:3 65:16 96:10,13 100:4,10 108:6

**administrations** 13:15

**administrator** 45:11 96:20

**administrators** 37:8 43:25 44:23 48:2,22

**advance** 11:2 29:11 54:4

**advice** 21:7 24:10 49:16

**advise** 20:13 22:2,8

**advised** 98:15

**advisement** 99:3,4

**advisor** 84:21

**advisory** 21:15,16 23:25 24:3 55:14 69:9 97:22

**affect** 55:21

**affiliates** 5:18

**affirmative** 46:20

**afterwards** 76:6

**against** 16:24 96:3,12

**ago** 17:19 65:14,21 108:20

**agreed** 22:18

**agreement** 13:20,23 15:23 27:10,14 40:8,15 94:2

**agreements** 14:2

**ahead** 82:2

**al** 1:8 5:8

**alcohol** 6:21

**alleging** 93:14

**allowed** 95:7

**alone** 110:1

**already** 108:19

**am** 5:14 18:21 53:6 70:2 81:14 88:2 98:19 113:11,13,14

**amended** 16:6

**amendment** 90:18 91:3,14 93:6 94:7

**amendments** 16:3

**among** 15:17 85:17

**amongst** 70:9

**amount** 10:11 86:5

**advised** 98:15

**answer** 41:2 42:9 46:5 102:15

**answers** 7:5

**ANTHONY** 2:16

**anticipatory** 31:14 50:11

**anybody** 7:9,12,14 8:7 21:16 31:4 40:19,20 42:23 48:3 56:18 57:2 64:4 65:3,8 68:11 79:8 80:8,22 87:19 88:24 89:17 96:2,10

**anymore** 39:6

**anyone** 33:12 83:23

**anything** 6:21 9:20 21:17 33:11 36:6 37:3,7,13 39:11 45:14 56:20 58:2 65:11 67:6,20 90:9,21 96:25 99:2 101:16 105:20

**anyway** 12:24 17:12 34:4 35:23 79:9 107:11,17

**apologize** 14:22

**apparently** 11:8

**appeal** 27:3,6

**appealed** 27:8

**appear** 37:18

**APPEARANCES** 2:1

**appeared** 114:6

**appears** 83:14 93:8

**APPENDIX** 4:17

**applied** 37:22 38:1,2 107:5

**applies** 67:2



appointed 26:15

appropriate 6:16

approval 25:3 49:4

approved 37:16

April 1:16 5:2,4 69:23 104:4 113:18 114:9

aren't 6:11 78:3

argument 94:15 96:3,12

arguments 91:16

arising 27:19

Article 4:3,8 33:5 34:17 37:11 44:17 66:17 68:12 94:6 104:15

articulate 100:19

articulated 89:5

assigned 10:25

assistant 100:22

Associate 8:19,20

associated 25:18

assume 60:18,19 77:23 85:1,17 90:21

assumed 20:15 46:8,24 102:20

assuming 61:3,5 67:21 84:24

Atlantic 1:8 5:7,8

atrophied 17:24

attempt 111:1

attempted 40:1

attempts 28:24

attend 13:3 109:20

attention 40:25 59:11 68:12 111:22

attorney 7:17 25:9,22 26:3,5,14 27:13 28:10 87:18 105:8 113:12,14

attorneys 25:21 27:23 50:24

attorney's 7:15

audio 109:7

authentic 76:22

authority 114:5

authorized 113:7

autonomy 21:11 87:11

AVE 2:12

avenue 81:19

avenues 81:9

avoid 94:7

aware 20:17 37:25 41:14 43:1 54:23 56:25 62:3,9,12,19 63:25 64:3 98:18 102:22 104:19,22 105:5 111:1,8,16,20

away 49:23

awkward 84:17

———————
**B**

bad 11:4 22:10 23:13

bag 90:13

bargain 31:18

bargainers 15:16

bargaining 10:11,24 11:16 13:12,13,19,20,23 14:3 15:14 22:16 31:15,17 32:9 94:2

bargainings 15:21

based 16:2 20:13 88:22

basically 48:2

basing 28:15

basis 101:3 109:15

BEACH 1:2 113:3 114:3

became 9:3,10

becoming 35:13

Beetle 109:5

behalf 2:2,7 28:20 46:22 62:14 103:2 105:12,13

behind 14:8 98:24

believe 14:21 24:5 25:8 34:5 35:1,3,7,19,20 37:14 50:8 52:10 63:12 69:15 82:9 90:10 92:22 95:10,14 97:13 101:6 104:1 105:19

belong 10:15

best 50:23 55:11 59:8 81:19

better 15:5 74:12 90:23 92:16

beyond 36:23 106:18

bit 24:7,8

blindsided 31:17

blocked 14:22

blog 36:24 37:5 38:25 42:7,13 67:10 86:25 91:2,10 98:16 99:5

blogged 38:24

blogging 40:20 41:20 42:20 67:8,9

blogs 37:2,9

BLVD 2:4

board 1:8 5:7 25:11 26:23

Bob 8:11 53:12 54:5 74:22 75:24 84:15 85:1,19 86:15 88:6,24 89:4 90:5,21 94:11

Boca 1:18 5:10

bottom 74:17 75:3 104:4

break 103:6 111:25

breakout 13:12

breaks 10:7

brief 8:5

bring 26:22 28:10 29:2 76:12,17

bringing 13:17 98:5 103:24

broad 71:16

Broadfield 19:11 20:10 23:23 28:20 53:8,9,11 54:1 97:23

broadly 54:23 107:5

broken 58:3

brought 29:5 32:17 40:25 54:14 63:12 68:11 87:13,16 92:20 96:4 99:10 109:22 111:22

Bruce 21:9

Bud 68:25 69:2



74:18 75:23
81:11,24 84:16
90:3 111:4

**Bud's** 75:7 82:10

**bug** 66:4

**bugging**
65:14,15,22

**build** 16:23

**bunch** 27:2,21
35:16 85:9

**business** 68:1

**busy** 53:18

—————
C
—————

**CAIR** 2:9

**campaign** 19:22
23:8 90:22

**campus** 13:18
67:1,3,6,11 68:21
86:9 91:9 92:7

**campuses** 13:13

**capacity** 21:4 23:25
55:14 69:9 84:21
97:21,22 98:3

**car** 18:21

**care** 31:20 98:24

**case** 1:3 5:8 20:3
33:9,24 34:14
36:13 44:8 50:14
56:4 57:19 63:6
76:1 84:11 85:12
88:16,25 90:11,14
91:19 93:12
102:18

**cases** 106:6

**caveated** 55:6

**caveats** 60:12 61:20

**CBA** 15:25 76:1

**CBC** 25:12

**censored** 66:23

**censorship** 66:21
94:3

**central** 35:14

**certain** 16:19 31:5
76:24 77:16 78:2
86:5,18 98:10
99:9

**certainly** 43:14
86:2

**CERTIFICATE**
113:1 114:1

**certify** 113:6,11
114:6

**chain** 84:24,25

**chair** 9:21,23 55:15
85:7

**chairs** 73:13

**chance** 71:4 79:20

**change** 13:5 31:24
104:11

**changed** 17:15
35:11 43:10

**changes** 10:10,12
16:8 45:3

**chapter** 12:20
13:16 15:7
21:5,12,14
22:12,24 24:4,14
28:10,21 54:16
55:4,8,20 57:7
62:21 78:9 89:23
102:10 103:19
105:12,13 106:25
107:2,4,8,10,21

**chapters** 12:17
13:1,5,13
16:19,21 17:6
23:4,7

**characterize** 91:2,3

**charge** 13:16,17

**chiming** 85:9

**choose** 21:7

**Chris** 1:15 3:2
5:1,6,22 65:12
71:11 74:22 77:15
114:6

**Christopher** 109:5

**circumstances**
27:18

**claim** 21:1 65:16

**claimed** 65:14

**clarified** 44:25

**clarify** 59:2 91:15

**class** 69:6

**classes** 33:17

**clear** 9:8 50:14
65:23 75:16 91:12
92:6 99:11

**clearly** 38:2 58:1
60:5 63:7 68:18
88:8 91:8 107:15

**clock** 67:10 106:1
107:21

**COCONUT** 2:5

**co-counsel** 5:14

**cognizant** 41:13
59:17

**colleague** 27:1

**collective** 60:20,25
75:19 94:2

**collectively** 81:18

**Coltman** 34:6 47:12

**comes** 46:4 57:19
94:5

**coming** 31:21 33:19
35:20

**comment** 89:11,15

90:25 105:23

**comments** 71:21

**commercial**
37:19,23

**Commission** 113:23
114:15

**committee** 4:6 31:2
50:16 54:24 70:12
104:2
108:16,18,23
109:22,23,24
110:3

**committees** 78:12

**communicate**
54:20,21 83:7
84:2 85:25

**communicating**
57:2 73:15

**communication**
23:8 90:4 97:5

**communications**
73:1,25 81:4
83:19 98:4

**community** 17:4

**compare** 13:14

**compensated** 36:22

**competent** 98:1

**complained** 44:18
65:12

**complaining** 77:20

**complaints** 41:20
42:19 44:19
105:24,25
108:14,22 111:13

**complete** 113:9

**complicated** 91:7
106:8

**comply** 48:12,18,23

**computer** 67:9,21



68:3,4

conceptions 55:12

concern 55:17
95:18 101:6

concerned 39:18
55:20 95:17 98:23

concerning 37:7
70:5

concerns 17:8
70:13 80:4,9
82:11

concluded 112:18

confer 51:24

conference 98:9

conflict 33:5 65:10

conflicting 85:4,10

confusing 44:25
73:21

connected 113:14

connection 7:10,16

conservative
106:16

consider 16:20
81:10

considered 48:14
67:17

consistently 38:2

conspiracy 112:9

constantly 97:19

constitute 95:4

constitutes 36:4
38:3

constitution 94:4

constitutional
66:20 67:5

constitutionally
104:16

consultation 29:25

30:8 31:11,13
32:5,14

consultations 10:24
29:22,23

contact 52:5
80:20,21 89:23

contacting 89:25

contained 86:14

contention 46:12

context 18:22

contingent 9:4

continue 40:18
41:24 42:2

contract 10:24
11:17 12:1 14:17
16:5 27:17
35:2,4,10,21
46:13 52:16 53:7
57:15
58:2,17,20,23
59:7 63:19,24
107:7

