# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# CASE NO. 9:16-CV-80655-ROSENBERG/HOPKINS

JAMES TRACY,

      Plaintiff,

v.

FLORIDA ATLANTIC UNIVERSITY
BOARD OF TRUSTEES a/k/a
FLORIDA ATLANTIC UNIVERSITY,
et al.,

      Defendants.

_____/

## OMNIBUS ORDER ON ALL PENDING MOTIONS FOR SUMMARY JUDGMENT

This is a case with two competing stories. One such story is by the Plaintiff in this case. Plaintiff brought this suit alleging that he, a tenured university professor, was fired from his position because of his exercise of his First Amendment rights. A second story is told by Plaintiff's former employer, a university, together with members of the university's faculty. Defendants' story is that Plaintiff was fired because he refused to comply with university policies and procedures.

Before the Court are three motions: Plaintiff's Motion for Partial Summary Judgment [DE 247], and two Motions for Summary Judgment [DE 242] [DE 245] filed by Defendants. Each Motion has been fully briefed. For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is denied and Defendants' Motions for Summary Judgment are granted in part and denied in part.

## I.      BACKGROUND AND INTRODUCTION

The Court sets forth below some of the facts in this case for background purposes. Although the Court has endeavored to only set forth undisputed facts, to the extent disputed facts

below are germane to the Court's ultimate decision, those disputed facts are discussed in the Court's analysis section, *infra*.

Plaintiff, James Tracy, was a tenured professor at Florida Atlantic University—a Defendant in this case. DE 246 at 1. Plaintiff taught in the School of Communications and Multimedia Studies. *Id.* Some of Plaintiff's courses included "Public Opinion and Modernity" and "Culture of Conspiracy." *Id.* Plaintiff conducted research in mass shootings, the JFK assassination, and the Sandy Hook Massacre—a mass shooting event in which many children were reported to have been killed. *See id.*

In December of 2012, Plaintiff began to blog about the Sandy Hook shooting. DE 248 at 2. Plaintiff's blog suggested that the Sandy Hook shooting had never taken place and was "staged by the government to promote gun control." *Id.* Plaintiff's blog garnered national attention and was widely reported by the press. *Id.* Many people called on FAU to fire Plaintiff. *See id.* at 2-9.

In January of 2013, FAU began to have internal discussions about Plaintiff's blog. *Id.* Ultimately, FAU issued a notice of discipline to Plaintiff pertaining to his lack of an adequate disclaimer (drawing a distinction between Plaintiff's opinions and FAU's opinions) on his blog. *Id.* at 3. Plaintiff's union defended him. *Id.* The parties eventually reached an agreement wherein Plaintiff used a disclaimer on his blog that was to FAU's satisfaction. *Id.* at 4.

After Plaintiff amended the disclaimer on his blog, he continued to teach courses at FAU. DE 246 at 5. In October of 2015, however, a new dispute—a contractual dispute—arose between the parties. *Id.* at 6. FAU has a Collective Bargaining Agreement (the "CBA") with its faculty. *Id.* at 2. The CBA contains many terms and conditions, including an article entitled "Conflict of Interest/Outside Activity." *Id.* This article, hereinafter referred to as the "Policy," imposes certain

conditions upon faculty members.  DE at 131-33.  One such condition of the Policy is that

"[c]onflicts of interest are prohibited."  *Id.* at 131.  A conflict of interest is defined as:

> (1) any conflict between the private interests of the employee and the public
> interests of the University, the Board of Trustees, or the State of Florida, including
> conflicts of interest specified under Florida Statutes;
>
> (2) any activity which interferes with the full performance of the employee's
> professional or institutional responsibilities or obligations; or
>
> (3) any outside teaching employment with any other educational institution during a
> period in which the employee has an appointment with Florida Atlantic University,
> except with written approval of the Dean.

*Id.*  The Policy also imposes certain reporting requirements upon faculty, including the following:

> An employee who proposes to engage in outside activity shall provide his or her
> supervisor a detailed written description of the proposed activity. The report shall
> include where applicable, the name of the employer or other recipient of services;
> the funding source; the location where such activity shall be performed; the nature
> and extent of the activity; and any intended use of University facilities, equipment,
> or services. A new report shall be submitted for outside activity previously reported
> at the beginning of each academic year for outside activity of a continuing nature
> and whenever there is a significant change in an activity (nature, extent, funding,
> etc.) The reporting provisions of this section shall not apply to activities performed
> wholly during a period in which the employee has no appointment with the
> University. Any outside activity which falls under the provisions of this Article and
> in which the employee is currently engaged but has not previously reported, shall be
> reported within sixty (60) days of the execution of this Agreement and shall
> conform to the provisions of this Article.

*Id.* at 132.  Importantly for this case, the CBA contains a mandatory grievance procedure that a

faculty member must use if the member has a grievance with any portion of the CBA, including the

disclosure Policy.  *Id.* at 133.

   In October of 2015, Plaintiff was completing an electronic acknowledgment form that FAU

had sent to him.  DE 246 at 6.  That form required Plaintiff to check a box "acknowledging [his]

obligation to report outside activities" as well as other things.  *Id.*  Plaintiff refused to check the

box.  *Id.*  Instead, Plaintiff printed out a hard copy of the form and submitted it to FAU without checking the box.  *Id.*

Also in October of 2015, an FAU supervisor ordered Plaintiff to report his outside activities by completing and submitting a conflict of interest form.  *See* DE 248 at 5.  Plaintiff does not appear to dispute that he was ordered to complete the conflict of interest form multiple times by his supervisors.  *See* DE 274 at 5-6.[1]  In lieu of completing the form in the manner in which FAU required, Plaintiff, in his own words, "asked his supervisors for clarification about the scope and application of the Policy" and he also required from FAU "a signed statement asserting FAU's position that his personal activities (media criticism, alternative journalism, and blogging) did not fall within the definition of 'conflict of interest'" under the Policy.  DE 248 at 5.