contracts 16:3

contradicting 79:25

control 21:20

convene 13:1

conversation 61:22
63:13

conversations
11:24

convey 70:16 96:2

convinced 111:6

Cooper 1:24 5:11
113:5,22 114:5,14

coordinate 12:23

copied 73:22 80:23
83:1

copy 35:15 77:1

corollary 21:20

correct 16:7,12
28:22 41:21
42:17,21 44:16
46:24 81:1

correction 33:13

cost 25:10,18

could've 91:25
93:14,25 96:7
110:23

council 23:1

counsel 2:1 5:12
87:13,16 97:6,17
98:4 102:24
113:12,14

counsels 31:25 32:1

counted 53:3

COUNTY 113:3
114:3

couple 16:8 45:16
46:10 56:3

course 21:12 36:13
58:21,25 79:6
95:19 101:5

Court 1:1,24
5:3,11,12 6:9
112:13,15
113:5,22 114:14

crazy 18:17

create 11:6 17:2
31:5 100:4

created 76:18

creating 30:20

CREEK 2:5

criteria 63:17

CROSS 3:4 112:6

culture 17:2

cutback 33:18

———————

——— D ———

date 5:4 50:20
52:13,16,20,21
61:6,21 63:5
69:21 73:5

dated 73:8 80:7
81:23 82:20

dates 62:1 79:21

day 24:3 113:17
114:8

days 50:22
52:10,15,20,23
53:3 60:9 61:4,8,9

deadline 52:13 61:6

deal 11:4 30:11
31:17 92:17,18,25
93:12

dealing 12:6
18:12,23 21:20,21
111:13

dealings 16:13
27:24 97:12

dealt 19:20 43:21
55:23 56:11 86:15
91:25

dean 34:5 37:14
76:13

Deandre 18:25
19:19 21:21
57:19,21 68:16
107:8,14 108:20

deceased 27:1

December 61:5,12
73:6,8 75:23
81:24 83:14 89:11

decision 24:14
26:23 27:3,5
49:13 60:21,25
62:10,13,17 63:25
75:19 109:3

decision-making
73:14



deeply 90:14

defend 46:17 56:6,7,10 57:12,15 58:13

Defendants 1:9 2:7 5:20

defended 40:4 107:8

defending 56:4 57:4,17,18

defense 85:15 92:6

defining 32:25

definitely 26:12 46:13 48:1 64:21 68:20 76:23 81:13 95:12 100:21 101:19

definition 71:15

delay 51:25

delaying 27:13

delegate 20:2 23:20 30:16

delegated 15:15 19:10 21:18 23:22 30:9 97:25

delegating 11:19 78:2

denied 63:12

department 41:1

dependent 99:22,25

depending 12:17 27:18 32:2 52:24 53:2

depends 17:11 25:19,20 27:11 28:5 32:24 78:24 106:6 108:1

depersonalize 63:21

deposition 1:15

5:1,5 6:7 7:18 8:2 103:12 112:3,18,19

described 109:14

DESCRIPTION 4:2

deserve 63:11

destroying 67:20

details 11:19 29:6,9 40:11 55:10 84:9 106:9

dialog 12:2

differ 67:16 94:11

differed 17:18

difference 29:14 102:2 107:2

different 18:8,9 34:14 35:4 55:7 58:16 81:7 91:16 93:11 110:20

differently 31:13 91:4

difficult 71:25 81:6 85:11

difficulty 100:4

digital 113:9

digitally 113:7

DIRECT 3:3 5:25

directed 98:14

directing 21:4 42:23 84:20

directive 47:11,19 48:12,19,23,24,25 74:2 83:6 84:1 85:24 94:23

directives 37:6 86:3

directly 15:13 20:3 54:18 61:22 86:10 93:3 94:18 98:13

Director 20:24

directors 21:9

disagree 48:4 58:7

disagreed 24:10 57:3

disagreements 21:13

disaster 18:22

disciplinary 18:13 49:20 50:6 54:14

discipline 4:5 26:16 28:24 40:2 42:6 49:22 50:7 52:12 54:13 60:8 61:15 62:7 64:2,6 66:21 93:15 94:1,3 101:3 106:11,12,14,17

disciplined 49:21 50:3 102:8 111:17

disclosing 50:2 111:18

disclosure 39:12 47:2

discriminatory 39:23

discuss 23:2 30:5 32:17 84:7

discussed 32:6 83:23 97:17 108:15

discussing 84:13 85:3 104:1

discussion 60:1 83:9 90:8 103:10 112:1

discussions 59:20 70:4,9,17 76:5 83:8

dispute 26:13 42:15

47:1 70:6 97:11

distance 43:20 55:5 56:13 81:8 95:3

distanced 106:21

distinctly 46:14

distinguish 106:25

distributed 45:14

DISTRICT 1:1

disturbed 105:4

disturbing 101:20

divest 87:2,9

DIVISION 1:2

document 13:25 38:8,15,17,18 51:6,7 64:9,20,24 65:5,7 66:6

done 7:19 50:10 74:15 86:25 89:21 98:9 103:7 112:13

door 17:6

doubt 110:18

Doug 19:11,17 20:4,17 40:10 53:8,9,11 54:1,3 60:23 74:22 75:25 97:23 106:23

drafted 15:23

draw 59:11

drugs 6:21

drummed 48:9 57:14 91:20

due 108:16 109:21

duly 5:24 114:7

during 11:25 33:11 44:23 45:24 104:1

duties 10:20 12:9 60:9

duty 46:20 57:11



---
E
---

**earlier** 25:5,7 78:1 100:23

**early** 29:6,12

**easier** 93:12

**easily** 19:5 20:6

**Eason** 84:15

**easy** 91:7

**EC** 85:18

**edit** 46:9

**editors** 47:4

**education** 70:15

**effect** 40:15 69:22,23 80:8

**egregious** 19:7 36:17

**either** 34:7 48:17 57:6 74:1 79:25 80:19 88:17 98:11

**elected** 13:2 69:14

**election** 12:22 69:19

**else** 8:7 85:1

**else's** 48:3

**elsewhere** 34:13

**e-mail** 32:8,9 37:15 55:2 59:21 70:5,8 72:21 73:5 74:15,17,20,25 77:22 80:4,9,17 81:14,23 82:8,13,20 83:19 86:8

**EMAIL** 4:9,10,11,12,13,1 4,15,16

**e-mails** 71:23 75:6,7 76:22 77:1,7 81:18

82:5,24 83:1 84:12 89:9 91:13 111:3

**Embry** 27:1

**emergence** 43:23

**emeritus** 69:5

**employee** 113:12,13

**employment** 4:4 8:13 19:6 37:2

**energy** 19:25

**enforce** 59:7 108:8

**enforced** 58:20,24

**enforcement** 59:22 82:12

**engage** 16:22

**entered** 34:19 38:14 40:9 51:4 53:21 64:18 66:9 70:23 72:6,13 74:10 79:17 87:25 103:16

**entirely** 9:7 76:24 77:15 92:6 99:9

**entities** 12:7

**entry** 57:8

**equipment** 67:13,18,23 68:6,10 91:11 92:9,13,14,21

**equity** 11:7

**especially** 81:4

**ESQUIRE** 2:3,8,12

**essential** 42:15

**essentially** 58:18

**et** 1:8 5:8

**evaluate** 58:2

**Evaluation** 76:11

**eventually** 95:10

**everybody** 77:1 79:2

**everybody's** 58:11,15

**Everyone** 83:13,18

**everything** 6:10 58:9 92:8,12 94:4

**everywhere** 10:23

**evidence** 63:10

**exact** 52:20 69:21

**exactly** 25:11 26:9 37:21 40:11 47:25 49:17 52:25 53:19 58:5 62:11 68:19 69:25 71:9 77:12 87:17 88:11 95:4,24 97:3

**EXAMINATION** 3:1,3,4 5:25 112:6

**example** 11:3 13:6 17:5 22:7 28:19 31:6 41:23 45:23 48:21 49:3,18 50:25 52:11 63:22 66:19,22 80:12 85:14 86:25 96:11 99:20 102:7 107:7,14