On November 10, 2015, Defendants issued a notice of discipline to Plaintiff.  *Id.*  The notice required Plaintiff to submit conflict of interest forms within forty-eight hours.  *Id.*  On November 22, 2015, Plaintiff responded by letter, informing Defendants that he had not received the clarification that he had requested on the "considerable confusion" created by FAU's administration of the Policy.  *Id.*  On December 11, 2015, Defendants responded to Plaintiff's letter by informing him that he had until 5:00 p.m. on December 15, 2015, to "completely and accurately fill out the conflict of interest forms."  *Id.* at 7.  Plaintiff appears to admit that he did not submit the forms by 5:00 p.m. on December 15, 2015.  *Id.* ("Tracy did not receive [the e-mail] until the evening of December 15, 2015.").

On December 16, 2015, Defendants issued a notice of termination to Plaintiff.  Defendants' position was that because Plaintiff had refused to fill out his conflict of interest forms, Defendants

---

1 Instead, it appears that Plaintiff's position is that he complied with his supervisor's directives by submitting a hard copy of the online form that did not contain a checkmark in the applicable box.

4

could not ascertain whether Plaintiff was in compliance with the Policy (pertaining to outside activities) in the CBA.  *Id.*

Earlier, sometime during the month of November of 2015, Plaintiff requested assistance from his union.  DE 246 at 7.  Plaintiff's union hired an attorney for Plaintiff.  *Id.* at 8.  After Plaintiff received his notice of termination, Plaintiff was required to file a grievance contesting his termination within ten days.  *Id.*  Plaintiff's attorney negotiated for an extension for additional time to grieve.  *See id.*  The extension was granted.  *Id.* at 9.  Plaintiff never filed a grievance.  Instead, Plaintiff filed this lawsuit on April 25, 2016.

Initially, Plaintiff filed this lawsuit against FAU, certain individual Defendants at FAU, his union, and certain individual Defendants at his union.  During the pendency of this suit, however, Plaintiff reached a settlement agreement with all union Defendants.  Only FAU and the FAU individual Defendants remain.  The individual Defendants are John Kelly, the FAU President, Diane Alperin, an FAU Vice Provost, and Heather Coltman, an FAU Dean.  The following counts are before the Court: a civil rights retaliation claim pertaining to Plaintiff's right to free speech (Count I), a claim alleging a conspiracy to interfere with Plaintiff's civil rights (Count II), a facial constitutional challenge against the Policy (Count III), an as-applied constitutional challenge against the Policy (Count IV), a request for a declaration on the constitutionality of the Policy (Count V), and a breach of contract claim (Count VI).

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would affect the outcome of the suit under the governing law."  *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  The Court does not weigh conflicting evidence.  *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).  Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment.  *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof."  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party.  *See Shiver*, 549 F.3d at 1343.

### III.    ANALYSIS

The Court addresses Plaintiff's Motion for Summary Judgment and Defendants' Motions for Summary Judgment by considering each count in turn.  After analyzing each count, the Court considers the individual Defendants' argument that they should be dismissed from this case.

### A.  <u>Plaintiff's Count I – First Amendment Retaliation</u>

For Plaintiff to establish a prima facie case for his First Amendment claim, he must show: (1) that his speech may be fairly characterized as constituting speech on a matter of public concern, (2) that Plaintiff's First Amendment interests outweigh the interest of his employer in promoting the efficiency of the public services it performs through its employees, and (3) that Plaintiff's speech played a substantial part in Defendants' decision to terminate Plaintiff.  If Plaintiff proves the foregoing, then (4) the burden shifts to Defendants to prove that they would have taken the same action against Plaintiff even in the absence of any protected speech.  *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993).  The Court examines each element of Plaintiff's claim.

<u>The Characterization of Plaintiff's Speech</u>

Plaintiff contends that his constitutionally-protected speech is his blog postings.  He characterizes his blogs as his observations, opinions, thoughts and viewpoints on government, the media, current events, history and politics.  DE 248 at 2.  Specifically, Plaintiff blogged about events in the national news media, including mass casualty events.  *Id.*  Plaintiff contends that he blogged from home during personal time on his personal computer.  *Id.*  Private speech on matters of public concern is protected by the First Amendment.  *Connick v. Myers*, 461 U.S. 138 (1983).

Defendants contest the characterization of Plaintiff's speech.[2]  Defendants argue that Plaintiff's blogs overlapped with his work for FAU and that Plaintiff used FAU resources for his blog postings.  DE 270 at 2.  Defendants, *inter alia*, point to similarities between Plaintiff's courses and Plaintiff's blog; Defendants therefore contest that Plaintiff blogged as a private citizen and instead characterize Plaintiff's speech as that of a public employee.  *See id.*  "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

The Court concludes that each side has evidence supporting their respective positions and, as a result, a dispute of material fact precludes summary judgment on the issue of how Plaintiff's speech should be characterized.  Each party's Motion for Summary Judgment is denied as to this issue.