**except** 16:8

**exchange** 13:5 71:4,8 74:23 77:17,22

**exchanged** 81:18

**excluded** 70:17 77:20,21

**excludes** 85:20

**exclusive** 110:11

**excuse** 60:7

**executive** 4:6 31:2 54:24 70:12 78:12

104:2

**exercise** 66:20 68:21,22

**Exhibit** 4:2 14:19 34:18 38:13 51:3 53:20 64:17 66:8 70:22 72:5,12 74:9 79:16 87:25 103:15

**EXHIBITS** 4:1

**exist** 36:10

**existed** 108:19

**Exp** 113:23 114:15

**experience** 81:5 88:23 90:7 98:7 111:13

**expertise** 98:11

**explicit** 37:13

**explicitly** 46:18 51:23 84:13 94:10

**expressed** 80:3

**extend** 27:14 36:23

**extended** 27:18 61:20 62:1

**extension** 62:6

**extensions** 27:22

---
F
---

**facebook** 36:16 39:1,2 101:23

**facing** 26:16

**fact** 21:15 46:6

**factors** 78:25

**faculty** 8:8,25 9:3 10:1,3,11 11:2,4,24 16:23 17:1,2,6 30:7 32:5 35:16,18 36:6 37:4,8 39:20,23 41:8,10 43:25



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

44:4,11,17,21,22,
24 45:8,13,24
46:10,14,20 47:10
56:15 57:16,18
58:3 61:11 64:4
65:11 67:7 69:4
76:14 95:20,25
96:18 100:9,14
101:22,24 102:5,8
106:1 107:1
109:19 110:4,6,8
111:13,16

**failed** 49:19 62:21

**failure** 102:5

**fall** 37:10 43:15
55:24 67:11 92:8

**fallout** 56:1

**falls** 12:11 94:5

**familiar** 68:25 83:2
103:17,21

**fashion** 62:22 79:3

**fast** 44:10

**FAU** 5:20 8:14,25
10:1,3 32:15
33:15 41:25
42:5,11,22
43:19,24 45:11
49:3 54:14 61:11
65:3 66:3 69:4
73:11 93:14 94:2
97:6 101:11 107:1

**FAU's** 98:4

**FEA** 12:7 64:1
80:20

**fear** 100:13,16
101:1

**feasibility** 25:15

**feasible** 26:23,25

**feel** 22:9 25:11
29:10,11 45:19
65:17 81:22 87:7

100:16

**feet** 34:11

**felt** 90:18 91:22
100:14

**FF** 113:23 114:15

**fight** 101:6

**figure** 49:12 97:18

**figured** 33:1

**file** 26:5 28:10 48:5
49:22 50:18
51:20,22 52:3,13
60:7,13,14,17
61:12,13 62:14
68:12 73:6 91:24
110:11,14

**filed** 20:13 28:20
41:18 61:5 93:14
94:20 102:11
103:1 104:4,20
105:8,10

**filing** 73:16 105:7
106:1 107:21

**filings** 23:19

**fill** 39:9 94:14
99:4,12,21 101:8

**filled** 38:22 95:8

**filling** 95:6,21 96:1
100:1,2 101:15

**finally** 29:13 50:17

**financially** 113:15

**fine** 11:19 29:18
56:8

**finesse** 90:6

**fire** 34:11 76:14
96:1

**fired** 95:11,14,21

**firing** 101:24

**firm** 5:11

**first** 5:23 13:8,10

18:12 24:13 30:21
33:9 36:21
73:1,12 74:25
75:1,4 77:15 80:3
83:11 85:7 90:17
91:3,14 92:25
93:6,12 94:7
107:9

**firsthand** 43:21

**FIU** 13:8

**five** 17:19 23:4

**FL** 2:5,10,13

**flak** 18:20 43:7

**flashpoint** 56:12

**Florida** 1:1,8,18,25
2:9 5:7,8,10
8:8,25 61:11 64:5
102:5 113:2,6,22
114:2,14

**fluctuates** 10:5,13

**folks** 59:22 84:20

**foray** 85:2

**force** 31:5,6,11

**forefront** 33:7 85:5

**foregoing** 113:8

**forgot** 22:25 51:10

**form** 4:4 38:22
39:11 42:8 45:17
47:14 50:1,2
98:16 99:4,13
100:2 101:2
102:13 108:20
110:17

**formed** 108:18

**former** 60:3

**forms** 11:25
42:3,7,13,23
99:21 100:24
101:9 110:20

**forth** 13:11 25:17

**forward** 44:10 79:2
88:2

**forwarding** 84:12

**FPR** 1:24 113:22
114:14

**freedom** 19:21
45:18,20,22
57:20,22 66:14
67:1,3 68:18,24
91:14 92:19 93:3
94:16 104:14
107:15 108:16
109:21

**friend** 84:8 95:20

**friends** 84:16

**front** 100:20

**fulltime** 11:4

**funny** 16:19 19:4
89:1

─────────────

G

**gain** 45:25

**gambit** 10:23

**geared** 36:19 37:19

**general** 41:8 54:25
71:19 89:25 92:3

**generally** 84:10
111:12

**gestures** 6:11

**gets** 14:8 52:1
104:23

**get's** 94:8

**getting** 9:7 11:5
19:16 25:4 28:3
31:17 43:7 46:10
55:19 63:14 89:9
94:13 95:21

**given** 6:7 7:12
47:11 81:4

**giving** 34:12



42:5,11 52:20
85:4 88:23 90:1

**Glick** 97:6,12

**god** 23:13

**gone** 53:9

**gosh** 10:22

**grain** 16:24

**grand** 23:4

**grassroots** 17:13

**great** 22:14 92:10

**grievability** 59:23
75:20

**grievable** 50:4,5
51:12 59:24
60:4,5 66:17
75:25

**grievance** 18:16
19:10,17 20:11
23:19 24:10,15,20
25:2,16,17 26:6
28:11,20 41:1,17
48:5 49:22
50:18,21
52:3,5,13 53:5,6
54:21 55:8 57:24
59:22
60:8,11,13,14,17
61:4,12,14,23
62:14 63:2,8
68:13
73:6,12,13,16
74:5
78:1,7,9,10,18
79:4 82:12
84:20,22 85:7
86:1,10 90:20
91:24 93:14 94:20
95:4 99:22
102:10,21
103:1,18,19
104:9,20 105:16
106:2,25
107:1,3,4,22

108:8 110:12,15

**grievances** 11:18
24:9,25 25:18
26:22 50:9 52:8
78:3,13 86:2
98:10 103:14

**grievant** 26:15
60:14 62:21 84:21
85:8,13 107:9

**grievants** 86:4

**grieve** 47:17 48:23
49:23 50:10 51:19
60:21,25 62:10,21
63:23 64:1
99:15,18,21
102:6,10 107:10
110:5,6,8

**grieved** 93:25
110:23

**grieving** 49:8 68:24
85:2 87:3 94:12
102:17,18,24
107:2

**gritty** 89:9

**ground** 6:5
17:12,23

**grounds** 93:19

**group** 83:22 86:14

**groups** 28:3

**guess** 8:23 9:9
12:10 29:20 33:10
93:8 102:23 110:7

**guidelines** 38:5

**GUNSTER** 2:12

**guy** 19:17 21:9
22:10 56:17 66:5
90:2

**guys** 8:1 20:2 40:25
50:24 65:24 97:25

—————————
H
—————————

**hand** 6:11 20:23
113:17 114:8

**handable** 19:5 20:6

**handled** 19:14

**hands** 20:7

**happen** 16:3 31:15
56:11 61:25 69:20
107:13 108:9
111:21

**happened** 19:1
33:24 41:12 69:18
109:2

**happens** 41:11
42:18 76:14

**happy** 82:17

**hard** 42:6,12 72:2

**haven't** 51:7 103:23

**having** 5:23 10:24
11:24 32:14 33:14
63:11 70:18 76:5
92:9 102:2

**hazy** 67:15

**head** 6:11

**hear** 13:12 33:1
42:22 43:6 56:16
105:25

**heard** 26:14,17
33:11 42:19 43:24
50:15 63:1 65:1
87:17 96:19

**hearing** 97:3

**Heather** 34:6

**heel** 91:19

**Heffner** 2:8 3:5
5:17 7:22 41:2
42:8 102:13,15
112:7,12

**held** 9:17 33:18,20
47:9 64:5 103:10
112:1

**help** 15:4 22:12
78:11 81:2,12
90:5

**helped** 108:20

**helping** 22:16 79:9
88:14

**hereby** 113:6

**he's** 19:11,12
21:6,25 22:14
65:18 67:9,10,20
69:4,5 81:24
87:8,9 88:12,21
90:5 92:15 98:9

**hesitant** 41:11

**hi** 16:18 74:22

**hierarchy** 15:18

**high** 18:3

**higher** 48:1

**HILLSBORO** 2:4

**hire** 20:2

**hired** 10:12

**history** 28:17

**hit** 18:21

**hoc** 110:2,3

**hold** 37:4

**holding** 13:22 34:10

**honest** 12:11 14:16
20:21 26:2 38:16
43:18 47:24 49:11
52:14 59:9 67:15
73:17 75:8 78:16
88:12 89:21 90:11
100:20 103:23
106:18

**honestly** 14:17 18:3
19:3,15 22:14
23:5 24:19 26:8
27:7 29:7,17
30:10 37:2 38:19
45:15 56:12,14,17



73:22 82:5 100:17
102:20 111:5

**hope** 80:24

**hosted** 93:10

**hours** 22:25 82:17

**Huff** 2:12 5:19

**humanities** 33:15

**hung** 104:25

**hurt** 88:25

**hurting** 88:16

———————

I

**I'd** 16:17 48:25
65:17 101:5

**idea** 13:7,9 32:21
67:19 70:19 88:19
89:5 92:10 105:21

**ideas** 21:24 85:4
86:16

**identical** 82:6

**identifying** 11:1

**I'll** 17:13 28:1
38:16 43:5 47:15
48:14 51:16 54:2
59:8 63:5 81:6
86:7 89:2 90:3,11
93:23

**illegal** 48:22,23

**I'm** 13:22 14:9 15:1
18:1 20:16,21
21:23,24 22:4
23:8 27:21
28:14,19 34:16
35:9 36:20 38:11
41:11,24 43:3
46:22 48:20
49:1,7 50:23 51:1
56:25 57:6,8
58:25 59:14 62:24
64:3,16 66:6
67:25 68:23 71:22