<u>The Balancing of Plaintiff's Speech with Defendants' Interest in Promoting the Efficiency of the Services it Performs through its Employees</u>

With respect to the balancing of Plaintiff's speech with Defendants' interests, this is an issue only tangentially briefed by all parties.  For Plaintiff's part, Plaintiff assumes (in a footnote) in a cursory fashion that Defendants are estopped from raising any such argument.  DE 275 at 9 n.3.  For Defendants' part, Defendants argue (also in a footnote) that Plaintiff's speech must be balanced against the Defendants' interest in "peacefully fulfilling its educational mission."  DE 245 at 7 n.3.  The Court declines to grant any relief on this incomplete record, and each parties' Motion for Summary Judgment is denied as to this issue.

---

2 Although Defendants' legal arguments on this point are quite brief, the Court does not construe Defendants' brief arguments as a concession or admission.  Instead, Defendants have cited evidence to refute Plaintiff's evidence on this issue.  *See* DE 270 at 2.

<u>Plaintiff's Speech must have Played a Substantial Part in Defendants' Decision to Terminate Plaintiff</u>

The parties vigorously contest whether Plaintiff's speech in his blog postings played a substantial part in causing Defendants' decision to terminate Plaintiff.  The Defendants rely upon evidence in the record that calls into question whether FAU's decision to terminate Plaintiff was connected to his blog postings.  For example, there were approximately two years between Plaintiff's most controversial blog posting—which pertained to Sandy Hook—and Plaintiff's termination.  *See, e.g.*, *id.*  During that period of time, FAU permitted Plaintiff to blog as long as he abided by FAU-required disclaimers.  *See id.*  Defendants have sworn testimony that the basis for Plaintiff's termination was his willful refusal to comply with FAU's disclosure Policy.  *See id.*

Plaintiff, on the other hand, emphasizes that while he was permitted to blog during this two-year time period, FAU was under constant public pressure to fire him.  *See* DE 248 at 2-4.  Plaintiff argues that his controversial speech was not isolated to a single point in time but rather, his speech continued to affect Defendants long after his speech was published.  Plaintiff also relies upon evidence that FAU officials were distressed and embarrassed over the content on Plaintiff's blog.  *See id.*

The record facts relevant to this issue are intertwined with the facts relevant to Plaintiff's evidence that Defendants' reason for termination was pretextual—those facts are discussed below.  Because of the close relationship between the facts supporting the third element—causation—and the facts supporting pretext, the Court's ruling pertaining to causation is included in its analysis pertaining to pretext.

<u>Defendants' Burden to Prove that they Would have Taken the Same Action Against</u>
<u>Plaintiff even in the Absence of any Protected Speech</u>

The central issue in this case is why Plaintiff was terminated. Defendants contend that Plaintiff was terminated because he willfully refused to comply with FAU's policy on the disclosure of outside activities. There is evidence in the record to support Defendants' position. Defendants issued a notice of discipline to Plaintiff informing him that he was required to comply with the Policy and that he had not complied. DE 243 at 6. Prior to being terminated, Plaintiff willfully refused on multiple occasions to comply with the Policy as FAU required. *Id.* at 6-7. Plaintiff's termination was officially premised on his refusal to comply with the Policy. *Id.*

Plaintiff's burden to refute Defendants' non-discriminatory reason for his termination is substantial. Plaintiff must take Defendant's reason "head on and rebut it" and he cannot succeed by "simply quarreling with the wisdom of that reason." *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1265-66 (11th Cir. 2010). Plaintiff must have evidence that Defendant's non-discriminatory reason for firing him was pretextual. *Id.* at 1264. Plaintiff may satisfy this burden by showing that Defendants' reasons are not credible by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Id.* at 1265. The Court examines Plaintiff's evidence of pretext.

That Plaintiff's blog postings were provocative is, in Plaintiff's own words, "an understatement." DE 247 at 7. Plaintiff blogged that the Sandy Hook massacre did not occur and that the families of the victims of that massacre were "playing a role." *See id.;* DE 248 at 2-3. Plaintiff's comments resulted in national attention and a backlash from the parents of the victims at Sandy Hook. DE 248 at 2-6; DE 247 at 7. Parents also alleged, through an op-ed in the Sun

Sentinel, that Plaintiff had harassed them by asking for proof in connection with the massacre.  DE 248 at 6.[3]  In the years following Plaintiff's blog postings about Sandy Hook, public pressure still existed on FAU to fire Plaintiff—the controversy surrounding Plaintiff's blogs never completely subsided.[4]  *See id.*  FAU met to discuss Plaintiff's blogging and the "impact" of the negative press.  *Id.* at 2.  Certain handwritten minutes indicate that Plaintiff's speech was a "black eye on all faculty" and that in the context of considering Plaintiff's First Amendment rights FAU needed to find "winning metaphors."  DE 250-10.  The minutes also indicate that there should be "no email on this."  *Id.*  After Plaintiff was terminated, an FAU dean circulated an e-mail that read "for the record, [Plaintiff] was not fired because he didn't report things."  DE 250-45.