72:10,15 75:16
76:23 77:15,18
79:15 81:1,23
82:15 83:10 84:24
88:20,22 94:12
96:4,19 98:22
99:9 101:13
103:5,13 104:12
105:4 108:24
111:20

**imagine** 10:5

**immediately** 51:24
54:7 62:19 76:6

**impersonal** 57:17

**implication** 107:17

**implications** 104:24

**implicit** 94:9

**implicitly** 106:22

**important** 17:7
89:22

**in-charge** 9:21
12:16,19 109:3

**incidental** 67:17,23

**include** 75:13
104:20

**included** 71:8
73:2,24 75:6,7,17
77:16 78:6,22
80:17 88:7 90:8

**includes** 77:17
83:23

**incomes** 33:16

**inconsistent** 80:1

**INDEX** 3:1 4:1

**indicated** 49:18

**indication** 41:22,23

**individual**
107:1,3,6 108:1

**individually** 107:16

**individuals** 60:24
76:5 80:19

**inevitably** 84:16

**influence** 6:22

**inform** 79:5

**informally** 24:18
25:6,7

**information** 13:5
85:10,17 86:18
90:1

**informed** 78:14
79:7

**initial** 28:11

**initially** 63:8

**input** 82:11 87:22
88:24 105:18

**inside** 68:1 87:15

**insight** 81:5

**instance** 57:10

**instances** 47:1 52:6

**institutional** 28:17
66:21

**instructor** 19:20
31:6

**instructors** 11:3
13:7 33:14 37:15
42:25 100:22

**instructor's** 31:20
34:11

**insubordinate**
48:11

**insubordination**
48:15,18 91:18
93:20 94:15 95:7

**insubordinations**
91:22 94:22

**interacting** 30:14

**interaction** 21:18
97:20

**interest** 17:8 33:5
65:10

**interested** 113:15

**Interesting** 21:21

**interim** 43:22

**intermediary** 12:24
98:3

**INTERN** 2:16

**internal** 84:25

**interpreted** 84:11

**interpreting** 102:23

**intervene** 20:3

**intervening** 22:19

**intervention** 15:15

**interviews** 46:1
92:15

**introduce** 5:13

**introduction** 6:4

**invite** 30:8 31:4

**involved** 9:7 19:19
25:21,22 26:3
28:3 54:6,17 55:7
59:20 61:22
73:13,20 78:2,6
85:19 86:4 111:8

**involvement** 70:4
105:15

**ion** 98:15

**irate** 45:24

**isn't** 35:6 36:19

**issue** 31:6,7 33:10
41:19 42:15 54:22
56:5 73:21 90:18
91:1,3,4 98:5
102:14 108:14

**issued** 54:15 73:11
83:6 84:1

**issues** 11:2,24 17:9
23:3 30:5,7,18



31:5,16 32:3
33:14 45:16 46:11
55:3,21 73:3 74:5
84:22 91:25 92:5
94:7 104:21
109:18

**it'd** 32:2 90:23

**it'll** 21:10 27:15
84:17

**it's** 6:9 8:5
9:4,7,13,18
10:6,14 11:14
12:21 14:12,19,22
15:6 16:2,7,19
19:3 20:5
21:14,15 23:1
25:12,20 26:12,23
29:13,18 30:20
31:23 33:6,19
35:3 38:1,2,8,9
39:10 44:17 46:8
47:25 48:3,9
50:5,14,17
52:14,23,24
53:2,23 55:5,7
56:5 57:14
58:2,18,25 60:5
61:3,8,9 63:16,18
66:2 67:1,4
68:9,17 69:25
71:24,25 72:2
76:10 77:1
78:8,25 82:24
83:11 84:3,24
86:11 89:1,22
90:23 91:5,8,14
92:3,16
94:9,10,13 95:2
98:5 99:25 102:4
104:10 105:20
107:15 108:4
112:16

**IV** 5:14

**I've** 7:18 8:5 22:5
26:17 38:16 89:6

96:19

---
### J
**James** 1:5 2:17
5:6,16 95:16
112:9

**January** 80:7

**Jeez** 82:23

**Jennifer** 12:21

**jeopardize** 58:3
76:21 79:3

**jeopardized** 107:6

**jeopardizes** 59:12

**jeopardizing** 58:17

**Jessica** 1:24 5:11
113:5,22 114:5,14

**Jesus** 18:25

**Jim** 17:20 33:13,21
35:15 37:3
51:9,10 57:21
83:23
84:4,13,14,16
90:15 92:4,7
95:5,16 99:8

**Jim's** 19:1,4 20:3
33:8,24 34:14
36:24 84:8

**job** 36:11 63:20

**jobs** 11:6 37:16

**Joel** 2:3 5:15

**JOEL@MEDGEB
OWLAW.COM**
2:6

**join** 11:23 55:19

**joined** 9:14

**joke** 69:24,25

**judgment** 86:19

**jump** 64:11

**June** 14:12 40:9

**Jupiter** 65:17

---
### K
**Katherine** 2:8 3:5
5:17 7:22,23,24

**Kathleen** 7:21

**Kelly** 43:11,19,21

**Kelly's** 43:23

**Kerry** 43:22

**key** 51:17

**KHEFFNER@CAI
R.COM** 2:11

**knew** 84:15

**knowledge** 28:18
37:12 40:17,22
44:6 45:1 50:23
56:20 57:5 62:14
64:7 65:2 73:25
109:18 112:8

---
### L
**language** 35:21
46:13 67:24
104:11,13 105:5
106:20

**largely** 9:24 16:7

**Larry** 97:6,12

**last** 50:17 77:13
104:4

**later** 25:24,25 26:12
43:4,6 46:14

**laughing** 88:3

**LAW** 2:4

**lawyer** 29:2,6 48:20
63:14 67:16 87:10
102:24

**lawyers** 63:4

**learn** 87:12

**learned** 13:8 30:15

111:5

**least** 11:17 12:1
56:13 62:18 74:25
83:15 102:1
106:19 108:12

**leave** 11:8 56:18
57:1 111:2

**leaves** 76:7

**legitimate** 36:9

**Lenz** 44:14 100:12
106:23

**Leo** 2:3 3:3 5:14 6:1
7:24 34:20 38:15
41:6 42:11 51:6
66:11 70:25
72:8,15 74:12
88:3 102:14,19
103:13,17
112:4,14

**Lester** 27:1

**let's** 6:4 8:13 15:8
48:21 56:1 63:15
64:21 67:7 68:3
84:9

**letter** 50:6,17,19
51:18,23 52:4
99:23 101:12
106:21 107:7

**letters** 43:25
106:4,11,12,16,20
108:2,11

**letting** 91:22

**level** 21:13,14,18
24:14 25:5 26:9
47:24 54:25 63:13
64:1 68:23 90:14

**life** 48:3

**like-minded** 82:4

**limits** 22:11

**line** 56:8



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

**link** 89:6

**listen** 21:7 39:24
   84:8,11

**listened** 35:15

**little** 20:16 24:8
   71:25

**living** 34:7

**local** 25:5

**located** 5:9

**long** 8:14,22,24
   22:25 27:20 52:7
   60:11 108:20

**longer** 19:11 28:7
   98:9,10

**losing** 63:20

**lost** 27:7 34:10

**lot** 8:6 11:10,14,20
   15:15 18:18,20
   19:10,25 27:9
   30:9,25 33:16
   45:24 56:14,15
   71:23 82:24
   98:9,10,22

**Louis** 2:3 5:14

**LOUIS@MEDGE**
   **BOWLAW.CO**
   **M** 2:6

**low** 10:8 11:5
   17:20,25 33:15

_____

**M**

**mail** 75:4

**mails** 84:4

**main** 11:1 15:15
   19:10 22:17 30:14
   46:11 55:16 85:2
   89:23 106:19

**mainly** 78:20

**major** 11:23 16:8
   23:2 30:7

**malleable** 10:15

**man** 90:2 96:11

**March** 69:21

**mark** 53:16 71:22
   72:10,11 79:14

**marked** 14:19
   34:17 38:12 51:2
   53:19 64:16 70:21
   72:4,16 74:7
   79:15 103:14

**MAROUN** 2:16

**Marshall** 80:16

**mass** 32:8

**matter** 5:6 21:15
   78:25 84:2

**may** 33:20 76:13

**maybe** 6:15 31:22
   33:21 56:19 99:8
   109:13

**mbud44@gmail**
   74:20

**McGetchin** 54:10
   60:24 64:5 70:18
   105:11 106:23

**mean** 9:1 10:22
   11:10,11
   12:3,10,13 15:24
   16:2,7,17
   17:10,20
   20:1,5,15
   21:12,25 22:4,5
   23:8,17 25:19
   26:1,3 27:19 29:5
   32:24 33:10,23
   36:8 38:3 39:20
   41:9 45:13,15
   47:21 48:20 49:13
   50:21 51:24,25
   52:19 53:13
   54:9,17 55:11
   56:19 57:6,8,13
   58:23 59:5,15,24