The Court is required to view Plaintiff's evidence in the light most favorable to him in connection with Defendants' Motion for Summary Judgment.  Viewed in Plaintiff's favor, the evidence outlined above establishes that (i) Defendants had a powerful motivation to fire Plaintiff and (ii) Defendants were planning to find a way to do just that.  Defendants' basis for terminating Plaintiff—his failure to comply with the Policy—has also been subjected to reasonable attack by other evidence.  For example, FAU's administration of the Policy was altered after FAU reached a settlement with Plaintiff pertaining to Plaintiff's use of a disclaimer on his blog.  DE 248 at 4.  Perhaps, as Plaintiff contends, FAU altered its administration of the Policy because its prior efforts to censor Plaintiff had failed.  Defendants arguably knew that their implementation of the Policy would have the result of resistance from Plaintiff.  On September 4, 2015, FAU faculty members held a meeting in which several faculty members voiced concerns over the Policy being applied to

---

3 FAU's decision to fire Plaintiff was made close in time with the publishing of the op-ed referenced above.  *See* DE 248 at 6.

4 For this reason, the Court finds cases such as *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000) (finding a four year temporal gap insufficient to support causation) distinguishable from the instant case.

constitutionally protected speech. *Id.* at 5. Soon after, Defendants enforced the Policy against the person who arguably had the most controversial public speech at the university—Plaintiff. Furthermore, notwithstanding Plaintiff's constitutionally-based protests against FAU's administration of the Policy, Defendants ultimately elected not to accept Plaintiff's untimely effort at full compliance. When these events are taken in their entirety, in context, and are viewed in Plaintiff's favor, a reasonable inference exists that Defendants altered and enforced their administration of the Policy against Plaintiff for the pretextual purpose of finding a way to retaliate against Plaintiff's speech.

After a full examination of the record, the Court concludes that Plaintiff has sufficient evidence to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Defendants contest many of the facts relied upon by the Plaintiff and there is evidence to support Defendants' position that Plaintiff was insubordinate. This juxtaposition of facts serves to highlight the dispute of material fact that exists as to the reason Plaintiff was terminated—a factual determination that must be made by a jury. For the foregoing reasons, each party's Motion for Summary Judgment is denied as to Count I, and Count I survives for trial.[5]

## B.  Plaintiff's Count II - Conspiracy

Plaintiff's second count alleges that a conspiracy existed to terminate Plaintiff from his tenured position. Under the intra-corporate conspiracy doctrine, FAU employees cannot conspire amongst themselves or with FAU. *See Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767

---

5 The Court also denies Defendants' request for summary judgment to be entered in their favor as to Defendants' failure to mitigate affirmative defense because of questions of material fact. *Compare* DE 246 at 11, *with* DE 274 at 9-10.

(11th Cir. 2000).   Thus, Plaintiff argues that a conspiracy existed between Defendants and Plaintiff's union.

Defendants argue that Plaintiff has insufficient evidence to support his conspiracy claim. In response, Plaintiff relies upon three points.   The first is a timeline.   The second is a quote.   The third is a witness.   As to Plaintiff's first point, Plaintiff contends that an agreement was reached between his union and FAU to convince Plaintiff not to file a grievance.   He contends that this agreement was reached at a collective bargaining meeting on November 30, 2015.[6]   DE 274 at 10. Prior to meeting, Plaintiff attests that he was advised by his union that "anything is grievable."   *Id.* Subsequent to the meeting, Plaintiff's says he was advised by his union that his situation was "not grievable."   *Id.*

The mere fact that there was a meeting between Plaintiff's union and FAU is not evidence of a conspiracy.   *See Lee v. Christian*, 221 F. Supp. 3d 1370, 1379 (S.D. Ga. 2016).   Upon review of Plaintiff's evidence, the Court concludes that Plaintiff's timeline does not support Plaintiff's theory of a conspiracy.   The objective, undisputed evidence establishes the opposite.   Plaintiff's own allegations establish that his union previously represented him against Defendants.   DE 93 at 15-16.   Plaintiff's union was successful in that representation.   *Id.*   Plaintiff's union defended him in connection with the instant case.   DE 246 at 4-5.   Plaintiff's union hired a lawyer to defend Plaintiff.   *Id.* at 8.   Plaintiff's union and union-appointed lawyer negotiated for an extension of time for Plaintiff to file a grievance *after* the date Plaintiff alleges a conspiracy was formed.   *Id.* at 8-9; DE 246-16 at 18.   Plaintiff was thereafter granted an extension.   DE 246 at 9.   The fact that Plaintiff's union doubted a grievance would lead to a positive result for Plaintiff is not evidence

---

6 Although Plaintiff's November 30, 2014 date is contested by Defendants, the Court accepts Plaintiff's date as true for the purposes of the Court's analysis on this issue.

that Plaintiff's union was involved in a conspiracy.  Thus, the objective timeline evidence in this case does not support Plaintiff's contention that his union was involved in a conspiracy with Defendants to deny him the right to grieve his termination.[7]

As for Plaintiff's second point, Plaintiff contends that a union official told a colleague "don't let [Plaintiff] respond."  DE 274 at 10.  Plaintiff relies upon this quote for the proposition that the union wanted Plaintiff to be prevented from filing a grievance.  This quote, which is taken out of context, is a quote with ambiguous meaning.  *See* DE 274-13.  The content of the relevant e-mail concerns various, unclear matters but no reasonable inference may be gleaned from the e-mail that it was the union's intent to deprive Plaintiff of the right to grieve his termination due to a conspiracy with Defendants.

Third and finally, Plaintiff relies upon a witness to support his claim of a conspiracy. Plaintiff cites to the deposition testimony of Mr. Shane Eason.  Mr. Eason was a colleague of both Plaintiff and certain members of Plaintiff's union.  Mr. Eason had a conversation about Plaintiff with union officials.  The contents of that conversation were later relayed by Mr. Eason to Plaintiff. In support of an inference that a conspiracy existed between Plaintiff's union and Defendants, Plaintiff relies in part upon the following quote from Mr. Eason's deposition:

> Q: Did you ***tell Professor Tracy*** that Zoeller [a union official] worked with FAU's counsel -- at least Zoeller told you that he worked with FAU's counsel and worked to get rid of Professor Tracy?
>
> A: Yeah.