60:12 61:18
63:3,5,15 67:20
68:14,16 71:16
73:18 78:21,24
80:21 81:16 82:4
83:9 84:15,23,24
85:10 86:2,3,5,23
87:1,2,8,14
88:5,6,13,18 89:2
90:3 91:12 92:3
93:7 95:19,20
96:7,17 97:19
99:8,19 100:17,18
102:1,16,22
104:12 105:21
106:15 107:6
109:9 110:10
111:21

**meaning** 15:16
   28:12 31:6

**means** 13:4

**MEDGEBLOW**
   2:3

**Medgebow** 2:4 5:15

**media** 37:9 40:21
   49:10 89:18
   101:23 111:18

**mediary** 98:3

**mediate** 78:11

**medications** 6:24

**meet** 15:17
   22:22,23,24 30:4
   97:16

**meeting** 35:18 36:7
   39:21,22
   44:11,23,24
   45:8,12 63:17
   104:2 105:25
   107:19 108:13

**meetings** 13:12
   64:5 109:19

**member** 9:1,3,4
   28:11,12 45:13

46:14 47:10 52:3
56:21 57:16,18
65:11 67:8 69:4
76:14 95:25
100:20 102:8
107:1 110:6,8,14
111:16

**members** 9:14
   10:1,3,4,9 17:11
   31:1,11 32:9 37:8
   41:7,8,9 44:4,18
   54:24 56:9 73:15
   85:24 100:14
   101:22,24 106:1
   111:14

**membership**
   9:21,23 17:15
   55:15,17,22
   56:2,17 69:3,12
   73:20

**memo** 27:15 46:25
   61:17 62:1,3

**memorandum**
   45:10

**memos** 27:11

**mentioned** 39:21
   90:21

**Meredith** 69:13

**mess** 19:2

**message** 67:22
   71:17 72:8,11,19
   76:4 80:20,23
   83:11,15

**messages** 84:10

**met** 86:8 95:13,15

**Miami** 19:12

**Michael** 19:14
   20:4,17,18
   21:2,23 22:10,21
   40:10 60:23 75:25
   80:17 88:24 89:3
   96:25 97:13



98:8,14 99:3
100:3
**Michael's** 20:23
**micro** 36:15
**mid** 18:3
**might've** 35:13
96:22 97:23
**Mike** 47:25 68:25
69:2 74:17
75:7,13,23
81:11,24 82:10,14
83:18 84:16 85:1
90:3 111:4
**mind** 14:15 53:14
**minority** 56:16
**minute** 51:20
**minutes** 111:25
**minutia** 11:14
**misconduct** 93:19
**misreporting** 89:10
**missed** 63:2,5
**missing** 105:20
**mitigating** 61:24
**mix** 43:11
**mixed** 90:13
**Moats** 19:14
20:17,18,20
22:2,8 23:25
24:10,12 60:23
75:25 80:17 87:19
88:10,24 96:25
97:13,21 98:2,14
99:3 100:3
**moderate** 35:22
**moment** 37:13
**money** 23:10,12
66:3
**monitor** 66:4

**monitored** 65:9
**monitoring** 4:7
65:1,12
**monthly** 78:12
**mostly** 21:22 86:14
**motives** 86:20
**Mountford** 69:13
70:1,2 77:18
78:5,21
**move** 27:20 79:2
**moves** 25:9
**moving** 24:18
**multifaceted** 10:22
**multiple** 41:15 96:7
**murking** 92:1
**murky** 53:6 91:10
92:1 94:13
**myself** 21:22 49:13
55:9 84:15
85:8,19 90:4,21
**MySpace** 39:5

---

**N**
**n/a** 4:14,15
**narrow** 96:8
**narrowed** 104:10
**necessarily** 11:18
36:10 41:3 51:24
54:6 56:7 68:17
77:3 78:13 99:25
105:4 107:5
111:21
**negative** 90:18
**negatively** 56:9
**negotiating** 35:21
**neutral** 17:3
**nitty** 89:9
**nobody** 60:3,6

**nods** 6:11
**non** 41:8
**none** 16:15,16,17
47:22 110:14
**nonetheless** 27:8
93:13
**nonmembers** 17:10
**nor** 89:4 113:13,14
**normally** 63:9
**Notary** 1:25
113:5,22 114:14
**notes** 113:10
**nothing** 63:18
104:15
**notice** 4:5 50:7
52:12 54:5,12,15
59:23 60:4,8
61:14 62:7
73:5,10 82:21
93:18 94:1,21
101:12 105:7
106:13
**noticed** 104:14
**notices** 80:1
**notion** 45:25 48:1
**November** 52:11
54:12 55:13 59:19
61:4,6,14 62:6
93:15 94:1,21
**nowhere** 30:14
**numerous** 52:6

---

**O**
**OATH** 114:1
**object** 49:5
**objected** 23:18
**Objection** 41:2 42:8
102:13
**objectively** 63:16

**obligated** 47:5
**obligation** 100:7
**obviously** 23:6
48:21 57:23 73:18
76:17 77:8,13
88:6,21 92:4
106:15
**occasionally** 19:16
**odd** 84:19
**offer** 55:11
**office** 65:14,22
67:14 92:9,15
**officer** 9:10,11
**officers** 54:21 79:7
**offices** 66:4
**official** 20:20
113:17 114:8
**officials** 39:13
**Ogletree** 80:16
**oh** 10:22 15:8 46:21
58:21 64:13 77:4
80:14 83:12,21
87:14
**okay** 5:3
6:9,12,13,20
7:7,24
8:1,4,7,13,24
9:6,16 10:17
15:9,12 16:9
21:24 26:11,18
29:3,18 30:3 31:3
34:3 38:10
40:14,16 41:3
42:10 49:1
51:5,14 53:24
54:12 59:4
64:10,15,19,22
70:1,24 71:5,13
72:7,17,24
73:5,7,9 74:11,16
76:15 78:19
79:18,21 80:18



82:7,10,20,25
83:3 88:5 92:23
96:8 98:2 104:6
109:17 110:8,23
111:23 112:12,15
**old** 30:10 55:4
**older** 16:2 100:8,9
**onboard** 43:19
**ones** 16:20 77:9,10
**online** 35:24 37:10
39:16,19 43:2
44:1,5 101:9
111:18
**op-ed** 43:7 46:6,7
47:4
**open** 76:7
**operate** 86:8
**operating** 55:13
**operative** 52:12
61:6 108:3
**opinion** 88:23
**opinion-ed** 43:7
**oppose** 62:19
**opposed** 55:9
**option** 112:16
**ORANGE** 2:12
**ordeal** 97:10
**order** 75:1
**organization** 23:13
24:25 25:3
**organize** 11:22
85:12
**organizing**
17:4,13,23
**originally** 76:20
102:17
**origionally** 13:8
**ORLANDO** 2:13

**others** 23:18 70:18
78:3
**ours** 29:10
**ourselves** 15:17
16:21 20:19
**outlandish** 46:2
**outline** 24:21
**outside** 4:4 7:15
19:6 32:16,19,25
33:2,5,17,19,20
34:8,22 35:17
36:4,10,17,22
37:2,5,7,11,15
38:17 43:8 45:17
47:13 50:1 55:10
56:6 57:22,23
63:4 64:8 65:10
67:3 71:15
87:13,16 91:8
92:16 98:16
100:23 101:2,22
104:23 105:8
108:15 110:9
**outside-activity**
42:23
**outsider** 104:10
**outweigh** 90:19
**overextended** 27:23
**overprotective**
101:15
**overseeing** 11:17,18
**owned** 16:25
**Oxter** 12:20
16:10,14 22:22

----

**P**

**P.A** 2:4
**p.m** 1:16 5:5 112:18
**page** 3:2 4:2 39:1,2
75:1
**paid** 11:5,8 33:2,14

37:3
**PALM** 1:2 113:3
114:3
**paper** 14:24 46:9
47:5
**paperwork** 39:9,12
91:24 94:14
95:6,8,21 96:1
**paranoid** 65:22
**participate** 14:2
29:23
**participating** 39:16
85:14
**participation** 70:8
**particular** 70:5
84:10 104:11,13
106:6
**particularly** 28:1
33:15 37:14 66:5
85:25 99:4
**parties** 113:12,13
**party** 7:14
**passes** 59:12
**passionate** 100:13
**past** 17:18 85:20
**pay** 34:7
**people** 9:13
10:12,13,15
11:20,22
13:2,17,18 16:22
21:19 24:17,20
30:8,16,18,20,23,
25 31:12 32:3
34:7 37:1 41:4,9
50:13 52:6 55:19
56:3 59:10 63:4
76:19,25
78:2,6,9,10,14
79:5 85:4,9,18
86:6,7,10,16
87:3,4 90:4 96:7

98:7,12 100:19
101:14,15 102:21
108:1,11 109:1
**people's** 66:4 78:14
**per** 10:12
**percentage** 10:6
18:5
**perfect** 19:2
**Performance** 76:11
**perhaps** 47:24
51:25 53:25
**period** 28:8 52:7,9
59:13
**permission** 34:12
45:25 46:5
**Perry** 43:22,24
45:10
**person** 12:18 19:10
20:18 21:2,10
30:14 51:25
52:1,5 53:5 55:8
59:20
63:6,10,13,14,22
65:18 67:25 79:4
85:8 87:2 88:2
89:23 101:14
**personal** 37:10
63:18 67:9 112:8
**personalize** 58:10
**personalizes** 57:24
**personally** 36:25
114:6
**person's** 65:17
**perspective** 20:8
48:17 104:10
**piece** 43:7 47:4 96:1
**pinpoint** 50:20
**pinpointing** 68:20
**Plaintiff** 1:6 2:2,17