---

7 Other evidence, not cited here, establishes that (i) Plaintiff knew how important it was to file a grievance for his termination, (ii) Plaintiff chose not to grieve despite this knowledge, (iii) Plaintiff hired an independent lawyer on his own initiative, and (iv) even though this new acquisition of counsel was still within the time period for Plaintiff to file a grievance, Plaintiff did not file a grievance.

DE 246-17 at 23 (emphasis added).  The practical effect of this quote, however, is lessened when placed in the context of adjacent questions:

> Q: Well, my question was whether you told Professor Tracy that Zoeller said that to you?
>
> A: But ***I don't know if Zoeller really said that to me***. I can't -- you know what I mean like –

*Id.* (emphasis added).  This answer by Mr. Eason, in which he emphasizes that he cannot remember what union officials actually said to him, is a consistent theme throughout entirety of Mr. Eason' testimony.  A second recurring theme in Mr. Eason's deposition is that all of the conversations he had with Plaintiff about a conspiracy were hypothetical.  While Mr. Eason did testify to a certain level of discomfort with how Plaintiff was personally regarded by union officials, Mr. Eason repeatedly emphasized that he was unaware of any conspiracy or criminal wrongdoing that caused Plaintiff's termination:

> Q: So, Zoeller detailed to you in your confidence that there was some kind of conspiracy that he was involved in or there was something he was involved in that was centered on getting rid of Professor Tracy?
>
> A: Again, I don't -- the word conspiracy is not one that he used.
>
> Q: Without using the word conspiracy though, he described a plot or some kind of an agreement to end Professor Tracy's employment, yes or no?
>
> A: I don't recall that. Like I said, he didn't like Jim and he was tired and frustrated by the whole thing.
>
> Q: That's what Zoeller told you?
>
> A: Yeah.
>
> Q: Among other things. It's not all he said, right?
>
> A: That's -- Yeah, some of the stuff I can recall. Yeah.
>
> . . .

Q: When he described -- When I say he, I'm referring to Zoeller. When Zoeller described his dealings with FAU's lawyer, it was not just shoot-from-the-hip small talk. He was describing his efforts to end Professor Tracy's employment, yes or no?

A: He was telling me that.

Q: I'm asking whether Zoeller told -- when he was describing his relationship with Larry Glick [FAU counsel], it wasn't a conversation about Larry Glick.

A: Right.

Q: It was a conversation about Professor Tracy.

A: They would have off the cuff conversations about Jim, yeah.

Q: That's what Zoeller told you?

A: Right.

Q: Zoeller told you that Glick and Zoeller were communicating about Tracy's employment, yes?

A: The communication I don't know where it went, but these meetings or whatever to collective bargaining, during downtime they would chat. That's really the set—

Q: About Tracy?

A: Yeah, about -- Yeah, about Jim and about –

. . .

Q: Would you agree with the characterization of whatever Zoeller and Glick did outside of the collective bargaining realm was unlawful, the way that he described it to you?

A: I don't know where it would fall under the law.

Q: Did it sound wrong?

A: Ethically.

Q: What Zoeller conveyed to you was ethically wrong in your opinion?

A: It could be, yeah.

16

*Id.* at 25.  This evidence is further attenuated by other deposition testimony in which Mr. Eason was emphatic that any discussion he may have had with Plaintiff about how and why Plaintiff was terminated was hypothetical:

> Q: So, to the best of your recollection today what exactly did you tell Professor Tracy about your conversation with Zoeller?
>
> A: The conversation I had back then with Jim would have been regarding the blog, regarding the frustration with Zoeller and the blog and the whole situation and telling Jim that Zoeller just doesn't really care for what it is that he's doing.
>
> Q: And are you saying that you didn't tell Professor Tracy that Zoeller put the fix in on him?
>
> A: I don't recall saying that.
>
> Q: You know what I'm asking.
>
> A: Right.
>
> Q: You understand what -- when I said fix?
>
> A: I understand, yeah, yeah.
>
> Q: Sabotage –
>
> A: Right.
>
> Q: Railroad, there's a lot of ways we can describe it, but my question is do you remember telling Professor Tracy that had Zoeller had it out for him, you know?
>
> A: We hypothesized about this stuff. We talked about it.
>
> Q: So, you are saying that you were speaking abstractly and posing hypotheticals about what happened?
>
> A: Yeah.
>
>                                    . . .
>
> Q: Okay. And you said you were hypothetically speculating?

17

A: Spec -- Yeah.

Q: And so, were you talking about actual conversations you had had with Zoeller or just speculating as to what Zoeller's actions may have been?

A: It was more I think speculation than anything

*Id.* at 21, 24.

For Plaintiff's conspiracy claim to survive summary judgment, Plaintiff must set forth specific facts that show there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Court must make the threshold inquiry as to whether there is a genuine issue for trial that can be resolved by a factfinder because the issue may reasonably be resolved in favor of either party. *Id.* When the evidence can lead to but one reasonable conclusion, the Court must grant summary judgment as a matter of law in favor of that evidence. *Id.* Here, the Court has reviewed Mr. Eason's deposition testimony carefully. The Court has considered all of the evidence cited by Plaintiff in the record and, based upon this review, concludes that no reasonable juror find that a conspiracy existed between Plaintiff's union and Defendants. Accordingly, Defendants' Motion for Summary judgment is granted as to Plaintiff's Count II.