**Plaintiff's** 34:18
  38:13 51:3 53:20
  64:17 66:8 70:22
  72:5,12 74:9
  79:16 87:25
  103:15

**plan** 4:7 65:1 112:9

**play** 94:22

**please** 5:12 83:18

**point** 13:5 20:18
  21:2 45:5 46:11
  57:8 87:12 90:2

**policies** 100:5

**policy** 32:16,20,22
  34:21,22,25
  35:11,25 36:18
  37:7,11,18 38:6
  39:18,22 40:2,18
  44:15,25 45:3,11
  64:9 66:11,13,16
  100:8,9 101:18
  104:11 107:24
  108:15

**Poole** 18:25 19:19
  21:21 57:19 68:16
  107:8 108:21

**Poole's** 107:14

**popular** 90:16,24

**portfolio** 63:7

**position** 56:10

**positions** 9:16

**possible** 47:3 96:23

**possibly** 28:7
  106:13

**post** 32:10

**post-tenure** 76:10

**PR** 38:9 51:2 59:23
  64:12,16 66:7
  72:1,4,11,16,18
  73:8 77:12,15
  79:15 82:22 87:24

90:8,22 103:14,15

**PR1** 4:3 34:17,18

**PR10** 4:12 74:9

**PR11** 4:13 79:16

**PR12** 4:14

**PR13** 4:15

**PR14** 4:16

**PR15** 4:17

**PR2** 4:4 38:12,13

**PR3** 4:5 51:3 52:11

**PR4** 4:6
  53:16,19,20

**PR5** 4:7 64:17

**PR6** 4:8 66:8

**PR7** 4:9 70:21,22

**PR8** 4:10 72:5

**PR9** 4:11 72:12

**Pre-bargaining**
  15:16

**precedent** 95:22
  101:18 102:4,6
  107:12

**precisely** 17:22

**prepared** 16:1

**present** 2:15 10:17
  70:14 90:6

**presidency** 12:19
  33:9 37:14

**president** 9:18
  10:21,25
  11:3,9,14
  12:9,11,13,20,21
  13:16 15:7,11
  16:10,11
  18:4,11,19 19:3
  20:1 21:17 22:25
  23:5,22 24:1
  26:2,8 28:15
  30:6,11 31:25

32:15 33:7,8,12
  34:5 36:25
  43:11,21 54:5
  55:5,8 56:14
  57:7,10,11 59:21
  60:3,23 63:4
  68:14 69:14,15,16
  74:2 78:8,15,17
  80:12 82:12 83:6
  84:1,6,19
  85:6,19,23 89:22
  90:12 92:5 97:11
  107:14 109:4

**presidents** 22:23,24
  23:2 31:13

**press** 15:19 46:1
  89:25 90:6,9,13

**pretty** 11:4 18:2
  35:9 50:14 88:2
  98:1 100:13,19

**prevailed** 40:6

**previous** 16:5

**prides** 21:11

**print** 14:25

**prior** 45:25 46:24
  47:21 92:8 108:11

**prison** 18:20

**privacy** 86:5

**privy** 45:2 61:21
  75:21 78:17 89:3
  96:17 103:8
  106:19

**probably** 15:5
  70:10 82:18

**problem** 79:9,22
  86:21,23,24 88:10
  106:20

**problematic** 19:18
  76:20

**problems** 59:17
  108:7

**proceedings** 113:8

**process** 18:16 25:24
  26:12 27:6,21
  50:21 73:14
  78:1,7 90:20
  108:16 109:21

**produced** 83:15

**Professor** 5:15
  8:19,20 18:12
  23:9 26:13
  28:19,21,24
  40:2,19 41:18,20
  42:2,5,11,19
  44:3,7,14 47:13
  49:25 54:13 55:21
  56:22 57:4,12
  58:6,13 60:16
  61:1,12,23
  62:13,20 64:1,6
  66:22 67:7 70:1,5
  73:2,24 74:3
  75:20 77:17
  78:5,21 79:9,23
  81:2,12 83:7 84:2
  85:13 86:18,22,24
  88:25 91:2 92:20
  93:13,25 95:15
  96:2,11 98:14,15
  99:20 100:12
  101:17 102:6,9
  103:2 104:7
  110:23
  111:1,6,10,17

**professors** 100:22

**Profit** 12:21

**progression** 54:3

**promises** 7:12

**promotion** 50:14
  63:18

**promotional** 11:6
  13:7 31:8

**promotions** 31:21

**protected** 94:4



104:16

**protection** 67:11

**protest** 49:5

**provost** 10:25 31:25
43:22 50:16

**public** 1:25 19:22
90:19 113:6,22
114:14

**publicity** 19:22
90:18

**pulled** 47:7

**pursue** 107:16

———————
Q

**question** 40:13 46:5
52:2 59:3 64:22
74:15 76:7 77:25
85:22 90:25 94:10
96:8 104:19

**questioning** 35:16
85:17

**questions** 6:16

**quick** 103:6 111:25

**quickly** 30:13,16
54:19 79:2

**quite** 18:3 22:14
23:5 24:19 26:8
27:7 29:6,17
30:10 37:2
56:12,14,17 61:25
73:22 82:4
100:17,20 102:20
111:5

**quote** 29:12

———————
R

**radar** 31:16

**rails** 65:19

**raised** 109:19

**raises** 11:7

**rally** 13:18

**rather** 29:16 65:17
92:17

**Ratified** 14:12

**Raton** 1:18 5:10

**reacted** 56:9

**reading** 53:7 77:7
89:8 112:19

**real** 11:14

**realize** 52:7

**really** 8:12 11:13
12:11,23 15:14,21
16:17,18 17:7,12
19:9,19,22 21:22
28:5 29:19
30:13,16 32:21,25
33:7,8 43:19,20
45:24 47:23 50:16
53:18 54:19 55:23
56:11 57:17 63:23
65:21 67:15 77:25
84:17 89:22 90:19
91:7,15 98:24
100:21 106:8,18

**reason** 7:1 28:19
48:5

**reasoning** 98:20,24

**reasons** 41:15

**recall** 6:15 20:22
25:14 32:11,14
35:13 37:13 42:16
45:9,18,21,22
51:10 53:4
60:18,20
70:4,7,8,16,20
71:9 73:4,17,23
74:1 75:8 76:4,25
77:6,8,10
80:6,10,15,22
87:17 89:16 96:22
97:3,24 103:24,25
108:13 109:9,10

**receive** 38:5

**received** 52:24 53:2
82:11

**recent** 14:10

**recently** 12:22
65:20 69:18

**recognize** 38:15
51:6 64:20,23,24
66:11

**recognized** 11:5

**recollect** 72:2

**recollection** 34:24
53:25 71:6 75:18
77:19 83:5,25
88:9 89:14 109:7

**record** 5:4,13 6:10
33:4 34:19,20
38:11,14 51:4
53:21 64:18
66:7,9 70:23
72:6,10,13,18
74:10 79:17 88:1
103:11,16 112:2
113:9

**recording** 68:7
92:14,21 109:7

**recourse** 62:20,23
63:1 102:9

**recruit** 9:14 22:12

**recruiter** 9:11,12
22:14,17

**recruiting** 9:21,25
10:1 22:13
69:3,11

**re-delegated** 22:5

**refer** 83:10

**reference** 67:6
104:14

**referred** 108:23

**referring** 34:21

41:24 59:23 67:1
71:11 72:9 83:10
84:3 88:12 108:14

**refresh** 34:24 53:25
71:6 75:18 77:19
83:5,25 88:9
89:14

**refuse**
48:12,18,24,25

**regarding** 8:8 54:12
59:22 64:5 75:19
80:9 83:7 89:11

**regardless** 76:14
84:5

**regularly** 98:4
109:20

**related** 89:4

**relationships** 53:7

**relative** 113:11,13

**relatively** 29:12

**release** 90:9

**rely** 49:14

**remember** 18:12
20:22 21:1 22:4
23:3,6 25:11
27:20 33:22 34:4
35:12 36:24 40:11
52:14,17,23 53:3
54:2,7,14,16,18
60:16 63:11 68:19
69:21 75:9 78:16
80:12,14 86:12
87:10,14 89:17
92:7 95:17 97:3
98:19 99:6,7
106:17