**C.** **Plaintiff's Count III, Count IV, and Count V – Constitutional Challenges**

Plaintiff has alleged three counts challenging the constitutionality of FAU's Conflict of Interest Policy: Count III (styled as a facial challenge), Count IV (styled as an "as-applied" challenge), and Count V (styled as a request for a declaratory judgment). The premise of Plaintiff's claims is that the Policy is unconstitutionally vague. Defendants argue that summary judgment must be entered in their favor as to these counts because the Policy is not positive law—that is, it is not an enactment of a state, local, or federal government. Instead, Defendants argue that the Policy is part of the collective bargaining agreement between FAU and its faculty.

Plaintiff provides no authority to this Court that the terms of the Policy may be challenged constitutionally in the same manner that positive law may be challenged.  Instead, Plaintiff merely cites to unremarkable cases in which positive law has been challenged.  By contrast, Defendants cite to persuasive authority for the proposition that the constitutionality of the Policy cannot be challenged on the record before the Court.

Defendants cite to *Hawks v. City of Pontiac*, 874 F.2d 347, 349 (6th Cir. 1989).  In *Hawks*, the plaintiff was an employee of a police department.  *Id.* at 348.  The plaintiff moved his residence out of the city in which he worked.  *Id.*  The plaintiff's collective bargaining agreement required police officers to maintain residency in the city and, as a result of the plaintiff's decision to move his residence, he was demoted.  *Id.* at 348-49.  The plaintiff challenged the residency requirement as being unconstitutionally vague.  *Id.*  The district court in *Hawks* granted summary judgment in favor of the defendant by concluding that the contractual provision could not be challenged as unconstitutionally vague in the same manner as positive law.  *Id.*  The appellate court affirmed, finding: "As a contract provision entered into through voluntary collective bargaining, it may not be characterized as a positive law subject to due process challenge for vagueness.  Its interpretation and clarification is subject to the grievance and arbitration process."  *Id.*

Notably, the plaintiff in *Hawks* had a stronger basis to argue that his collective bargaining agreement terms were subject to a constitutional challenge than the Plaintiff in the instant case.  In *Hawks*, the plaintiff argued that the residency requirement originated from the city's charter, and had only been *incorporated* into his collective bargaining agreement.  *Id.* at 349.  The *Hawks* court rejected that argument, and no such nuance exists in the instant case.  In his Response, Plaintiff only acknowledges *Hawks* a single time.  DE 275 at 4-5.  Plaintiff argues that *Hawks* is distinguishable because in *Hawks* the plaintiff "ha[d] not demonstrated that procedures used in the

past would be futile." *Id.* Plaintiff argues that the holding in *Hawks* should not apply to his case because, if he had grieved, his grievance would have been futile. The Court does not agree.

Here, Plaintiff alleges that the terms of the Policy are "overbroad and vague . . . do[] not serve a significant governmental interest . . . [and are] so vague and overbroad, persons of common intelligence must necessarily guess at its meaning and differ as to its application." DE 93 at 44. If Plaintiff had challenged the vagueness of the Policy by filing a grievance, the Court would have the benefit of evaluating the official rationale, purpose, and scope of the Policy through that grievance procedure—the plaintiff in *Hawks* complied with his grievance procedures and the court had the benefit of the underlying record.[8] Regardless of Plaintiff's reasons for failing to grieve, that fact remains that Plaintiff did not file a grievance. A grievance was required. DE 243-1 at 134-36; *see generally* DE 246-6. While Plaintiff may have subjectively believed that his desired outcome would have been a futile goal if he grieved, the grievance procedure would have enabled the Court to evaluate FAU's implementation of the scope, purpose, and terms of the Policy.

On this issue, Plaintiff conflates the relief he seeks. Plaintiff's contention that he was advised that his employment situation was not grievable (DE 275 at 6) is not germane to the relief Plaintiff seeks through his vagueness challenges. Plaintiff seeks a declaration that the terms of the Policy are unconstitutionally vague. Any such declaration by the Court would have a far-reaching impact beyond Plaintiff's individual employment circumstances and would be directly tied to the wording and implementation of the Policy generally. Plaintiff has not shown or cited any evidence to this Court that it would have been futile to file a grievance to establish the rationale, purpose, and scope of the Policy.

---

8 The *Hawks* court analyzed the administrative record and determined that there was no basis to overturn the result of the plaintiff's administrative proceedings and grievance process. *Hawks*, 874 F.2d at 350.

For the foregoing reasons,[9] Defendants' Motion for Summary Judgment is granted as to Count III, Count IV, and Count V and Plaintiff's Motion for Summary Judgment is denied as to the same.

### D.  Plaintiff's Count VI – Breach of Contract

Plaintiff's final count, Count VI, is a breach of contract claim against Defendant FAU. Plaintiff alleges that he was wrongfully terminated pursuant to his collective bargaining agreement.  Defendants argue they are entitled to summary judgment as to Count VI because Plaintiff did not file a grievance.  *Mason v. Continental Grp., Inc.*, 763 F.2d 1219, 1222 (11th Cir. 1222) ("Employees claiming a breach of a collective bargaining agreement or wrongful termination of employment by their employer are bound by that agreement's terms providing a method for resolving disputes between them and their employer.").  Plaintiff only response is that his grievance would have been futile and that he was advised not to grieve.