**remembers** 17:21

**rephrase** 6:19

**replaced** 53:11 54:1

**report** 4:4 32:4,5,7
39:7 40:20



41:4,16 49:19
98:12 113:7

**reported** 1:24 41:10

**reporter** 1:24
5:3,11 6:9 46:4
112:13,15
113:1,5,22 114:14

**reporters** 46:9

**reporting** 5:12
101:25

**represent**
5:15,18,20 17:1
26:15 30:9,18
46:8 57:11 78:10

**representative**
78:11 96:16 97:21

**represented** 20:10

**representing**
46:15,17,18 63:6
79:4 85:6 87:4,9

**reprimand**
51:18,19 68:22
99:23 106:21

**REQUEST** 4:17

**require** 40:19 42:2
68:7

**required** 47:2

**requiring** 42:12,22

**research** 31:9,22

**resign** 56:3

**resolve** 24:18

**resolved** 25:5 41:19
98:23

**respect** 13:19 16:9
18:15 23:19 24:9
35:25 41:19 56:2
61:14 70:1 73:2
75:1 77:25
85:5,25 93:15
94:21 102:14

**respond** 6:14
80:9,20

**responded** 80:22

**responding**
73:18,23 77:14
81:25

**responds** 78:22

**response** 60:8 62:16
75:11 83:14

**responses** 6:16

**responsibilities**
10:21 60:10

**responsibility**
66:15 68:19,24
69:11

**resumed** 103:12
112:3

**retire** 10:14

**retired** 69:5

**review** 4:17 76:10

**revised** 35:2

**revisions** 16:3

**rid** 76:18

**ridiculous** 36:17
37:1 43:9 46:3

**rights** 58:11,15
59:10 66:20 68:13

**Road** 1:17 5:10

**robe** 1:15 3:2
5:1,6,22 49:25
72:21,22 114:6

**role** 18:15

**room** 7:15 30:18

**root** 95:7

**roughly** 10:5 17:16
52:22 61:10

**round** 54:13

**route** 102:4

**rules** 6:5 27:9

**run** 10:23 21:24

**running** 106:1
107:21

---

## S

**sabbatical** 9:19
43:14,18 53:14

**safe** 24:16 73:11

**safer** 92:11

**Sara** 2:12 5:19

**Saunders** 30:12

**save** 14:24

**saw** 31:14 55:24

**school** 67:8,9 68:4
82:15

**scope** 37:10

**seal** 113:17 114:8

**second** 36:11 54:13

**secret** 88:6

**seeing** 81:9 92:7,9

**seeking** 42:6

**seem** 12:4 86:14
93:9

**seemed** 19:6,7,17
20:5,6,7 21:25
36:24 46:2

**seems** 12:4 19:4
23:12 36:16,22
37:23,24 56:13
91:6 93:7

**seen** 38:16,18
51:7,9

**select** 59:1

**selectively** 58:20

**semester** 11:1 12:25
22:22 30:5 31:15
32:4 33:21,25

69:6

**senate** 12:25 16:18
22:23 35:15,18
36:7 39:21
44:11,22 45:8,24
108:5,25 109:4,19
110:4

**senators** 13:2

**send** 32:8 37:15
50:6 101:11

**sending** 43:25

**sense** 7:17 13:10,14
15:18 16:25 24:12
61:13 84:14 107:4

**sensitive** 83:20

**sent** 37:6 51:10 82:8

**sentiment** 43:13

**September** 35:18
39:21 44:10
100:12 105:24
107:18,19 108:23

**series** 24:16 71:18

**served** 97:21

**serves** 69:8

**service** 20:24 21:8

**serving** 98:2

**setting** 102:6

**settled** 28:23

**settlement** 40:8
41:18 42:18

**Shane** 84:15

**share** 82:14

**she's** 12:23
69:14,16 70:15
71:11 77:14

**shooting** 86:16

**short** 103:10 112:1

**shortly** 80:7 95:11



**shot** 109:8

**should've** 41:10

**showing** 34:16
38:11 81:23

**SHUFF@GUNSTE
R.COM** 2:14

**sick** 24:7

**sign** 47:17 49:6
91:21,24 101:16

**signature** 15:2

**signatures** 14:21

**signing** 34:11
112:19

**signs** 50:17

**similar** 16:7 50:18
110:17

**Similarly** 85:6

**simple** 6:9

**simplify** 93:23

**Sine** 8:23

**singled** 44:8

**sir** 6:8

**situation** 66:23
75:24

**six** 8:23

**smarter** 93:1

**social** 37:9 40:21
49:10 101:23
111:18

**somebody** 16:1
26:16 36:11,14
43:6 63:9 65:14
67:4 96:4

**somehow** 46:7
100:2,11

**someone** 76:21
80:23

**somewhat** 11:17

52:22 72:2

**somewhere** 15:6

**sorry** 7:23 15:1
20:22 34:4 48:13
64:11 71:22 93:23

**sort** 11:1 18:22,23
20:2,18 22:15
31:14 33:18
36:5,6 54:4 55:24
57:8 59:1
69:10,11 71:19
81:7,8,9
91:13,18,24 92:5
93:11 95:3 106:21

**sound** 30:17 57:17
83:2

**sounds** 20:24,25

**SOUTHERN** 1:1

**space** 30:20

**SPE** 76:9,15,18

**speak** 7:20 8:7
24:20 30:19,20
41:9 67:10 81:19
84:21

**speaking**
46:21,22,23 48:15
63:16 91:1

**specifically** 96:19

**specificities** 53:13

**specificity** 55:1,10
106:23 109:10

**speech** 43:2 44:5,14
45:18,20,22 57:22
58:14 67:3 68:7
93:3,21 94:16
100:13 104:15
111:18

**spite** 106:17

**spoken** 7:14

**sporadic** 77:1

**ST** 2:9

**stabilized** 18:3

**stadium** 18:20 28:4

**stages** 25:5,7

**stake** 58:4

**stamp** 104:3

**stand** 100:10 110:1

**standing** 109:23

**start** 6:4 50:21 61:7
101:24 102:18
106:1

**started** 17:20 30:21

**starts** 24:18

**state** 1:25
12:11,18,25 20:19
21:13,18 22:25
23:7 24:25
25:2,11 26:22
27:5 31:7 46:18
47:24 63:12,25
78:11 113:2,6,22
114:2,14

**statement** 89:20

**states** 1:1 22:23
51:23

**Statewide** 12:14

**station** 13:3

**stay** 111:6

**STE** 2:4,12

**step** 24:21 28:13
29:13,14

**steps** 24:17

**Stomp** 18:25

**stopped** 29:12

**straight** 61:8

**strategizing** 9:24

**strike** 9:4

**strong** 15:14

**struck** 46:19 91:18

**structure** 11:6 13:7
24:13

**student** 18:21

**studying** 31:7

**stuff** 14:23 19:9,18
27:2 46:10 69:12
73:20 78:18 82:5
84:5 87:16 97:25

**stuffs** 9:15

**subcommittee**
110:3

**submit** 25:2
42:3,12,23 47:13
98:15

**submitted** 42:6
100:24 101:2

**subordination** 48:7

**suddenly** 54:4

**suggesting** 58:19

**Suite** 1:18 5:10

**summer** 10:13

**supervisory** 21:3,6

**supplement** 33:16

**support** 90:16

**supposed** 68:8,9

**sure** 6:17 11:15
14:14 21:23 22:4
27:21 35:9 44:22
53:22 68:23 71:7
77:18 82:1,15
96:4,19 100:18
102:4 110:16

**surprised** 41:3

**Sustained** 76:11

**sweep** 65:24 66:2

**sworn** 5:24 114:7

**system** 12:18 31:8



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

---

T

**table** 7:15

**tabled** 109:12

**tag** 69:11

**talents** 22:11

**talk** 8:1,11,13 16:21
17:10 24:19 30:6
31:10 49:11 56:1
60:24 70:13 74:3
82:15 84:4,14,17
85:8 89:18 92:4
108:13

**talked** 20:4 22:17
54:24 56:4 78:1
82:15

**talking** 9:13,25
17:6 18:1 20:17
25:8,10 33:4
34:5,21 36:7 41:6
56:15 60:9 66:3
67:21 73:14
86:6,9 103:14
106:7

**Tallahassee** 12:21

**tamed** 30:24

**TAMPA** 2:10

**target** 39:19

**targeted** 44:4 58:14
102:7,8 104:16

**targeting** 93:21
94:3

**task** 31:5,6,11

**teach** 34:12

**team** 15:14

**teams** 69:11

**technicalities** 95:2
105:1

**technicality** 91:17
93:4,10

**technically** 48:15

**telephone** 59:21

**tempting** 102:1

**tenure** 50:14
63:7,9,11,18
76:21 95:23,25
96:3,12 100:19

**tenured** 8:20,22
76:14,19 101:24

**terminate** 112:9

**terminated** 79:23
102:9

**termination** 26:14
73:11 80:8 82:21
93:18 101:4,17
104:7

**terms** 10:15 17:3,14
21:15 25:14,15
26:19 27:20 33:1
34:9,14 35:14
45:6 61:18 68:2
75:22 76:20 82:6
84:25 85:2 86:20
90:5 91:7 92:6
97:16 100:9

**testified** 5:24 99:12
100:23

**testify** 7:2

**testimony** 7:10,16
8:9 99:11

**textbook** 68:21

**thank** 80:13

**Thanks** 83:18

**that'll** 9:8

**that's** 9:22 12:4
14:8,10,24 16:5
17:7 20:25 21:7
22:18 29:8 30:19
32:21
36:5,6,13,20
37:22 43:1,19

50:9,20,22 52:2
58:3 59:2,5
63:21,22 64:13
67:12,15 69:24
72:8,18 73:8,10
74:20 75:16 85:11
89:13 91:19
95:2,3,22 99:17
101:19 102:2,4
107:25 108:3,8,17
109:13,14 111:4
112:12

**themselves** 5:13
15:22 27:24 28:8
30:9,19 108:2
109:22

**theoretically** 67:13
68:9

**thereafter** 95:11

**there's** 7:4,5
12:4,17 13:20
16:5,19 27:9,11
36:8 37:12 40:23
44:11 51:25 52:7
56:8 58:4 59:13
60:7,12 61:17
69:19,22 77:14
80:16 98:21
100:20 106:4,7
108:6