Plaintiff relies on *Artz ex rel. Artz v. City of Tampa*, 102 So. 3d 747 (Fla. Dist. Ct. App. 2012) in support of his argument that the grievance process would have been futile.  *Artz* is distinguishable.  In *Artz*, administrative proceedings were exhausted by some parties—the only question before the court was whether other parties would be required to undergo the same proceeding for what was expected to be the same result.  *Id.* at 751.  Plaintiff relies upon one other case, *N.B. by D.G. v. Alachua County School Board*, 84 F.3d 1376 (11th Cir. 1996), but in that case the appellate court rejected every argument the appellant raised to establish that exhaustion would be futile.  The law requires Plaintiff's exhaustion of administrative remedies: "It would be a strange doctrine indeed under which an employee could relieve himself of engaging in the

---

9 The Court also accepts and adopts Defendant's ripeness argument—that Plaintiff's First Amendment rights were never constrained by the Policy—as to Count IV without comment.  *See* DE 245 at 6.

grievance process merely by supinely accepting an adverse decision of his employer as unchallengeable until the filing of an action in court.  Such a rule would render the exhaustion principle itself entirely meaningless." *City of Miami v. Fraternal Order of Police Lodge No. 20*, 378 So. 2d 20, 25 (Fla. Dist. Ct. App. 1979).  Furthermore, the grievance process Plaintiff was required to follow ultimately allowed for adjudication by an independent arbitrator—Plaintiff  has provided no argument or evidence that an independent arbitrator would have been biased against him.  *See* DE 246-6 at 138.  Plaintiff has not shown that his act of filing a grievance would have been so futile that he was relieved of the requirement to do so by law.

Plaintiff also argues that he was advised by his legal counsel (and possibly by counsel for a Defendant) that he could "always challenge in court adverse employment actions *that affect statutorily or constitutionally protected rights*."  DE 275 at 4 (emphasis added).  Even if Plaintiff's argument possessed some legal significance[10] and even if Plaintiff was so advised, there is nothing incompatible with the advice Plaintiff received and the Court's rulings herein—Plaintiff's claim for the violation of his First Amendment rights, Count I, shall proceed to the jury.  Plaintiff's *contractual* claim, Count VI, is another matter, however, and for all of the foregoing reasons the Court grants Defendants' Motion for Summary Judgment as to Count VI and denies Plaintiff's Motion for Summary Judgment as to the same.

### E.  <u>Arguments Specific to the Individual Defendants</u>

Defendants argue that the three individual Defendants in this case—Kelly, Alperin, and Coltman—are entitled to summary judgment.  Defendant Kelly argues that he had no involvement with Plaintiff's termination.  Defendants Alperin and Coltman argue that they only disciplined

---

10 The Court rejects any contention that Defendants should be estopped from arguing that Plaintiff failed to grieve.

Plaintiff based upon his willful insubordination and refusal to comply with FAU's disclosure Policy and, as a result, they are both entitled to qualified immunity.

<u>Defendant Kelly</u>

Defendant Kelly has cited evidence that he had no involvement in the events in this case. Defendant Kelly is the President of FAU.  DE 243 at 1.  As such, he has delegated his duty to discipline and terminate faculty to an FAU Provost who in turn delegated the duty to a Vice Provost—Defendant Alperin. *Id.*  Supervisory officials are not liable under section 1983 claims on the basis of *respondeat superior* or vicarious liability.  *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047-48 (11th Cir. 2014).  Instead, for a supervisor to be liable in his individual capacity the supervisor must either directly participate in unconstitutional conduct or there must be a causal connection between the actions of the supervisor and the alleged constitutional deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Fla. Dep't of Labor*, 133 F.3d 797, 802 (11th Cir. 1998).

Plaintiff argues that Defendant Kelly is personally liable due to his personal involvement in this case because he admitted at his deposition that he has the "ultimate responsibility" for the termination of faculty members and that he "monitored the fallout" from Plaintiff's termination. *See* DE 273 at 3-4.  That is precisely the kind of vicarious liability that the Eleventh Circuit has repeatedly held is insufficient as a matter of law.  *See, e.g.*, *Keith*, 749 F.3d at 1047-48.  Plaintiff also argues that Defendant Kelly was personally involved in the events of this case because he sent an e-mail pertaining to Plaintiff in which he said he intended to "deal with this personally."  DE 273 at 4.  That contention is frivolous.  The e-mail and the record, reviewed in context, reveals that Defendant Kelly (i) was expressing his desire to communicate to the parents of a deceased child

23

from the Sandy Hook massacre (who had called FAU to complain) personally and (ii) that he never

actually spoke with the parents:

> Q: When you say, "Please ask Mr. Stern – for Mr. Stern to put the parents of the child in direct contact with me, I intend to deal with this personally," what do you mean by that?
>
> A: Frequently when someone has lost a child, if they -- if they lose a child who is here at the university, I write them a letter; and then if it's a university student, I also give a scholarship in their name, just a letter of condolence and how sorry I am for what happened and their loss. And I felt compelled -- the same thing with this -- this letter, that I'd like to send a letter just saying how sorry I am he lost a child.
>
> Q: What about Mr. Stern's communication, on December 11th, compelled you to respond?
>
> A: Just – I've lost a child before and I know the pain, and so when I read about a lost child, I felt like I should respond as a spokesperson for the university that I was sorry. I never did though, I never did write the letter.
> Q: Is there a reason why not?
>
> A: I guess I just decided that it wasn't something maybe the family wanted to have hashed up again.
>
> Q: Did you ever speak to Mr. Stern?
>
> A: No.
>
> Q: Did you ever speak to the individual that Mr. Stern's referring to whose daughter lost their life?
>
> A: No.
>
> Q: What was the result of your request to Stacy Volnick?
>
> A: There was no follow-up, further information, nothing else happened.