**Thereupon** 5:21
34:18 38:13 51:3
53:20 64:17 66:8
70:22 72:5,12
74:9 79:16 87:25
103:10,15 112:1

**they're** 10:22 12:2
24:14 25:16 46:21
86:4 91:17 94:6
100:7 109:22,24
110:1,2,3

**they've** 35:1,2

**Thirteen** 8:15,16

**thoroughly** 58:24

**thread** 83:15

**threat** 57:2

**threaten** 63:14

**threatened** 63:4

**threatening** 43:25
48:3 101:12 106:4

**threats** 7:9 57:1

**three-year** 35:10

**throughout** 10:16

**throwing** 23:12

**till** 50:16

**Tim** 106:23

**timely** 62:22 79:1,2

**timestamp** 75:3

**tips** 13:10

**title** 8:18 20:20

**titles** 9:16

**today** 6:2 7:10
38:12,20,21
51:2,8 70:25
101:8

**Today's** 5:4

**Tom** 12:20 16:10
22:22

**top** 11:23 22:1
74:13,25 83:11
91:17 97:22

**totally** 20:16 48:4

**touch** 40:12

**towards** 36:19
37:19

**Tracy** 1:5 2:17
5:6,16 18:12
28:20,21,24
40:2,19 41:18
42:2,5,12 44:3,7
56:22 57:4,12



60:16 61:1 62:21
67:7 73:24 74:3
79:9,23 81:2,12
83:7 84:2 85:13
86:18,22,24 88:25
91:2 92:20
93:13,25 95:15,16
96:2,11 98:14,15
99:20 102:6,10
103:2 110:23
111:6,10,17 112:9

**Tracy's** 26:13 41:20
42:19 54:13 55:21
61:23 62:13
64:1,6 66:22 70:5
73:2 75:20 101:17
102:18 104:7
111:1

**transcribe** 113:8

**transcript** 39:24
113:9

**transition** 69:22

**transmit** 67:22

**trap** 94:25

**traps** 90:9

**travelling** 8:5

**tricky** 50:9 56:5
67:12 90:11 94:8
104:23 107:25

**tried** 30:11 87:8

**true** 89:13 113:9

**trump** 94:15

**Trustees** 1:8 5:7

**truth** 8:3

**truthful** 7:5

**truthfully** 7:2

**try** 24:17 40:18
58:1 63:21
76:13,18 90:4,20
93:23

**trying** 6:10 11:22
13:18 14:9,24
15:1 16:22 18:19
29:8 43:3 78:25
81:2,11,17,18
86:17 91:17
93:4,5,9 94:14,16

**tsunami** 19:2

**turn** 50:1

**tweet** 68:4

**Twitter** 36:16 39:3
47:14 49:4,10,19
50:1,2 101:23

**type** 31:8

**types** 91:16

**typically** 30:6

———————
U
———————
**UFF** 7:17 10:3 11:9
12:6,13,15 13:3
16:11,18 20:14
21:11 22:23 24:13
27:13 64:1 69:14
73:15 80:19 85:7
87:13,19 88:24
89:17 93:13
110:9,11,14,22
111:2 112:9

**UFF-FAU** 4:6 5:18
9:17 28:10 32:12
41:18 52:3 53:23
56:21 63:6 70:9
85:23 90:1 93:25
109:24 111:10

**ultimately** 25:4

**UM** 19:12

**umbrella** 12:6

**Um-hum** 6:6,18
8:17 17:17 18:10
19:24 23:21
24:2,23 27:25
40:7 49:2 71:12

74:11 75:12 89:7
99:16 100:15
105:12 110:25
111:15

**unaware** 40:23
59:11

**uncertainty**
100:13,16 101:1

**unclear** 6:17 36:21
61:9 80:2

**uncompensated**
36:19

**undersigned** 114:5

**understand** 37:19
83:19

**understanding**
27:12,15 32:19
41:17 43:10 61:17
62:2,4 89:6,8,10

**unevenly** 37:22

**union** 9:18 19:2
20:1,8 21:17
25:23 26:15
30:3,6,19,25
31:1,10 34:5
36:25 40:4
47:16,19,22
49:12,14 55:18
56:18 57:4 58:22
59:4,5,11 60:17
67:25 68:1 69:7
92:5 100:20 102:2
106:15

**union's** 60:9

**unit** 10:11 20:24
21:8 32:9

**United** 1:1 8:8,24
61:11 64:4 102:5

**Universal** 5:12

**universities** 31:8

**University** 1:8 5:7,8
8:8 10:11 12:18

18:18 19:12 27:22
28:24 30:10 32:1
33:17 35:14 36:13
37:6 39:12,13,15
40:1,17,20
41:1,14 42:13
43:23 44:8
46:3,6,8,15,19,22
49:18,25 57:23
66:16,24 67:13
68:1,22 70:6
91:6,11 92:17
93:1 96:16 100:14
101:21 104:17
111:19 112:10

**University's** 18:13
79:25 101:18

**unjust** 34:9

**unlawful** 48:12,19

**unless** 48:3

**unpopular** 90:14

**unprofessional**
46:2

**unusual** 29:4

**update** 79:2

**updated** 78:13

**updates** 19:16

**upon** 49:14
99:22,25

**upset** 36:6

**useful** 22:16

**usually** 13:1 15:6
21:14 27:15 31:23
32:2,4 36:13 52:5
57:7 67:1 107:4
108:4,8

**utilizing** 34:15

———————
V
———————
**vagaries** 36:5

**vague** 23:9 33:6



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

36:1 44:25 55:11

**vaguely** 35:12

**vagueness** 39:22

**varied** 30:21 32:2

**various** 13:14 33:2

**verbal** 50:8

**verbally** 6:14 80:5

**versa** 12:3

**versus** 53:1

**vet** 90:5

**vetted** 24:25 25:14

**via** 70:5

**vice** 12:3 69:15
  78:16

**victims** 100:8

**video** 5:4,5

**VIDEOTAPED**
  1:15 5:1

**view** 106:16

**violated** 66:17
  68:13 76:2 93:15
  94:11

**violating** 93:20

**violation** 63:19,24
  68:18 94:5

**violations** 59:10

**vocal** 56:16

**vocalizes** 88:21

**vs** 1:7 5:7

**vulnerable** 58:18
  95:6 100:2,18

---
W
---

**wage** 34:7

**waging** 19:22

**wait** 46:4 49:22
  50:16 52:7

**waive** 112:16,17

**waived** 61:13
  112:20

**waiving** 58:9,11,14

**warning** 106:11

**wasn't** 9:20 14:4
  15:13 20:9 21:22
  22:21 24:11 33:6
  37:3 45:2 53:13
  54:6,17 56:14,15
  57:20 61:22 70:14
  75:21 84:9 86:12
  87:15 91:12 92:4
  102:16,21 103:8
  104:22 105:5
  107:8

**water** 92:2

**ways** 31:12 37:25
  73:19 85:16 86:13
  89:2 93:6 94:9
  98:8

**website** 14:11 19:9
  32:10,12 35:24
  53:23

**weeds** 20:16 106:18

**weekends** 53:3

**we'll** 78:14 79:13
  83:10

**well-received** 44:19

**we're** 5:3 12:16
  13:17 17:1 19:21
  21:20 22:20 23:11
  25:4,8,9 31:21
  33:4 56:15
  57:16,17,18
  59:11,17 60:9
  66:3 67:21,25
  68:2,8 74:7 78:12
  80:13 81:14,17
  82:14 92:2 94:18
  98:5 100:19
  103:14 104:1

112:4

**WEST** 1:2

**we've** 24:12 47:15
  50:15 100:8

**whatever** 23:16
  27:18 30:5 46:25
  56:9 57:19 109:1

**whenever** 41:11
  81:17 82:17

**whether** 47:2 52:14
  59:20 75:19 77:19
  83:6 84:1 88:10
  94:10 104:19

**whoever** 9:22 12:12
  46:21 47:12 57:15
  78:9 85:1 87:10
  89:23 94:12 98:2

**whole** 18:16 71:2,4
  74:13,14 93:10
  108:1

**whomever** 13:1

**who're** 46:10

**who's** 58:14 69:2,13

**who've** 13:2

**win** 25:16,17 26:25
  50:15 63:17 90:16
  99:1

**window** 63:2 73:6
  108:4

**wish** 41:12

**witness** 3:2 5:23
  7:21 112:17,20
  113:17 114:8

**wont** 41:15

**work** 13:10,11 30:2
  34:8 68:10 90:20
  98:9

**worked** 8:14 53:5

**working** 36:11,12
  52:15 61:9

**works** 69:6

**worried** 20:9
  101:11

**worry** 100:21

**would've** 91:23

**Wow** 18:24

**wraps** 19:18

**write** 74:22

**writes** 75:23

**written** 47:6 76:20

**wrong** 7:5 18:18
  35:22 81:1

**wrote** 74:23 75:13
  77:9 80:24

---
Y
---

**Yamato** 1:17 5:10

**You'll** 41:3

**yourself** 25:13
  100:1

**you've** 38:18,22
  47:6 100:24

---
Z
---

**zdoug2014** 75:11

**Zoeller** 8:11 47:20
  53:12 57:11 59:21
  60:23 64:5 70:18
  73:12 74:3 75:11
  80:13 82:12 83:6
  84:1,6,15,20
  86:17,21
  87:7,12,19 88:24
  90:1 96:21 103:25
  105:10



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com