DE at 243-1 at 344; DE 243-2 at 89-90.   Plaintiff has no evidence that Defendant Kelly directly

participated in Plaintiff's termination or was otherwise casually involved and, at the very least,

Plaintiff has no evidence upon which a reasonable juror could rely to meet the "extremely

rigorous" standard necessary to impose supervisor liability on Defendant Kelly.  The Court grants Defendant Kelly's Motion for Summary Judgment.

<u>Defendants Alperin and Coltman</u>

Unlike Defendant Kelly, Defendants Alperin and Coltman admit that they were personally involved with Plaintiff's termination.  *See* DE 243.  Both Defendants argue that they cannot be held personally liable in this case because they, acting in their undisputed capacity as university officials, are entitled to qualified immunity through their decision to terminate Plaintiff for his willful refusal to comply with FAU's disclosure Policy.  This issue is intertwined with the central issue of this case: "Why was Plaintiff terminated?"  The Court has already analyzed this issue at length and has concluded that a question of material fact exists as to why Plaintiff was terminated.

The mere fact that an issue of material fact exists, however, is not dispositive of a qualified immunity analysis.  Defendants cite to *Sherrod v. Johnson*, 667 F.3d 1359 (11th Cir. 2012).  In *Sherrod*, a plaintiff school teacher sued a defendant school board.  *Id.* at 1361.  The plaintiff alleged that he had been terminated because of his exercise of his First Amendment right to criticize the school board on matters of public concern through letters and appearances at board meetings.  *Id.*  The defendant cited evidence that the plaintiff had deviated from school curriculum standards and that he had been subject to multiple parental complaints for his teaching style.  *Id.*  On summary judgment, the district court determined that there was a question of material fact as to why the plaintiff had been terminated.  *Id.* at 1363.  Specifically, the district court determined that there was an issue of material fact as to whether the defendant's non-discriminatory reasons for termination were pretextual.  *Id.*  Because of that dispute of material fact, the district court denied the individual defendants qualified immunity as a matter of law.  *Id.*  The Eleventh Circuit

reversed, finding that qualified immunity did not turn on whether there was a material fact as to

why the plaintiff had been terminated.  *Id.*  Instead:

> A proper analysis of [the individual defendants'] entitlement to qualified immunity
> is not whether they knew that terminating [plaintiff] in retaliation for protected
> speech was lawful, but rather whether terminating him based upon all the
> information available to them at the time, to include any knowledge of his protected
> speech, was objectively reasonable. In *Foy*, we noted that the presence of a jury
> issue about a defendant's improper intent does not necessarily preclude qualified
> immunity.  *Foy*, 94 F.3d at 1533. We explained that "[w]here the facts assumed for
> summary judgment purposes in a case involving qualified immunity show mixed
> motives (lawful and unlawful motivations) and preexisting law does not dictate that
> the merits of the case must be decided in plaintiff's favor, ***the defendant is entitled
> to immunity***."

*Id.* at 1535 (emphasis added).

*Sherrod* is both analogous and binding on this Court.  This is a mixed motives case, with

both lawful and unlawful motivations at issue.  While Plaintiff may facially dispute whether he

complied with Defendants' Policy, a close examination of Plaintiff's evidence reveals that there is

no material dispute that (i) the Policy existed, (ii) FAU's administration of the Policy required

Plaintiff to undertake certain actions, (iii) Plaintiff willfully did not comply with the specifics of

what FAU required despite advice to the contrary and (iv) if Plaintiff ever attempted to fully

comply with the Policy (as administered by FAU), his attempt was not timely.  *See* DE 272.

Viewing the record in the light most favorable to Plaintiff,  the Court concludes that Defendants

Aplerin and Coltman could have reasonably and lawfully decided to recommend Plaintiff's

termination, based upon how Plaintiff governed himself after being required to comply with the

Policy.  Accordingly, both Defendants are entitled to qualified immunity.  *Sherrod*, 667 F.3d at

1535.  Defendants Alperin's and Coltman's Motion for Summary Judgment is granted.[11]

---

11 Because the individual Defendants are dismissed from this case, the Court need not consider the individual
Defendants' arguments pertaining to punitive damages and failure to mitigate.

The Court addresses one final matter.  Both Plaintiff and Defendants moved to supplement the summary judgment record.  Although the Court denied both motions, the Court notes that the requested supplements would not have changed the Court's disposition of the motions.

### IV.   CONCLUSION

It is therefore **ORDERED AND ADJUDGED** that:

1. Plaintiff's Motion for Partial Summary Judgment [DE 245] is **DENIED**.

2. Defendant FAU's Motion for Summary Judgment [DE 245] is **GRANTED IN PART AND DENIED IN PART** insofar as summary judgment is entered in Defendants' favor as to Count II, Count III, Count IV, Count V, and Count VI.  Count I survives for trial.

3. The Individual Defendants' Motion for Summary Judgment [DE 242] is **GRANTED** and each individual Defendant is dismissed from this case.

**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 31st day of October, 2017.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record

27