**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:16-CV-80655-ROSENBERG**

JAMES TRACY,

       Plaintiff,

v.

FLORIDA ATLANTIC UNIVERSITY
BOARD OF TRUSTEES a/k/a
FLORIDA ATLANTIC UNIVERSITY,
et al.,

       Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL AND DENYING PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

This matter is before the Court on Plaintiff's Motion for New Trial [DE 453] and Plaintiff's Renewed Motion for Judgment as a Matter of Law [DE 450]. The motions have been fully briefed. The Court has reviewed the briefing papers, the evidence at trial, and the entire record. For the reasons set forth below, both motions are denied.

## I.      BACKGROUND[1]

Plaintiff, James Tracy, was a tenured professor at Florida Atlantic University—a Defendant in this case. DE 246 at 1. Plaintiff taught in the School of Communications and Multimedia Studies. *Id.* Some of Plaintiff's courses included "Public Opinion and Modernity" and "Culture of Conspiracy." *Id.* Plaintiff conducted research in mass shootings, the JFK assassination, and the Sandy Hook massacre—a mass shooting event in which many children were reported to have been killed. *See id.*

---

1 These undisputed facts are taken from the Court's Order on Summary Judgment; these facts adequately summarize the background of this case as introduced and admitted at trial.

In December of 2012, Plaintiff began to blog about the Sandy Hook shooting. DE 248 at 2. Plaintiff's blog suggested that the Sandy Hook shooting had never taken place and was "staged by the government to promote gun control." *Id.* Plaintiff's blog garnered national attention and was widely reported by the press. *Id.* Many people called on FAU to fire Plaintiff. *See id.* at 2-9.

In January of 2013, FAU began to have internal discussions about Plaintiff's blog. *Id.* Ultimately, FAU issued a notice of discipline to Plaintiff pertaining to his lack of an adequate disclaimer (drawing a distinction between Plaintiff's opinions and FAU's opinions) on his blog. *Id.* at 3. Plaintiff's union defended him. *Id.* The parties eventually reached an agreement wherein Plaintiff used a disclaimer on his blog that was to FAU's satisfaction. *Id.* at 4.

After Plaintiff amended the disclaimer on his blog, he continued to teach courses at FAU. DE 246 at 5. In October of 2015, however, a new dispute—a contractual dispute—arose between the parties. *Id.* at 6. FAU has a Collective Bargaining Agreement (the "CBA") with its faculty. *Id.* at 2. The CBA contains many terms and conditions, including an article entitled "Conflict of Interest/Outside Activity." *Id.* This article imposes certain conditions upon faculty members. One such condition of the article is that "[c]onflicts of interest are prohibited." *Id.* at 131. A conflict of interest is defined as:

> (1) any conflict between the private interests of the employee and the public interests of the University, the Board of Trustees, or the State of Florida, including conflicts of interest specified under Florida Statutes;
>
> (2) any activity which interferes with the full performance of the employee's professional or institutional responsibilities or obligations; or
>
> (3) any outside teaching employment with any other educational institution during a period in which the employee has an appointment with Florida Atlantic University, except with written approval of the Dean.

*Id.* The article also imposes certain reporting requirements upon faculty, including the following:

An employee who proposes to engage in outside activity shall provide his or her supervisor a detailed written description of the proposed activity. The report shall include where applicable, the name of the employer or other recipient of services; the funding source; the location where such activity shall be performed; the nature and extent of the activity; and any intended use of University facilities, equipment, or services. A new report shall be submitted for outside activity previously reported at the beginning of each academic year for outside activity of a continuing nature and whenever there is a significant change in an activity (nature, extent, funding, etc.) The reporting provisions of this section shall not apply to activities performed wholly during a period in which the employee has no appointment with the University. Any outside activity which falls under the provisions of this Article and in which the employee is currently engaged but has not previously reported, shall be reported within sixty (60) days of the execution of this Agreement and shall conform to the provisions of this Article.

*Id.* at 132. The CBA contains a mandatory grievance procedure that a faculty member must use if the member has a grievance with any portion of the CBA. *Id.* at 133.

In October of 2015, Plaintiff was completing an electronic acknowledgment form that FAU had sent to him. DE 246 at 6. That form required Plaintiff to check a box "acknowledging [his] obligation to report outside activities" as well as other things. *Id.* Plaintiff refused to check the box. *Id.* Instead, Plaintiff printed out a hard copy of the form and submitted it to FAU without checking the box. *Id.*

Also in October of 2015, an FAU supervisor ordered Plaintiff to report his outside activities by completing and submitting a conflict of interest form. *See* DE 248 at 5. Plaintiff does not appear to dispute that he was ordered to complete the conflict of interest form (also called an outside activities form) multiple times by his supervisors. *See* DE 274 at 5-6.[2] In lieu of completing the form in the manner in which FAU required, Plaintiff, in his own words, "asked his supervisors for clarification about the scope and application of the Policy" and he also required

---

2 Instead, it appears that Plaintiff's position is that he complied with his supervisor's directives by submitting a hard copy of the online form that did not contain a checkmark in the applicable box.

from FAU "a signed statement asserting FAU's position that his personal activities (media criticism, alternative journalism, and blogging) did not fall within the definition of 'conflict of interest'" under the CBA. DE 248 at 5.

On November 10, 2015, Defendants issued a notice of discipline to Plaintiff. *Id.* The notice required Plaintiff to submit conflict of interest forms within forty-eight hours. *Id.* On November 22, 2015, Plaintiff responded by letter, informing Defendants that he had not received the clarification that he had requested on the "considerable confusion" created by FAU's administration of the CBA, together with related policies. *Id.* On December 11, 2015, Defendants responded to Plaintiff's letter by informing him that he had until 5:00 p.m. on December 15, 2015, to "completely and accurately fill out the conflict of interest forms." *Id.* at 7. Plaintiff admits that he did not submit the forms by 5:00 p.m. on December 15, 2015. DE 467 at 112.

On December 16, 2015, Defendants issued a notice of termination to Plaintiff. Defendants' position was that because Plaintiff had refused to fill out his conflict of interest forms, Defendants could not ascertain whether Plaintiff was in compliance with the outside activities / conflict of interest portions of the CBA. *Id.*

Earlier, sometime during the month of November of 2015, Plaintiff requested assistance from his union. DE 246 at 7. Plaintiff's union hired an attorney for Plaintiff. *Id.* at 8. After Plaintiff received his notice of termination, Plaintiff was required to file a grievance contesting his termination within ten days. *Id.* Plaintiff's attorney negotiated for an extension for additional time to grieve. *See id.* The extension was granted. *Id.* at 9. Plaintiff never filed a grievance. Instead, Plaintiff filed this lawsuit on April 25, 2016.

Initially, Plaintiff filed this lawsuit against FAU, certain individual Defendants at FAU, his

union, and certain individual Defendants at his union. During the pendency of this suit, however, Plaintiff reached a settlement agreement with all union Defendants. After extensive motion practice, this case was tried from November 29, 2017, to December 11, 2017. A single count was submitted to the jury: Plaintiff's First Amendment retaliation claim. The jury returned a verdict on December 12, 2017, finding that Plaintiff's termination was unrelated to Plaintiff's exercise of his First Amendment rights. DE 437. On January 8, 2018, Plaintiff filed a Renewed Motion for Judgment as a Matter of Law. On January 12, 2018, Plaintiff filed a Motion for New Trial.

## II. ANALYSIS AND DISCUSSION

A new trial should not be granted "unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*., 684 F.3d 1211, 1231 (11th Cir. 2012). Although the Court is permitted to weigh the evidence, it must be with this standard in mind. *See Watts v. Great Atlantic & Pacific Tea Co., Inc.*, 842 F.2d 307, 310 (11th Cir. 1988) ("In ruling on a motion for new trial, the trial judge is permitted to weigh the evidence, but to grant the motion he must find the verdict contrary to the great, not merely the greater, weight of the evidence.").

In assessing evidentiary rulings already made by this Court, the question is whether the exclusion of the evidence affected Plaintiff's substantial rights. "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984). Plaintiff bears the burden of showing that the decision(s) affected his substantial rights. *Id.*

Before the Court analyzes the merits of Plaintiff's arguments, the Court addresses one recurring issue in the motions before the Court. Plaintiff cites multiple times to the Court's Order

on Summary Judgment and the Court's oral ruling denying Defendants' motion for judgment as a matter of law in support of his pending motions. Plaintiff's citations and quotations to the Court's prior orders reference the Court's discussion of the evidence. That is improper argument. The Court was required, in the cited orders, to view the evidence in the light most favorable to Plaintiff. With respect to Plaintiff's Motion for Judgment as a Matter of Law, the Court is required to view the evidence in the light most favorable to Defendants. With respect to Plaintiff's Motion for New Trial, the Court is required to independently weigh the evidence introduced at trial—not refer back to the Court's analysis of evidence viewed in the light most favorable to a specific party.

Plaintiff raises five separate arguments: (A) that the jury's verdict was not supported by the evidence, (B) that this Court erred in excluding a certain audio recording, (C) that this Court erred in excluding certain third-party letters, (D) that this Court should enter judgment as a matter of law in Plaintiff's favor, and (E) that this Court should reconsider its prior Order on Summary Judgment. Each argument is considered in turn.

## A. The Jury's Verdict Was Supported by the Evidence at Trial

The central premise in Plaintiff's Motion for New Trial is that the jury's verdict was against the great weight of the evidence. This contention is without merit. Instead, the Court concludes that the great weight of the evidence at trial was in favor of Defendants. The jury was entitled to disregard and discredit all of Plaintiff's evidence at trial, provided that there was an evidentiary basis on which to do so. And there was. Plaintiff's evidence was called into question in every possible way at trial. For the purpose of explaining why Plaintiff's premise is rejected by this Court, and for the purpose of demonstrating why the jury's decision was not against the great

weight of the evidence, the Court sets forth below a portion of the evidence introduced at trial that favored Defendants.

First, evidence was repeatedly introduced that Plaintiff was at all times permitted to blog without any censorship by Defendants:

> *Q.* Did you place any limits on Professor Tracy's speech or his research?
>
> *A.* Never.
>
> *Q.* You didn't tell him to stop blogging and cut it off, none of that stuff?
>
> *A.* No. He had the freedom to do that.

*E.g.*, DE 470 at 120. The jury was entitled to credit this testimony. Similarly, Defendants repeatedly elicited testimony that if Plaintiff had complied with his obligation to complete all necessary university forms, he would have been permitted to keep his job:

> *Q.* If Dr. Tracy had submitted the fully completed forms, would you have made the decision to send him the notice of proposed termination?
>
> *A.* I would not have sent him that notice, correct.

DE 469 at 36. The jury was entitled to credit this testimony. Moreover, the period of time running from Plaintiff's most controversial blog posts about Sandy Hook to the time of Plaintiff's termination was *three years*—this time period calls into question the entire theory of Plaintiff's case. While Plaintiff contends that Defendants essentially bided their time, and were waiting for an opening to terminate Plaintiff because they disliked Plaintiff's blog speech, evidence was introduced at trial that called Plaintiff's theory into question.[3] By way of example, another professor at FAU caused a controversy that resulted in "massive media attention," because of an

---

[3] Plaintiff also posited that persistent media attention triggered Defendants' termination of Plaintiff, but Defendants succeeded in calling into question this theory as well. *Compare* DE 471 at 26-28, *with* DE 473 at 36, 56-57.

event entitled "Stomp on Jesus." DE 470 at 135. That controversy resulted in a police presence on campus. DE 470 at 172. Yet, that professor was able to keep his job at FAU—there was no censorship. DE 470 at 135. Defendants' position throughout trial was that Plaintiff was terminated solely for his insubordination in refusing to fill out outside activities forms, and Plaintiff failed to produce any evidence of an employee at FAU who refused[4] to fill out the form (when asked to do so) and was treated differently. Instead, the evidence showed that another professor who, like Plaintiff, did not fill out the necessary forms and who received compensation from outside activities received a notice of termination. DE 469 at 22-23; Defendant's Exhibit 206.[5] Finally, Plaintiff's own witness, Professor Robe, admitted that if he were asked to fill out outside activity forms he would do so lest he be considered insubordinate. DE 470 at 224.

Second, a large amount of evidence was introduced at trial that showed Plaintiff's refusal to fill out FAU forms was insubordinate. Plaintiff was advised to fill out the forms by virtually everyone—even his union representatives:

> *Q.* What did you advise Professor Tracy once you read this letter?
>
> *A.* I think I said something to the effect that -- I think I said something like sign it or -- I said, even if you say under duress, sign it, say you did it under duress to do it.
>
> *Q.* You told him to submit the forms?
>
> *A.* I believe so, yes, that is the best of my recollection. I am sure you have the emails that say that.
>
> *Q.* Why did you recommend that Dr. Tracy fill out those outside activity forms in November 2015?

---

4 While Plaintiff may have testified that he never refused to complete FAU's outside activities forms, there was a plethora of evidence at trial upon which a reasonable juror could rely to conclude that Plaintiff unequivocally refused FAU's demand to complete outside activities forms. *E.g.,* "[Plaintiff] told me he refused to submit [the forms]." Video Deposition of Mr. Michael Moats, 293:06.

5 The professor at issue ultimately resigned before the termination process concluded. Defendant's Exhibit 206. FAU refused to accept the resignation, however, and treated the situation as a termination.

*A.* I was afraid he was going to get fired.

*Q.* And were you advising Dr. Tracy to try to help him keep his job?

*A.* Yes.

DE 471 at 86. Plaintiff's union representatives also advised Plaintiff that the insubordination

charge was valid:

*Q.* And so you told Professor Tracy that the termination was likely valid, right?

*A.* Yes, I think that may have been my words.

*Q.* What was the reasoning, if any, behind that advice?

*A.* Well, one, every indication that I'd had from him prior to that was that they had a very good case against him on insubordination.

Video Deposition of Mr. Michael Moats, 214:17. Evidence showed that Plaintiff privately

admitted to others that his refusal to fill out the forms was a mistake—that he thought he would be

protected from termination because of his tenured status:

*Q.* Based on your personal experience and your interactions with Dr. Tracy, did he seem to appreciate the gravity of this notice of proposed discipline and act in his own best interest?

*A.* I know when he was terminated, and that was actually the first time that I actually talked to him, most of the other communications were via email, I said, you know, if you thought the university was after you, why did you make it so easy for them? And he said -- I was referring to not filling out the forms, and he said, I thought tenure would protect me.

DE 471 at 88. Additionally:

*Q.* [W]hen in 2015 did you go back and look at [Plaintiff's file]?

*A.* After [Plaintiff] called me and said, 'I think I fucked up.'

Video Deposition of Michael Moats, 90:14. Evidence in the form of an e-mail from Plaintiff showed that Plaintiff knew his refusal to fill out the forms was insubordinate insofar as he called the insubordination charge against him "cut-and-dry" as follows:

> So Doug, yes, I am interested in going through the necessary grievance procedure and would appreciate your help. I don't know if the union will support the case to arbitration, because in terms of the specific description of "insubordination" and my actions it's cut-and-dry, the admin is like a mule regardless of how irrational its stances may be, and the union might not think we can prevail. Then again it could be resolved before arbitration. In any event,

Defendants' Exhibit 111. Finally, the evidence also showed that Plaintiff was consistently told by others that any grievance of his proposed termination was unwinnable because the insubordination charge against him was so strong. *See* DE 471 at 96-105; Defendants' Exhibit 48.

Third, Plaintiff's contention at trial was that he did not fill out FAU forms because those forms were confusing, but Defendants introduced substantial evidence to call into question Plaintiff's position. As an initial matter, it appears that Plaintiff, and Plaintiff alone, completely refused to fill out the forms. It therefore follows that every other faculty member or, at the very least, every other faculty member who was asked to fill out the forms, did so. A logical inference that the jury was entitled to make, then, was: "If every faculty member fills out the forms, how can the forms be so confusing that Plaintiff could not possibly fill them out?" Similarly, Plaintiff ultimately *did* fill out the forms, albeit after the deadline imposed by FAU, which logically led to a related question: "If Plaintiff ultimately filled out the forms, how was it impossible for him to fill out the forms earlier?" The reasonable and logical inference, then, that the jury was entitled to make, was that Plaintiff simply *chose* not to fill out the forms for his own purposes—to not even make an attempt. Defendants introduced evidence that showed that Plaintiff had an ulterior motive in choosing not to fill out the forms. Specifically, Plaintiff privately e-mailed a friend, using a non-university e-mail account, in which he said the following:

hours per week. Nor was I ever asked to do so by my chair. Although I mentioned that I contribute to GR I don't plan on using those pieces for promotion because they're not peer reviewed. Yet, they may inform some of my research and teaching. So I'm uncertain whether I should fill out such a form for the activity ex post facto, especially since it might give them reason to take disciplinary action as my remarks may no longer be regarded solely my own free expression. Our union guy suggested I do so but I'm going to get some additional opinions.

DE 467 at 70; Defendants' Exhibit 114. This evidence, together with other evidence introduced at trial, could lead to the reasonable conclusion that Plaintiff did not want to disclose his outside activities because he did not want the university to have that information—but FAU never took any action against Plaintiff's blog speech[6] because Plaintiff refused to disclose his outside activities. In any event, the jury was entitled to discredit Plaintiff's explanation—confusion—because evidence was introduced to call into question Plaintiff's purported reason for his failure to comply.

Fourth, evidence was introduced that Plaintiff's refusal to fill out FAU forms was in the context of an actual violation, by Plaintiff, with respect to the outside activities that he refused to report. Plaintiff admitted that he received compensation through his blog; he simply contended that, according to him, the compensation was not enough to warrant reporting. DE 467 at 40-45. Even so, Plaintiff admitted that the *amount* of the compensation is not a determinative factor in terms of whether or not compensation (or an activity) should be reported. DE 467 at 48. Plaintiff took the position that his blog did not amount to a reportable outside activity. Yet, Plaintiff privately admitted to others that his blog was a reportable activity,[7] Plaintiff's union advised him that his blog could be a reportable outside activity,[8] Plaintiff's solicitation for donations on his blog was entitled "Memoryhole Independent Research Fund,"[9] Plaintiff admitted to spending

---

6 The Court notes that, in prior years, when Plaintiff did complete the outside activities forms, Defendants did not attempt to silence Plaintiff's speech on his blog.

7 DE 467 at 70.

8 Video Deposition of Mr. Michael Moats, 88:20.

9 DE 467 at 48.

hundreds of hours on his blog and related research, Plaintiff's blog was closely related in terms of subject matter to the courses that Plaintiff taught, and Plaintiff admitted to, at times, using school equipment while working on his blog and associated podcasts.[10]  Plaintiff privately conceded the close relationship of his blog and podcasts with the courses that he taught in an e-mail, using a non-university account, to a colleague:

> Because I teach journalism and media studies I had found doing the program a reinforcement to my formal professional endeavors, as I was able to interview authors, journalists, filmmakers, and fellow academics, getting their insights on what they do, and how they function and see the world. Because some of the content was controversial and in light of my personal experience and the press' controversial coverage of me since early 2013, I had felt uneasy about approaching my chair to ask that the project be acknowledged as part of my assignment.

Defendants' Exhibit 217m.  Evidence also showed that Plaintiff admitted to his union that he had reportable outside activities:

> *A.* They fired him because they determined that he did not report the activity once he by his own admission admitted that the activity rose to the level of a reportable activity.
>
> *Q.* By his own admission where?
>
> *A.* To me.
>
> *Q.* When?
>
> A.  When we had our first conversation about whether or not he needed to report this activity.

Video Deposition of Mr. Michael Moats, 88:20.  Plaintiff also received compensation for a book that was published entitled "Nobody Died at Sandy Hook: It was a FEMA Drill to Promote Gun Control."  DE 467 at 99.[11]  That book, not disclosed to FAU, contained articles from Plaintiff's

---

10 "[I]f he's using the University resources it's got to be reported no matter what he's doing with the blog."  Video Deposition of Mr. Michael Moats, 188:09.

11 Although the book was published prior to Plaintiff's termination and "an honorarium was discussed," it appears, as best as the Court can discern, that Plaintiff did not receive the honorarium check until after he was terminated.  DE 467

blog; Plaintiff promoted the book on his podcasts. Defendants' Exhibit 225. Plaintiff's receipt of compensation, both from his blog and the Sandy Hook book, is particularly significant in light of Plaintiff's concession that when "money would be changing hands this surely would make filling [the forms out] appropriate." Defendants' Exhibit 22.

Fifth, Defendants introduced evidence that called into question Plaintiff's truthfulness in general. By way of example, Plaintiff testified that the reason he did not communicate with FAU on various matters, such as reporting the book *Nobody Died at Sandy Hook*, and the reason Plaintiff did not respond to Defendants' compliance demands in a timely fashion, was because he was on paternity leave and was therefore either unable or unwilling to check his e-mail inbox. DE 467 at 82-83; 86-88; DE 466 at 188. Yet Defendants were able to show that Plaintiff authored detailed, lengthy e-mails concerning the Sandy Hook massacre during his paternity leave. Defendants' Exhibit 165. Similarly, Plaintiff testified that he was unable to inform FAU about the publication of the Sandy Hook book because he "was too busy attempting to defend [himself]" due to his refusal to complete FAU's outside activity form. DE 467 at 130-32. But during this same period of time, Defendants introduced evidence that Plaintiff took the time to conduct a podcast to promote the book. *Id.* Defendants' characterization of Plaintiff at trial was that he was condescending, arrogant, untruthful, and that he cared more about his blog than his duties as a teacher. The Court observed at trial that the tone, demeanor, and vernacular of Plaintiff on the witness stand could support, if the jury was so inclined, Defendants' characterization of Plaintiff.

Sixth and finally, Plaintiff's Motion for New Trial (which incorporates Plaintiff's Motion for Judgment as a Matter of Law) consistently distorts the evidence that was introduced at trial. By

at 99.

way of example, Plaintiff quotes and greatly relies upon the following phrases (taken from an

e-mail), which Plaintiff attributes to FAU's employee Heather Coltman:

> [W]ith every blog post, tweet and proclamation of false flags, hoaxes, child actors and millionaire imposter parents, pressures build in the public to strip all faculty of the protections of tenure. His termination both holds Tracy accountable for his despicable behavior and reduces pressure on the elected officials to end tenure.

DE 450 at 2. Plaintiff treats this quote as if it is, without question, the opinion of Ms. Coltman and

the opinion of FAU. That is improper for the purposes of a Motion for New Trial, because the jury

was entitled, if it chose, to believe that this quote belonged to an independent FAU faculty member

completely uninvolved in Plaintiff's discipline proceedings. According to Ms. Coltman, the origin

of the quote is as follows:

> *Q.* (Referring to the quote above) That is what you sent, right?
>
> *A.* I did not write that statement, it was a copy and paste.
>
> . . .
>
> *Q.* And you said you sent this message because you agreed with it, right?
>
> *A.* No, that is not right.
>
> *Q.* Isn't this the real reason FAU fired Professor Tracy?
>
> *A.* No, it is not.
>
> *Q.* This isn't the real reason?
>
> *A.* This is not the real reason.
>
> *Q.* Who did you say wrote this?
>
> *A.* This was written by Jeffrey Morton.
>
> *Q.* And Jeffrey Morton was a faculty member at the university?
>
> *A.* Yes.

*Q.* In your college?

*A.* Yes.

*Q.* He sent this statement to the press, didn't he?

*A.* Yes.

*Q.* To multiple media outlets, didn't he?

*A.* I don't know.

*Q.* You knew about this statement, didn't you?

*A.* Yes, I knew about the statement.

. . .

*Q.* Is the email something you wrote?

*A.* No.

*Q.* Who wrote it?

*A.* Jeffrey Morton.

*Q.* Again, who is he?

*A.* A professor of political science in the college.

*Q.* And you were explaining why you didn't stop him or prevent him from sending out this -- he sent it to the newspaper or something. How did it go?

*A.* As I recall, I believe the *New York Times* had written him requesting comment or something like that, and I believe he subsequently determined to send a statement to the *Sun Sentinel*. I may have that wrong. Yeah, he sent this out because he was able to make a statement as a matter of opinion.

. . .

*Q.* Why didn't you discipline him?

*A.* Faculty have a right to express their opinion.

DE 470 at 46-47, 78. The jury was entitled to credit this testimony. As a result, it was within the jury's purview to believe that the quote did not express Ms. Coltman's views or FAU's official views, and that Ms. Coltman had forwarded the quote in an e-mail only because it had been distributed to the news media by an independent professor at FAU expressing his personal views, much like Plaintiff James Tracy. Another point of distortion in Plaintiff's motion before the Court is Plaintiff's repeated emphasis on the fact that other professors at FAU did not report their personal blogs or social media accounts to FAU. *E.g.*, DE 450 at 9-10. That was never the issue in this case. The issue was Plaintiff's refusal to report *anything* despite multiple direct orders to do so, his refusal to acknowledge his duty to report (in the form requested), and also whether Plaintiff's specific blog (for which he received compensation) was so closely related to his professional, paid activities that he was required to report it. As explained at trial by Mr. Michael Moats:

> *Q.* So, what you're saying is that every single faculty member at that University is in violation of Article 19 aside from Professor Tracy who's now been fired for it, is that what you're saying?
>
> *A.* Absolutely not. No.
>
> *Q.* Well, none of them have submitted their Facebook pages or their Twitter accounts that we know of.
>
> *A.* None of them—none of them have acknowledged that they're using their Facebook page for research. [Plaintiff] did.
>
> *Q.* Okay. And if they did acknowledge that they would be in violation of Article 19?
>
> *A.* Absolutely.

Video Deposition of Mr. Michael Moats, 124:16.

To be clear, the Court does not conclude that Plaintiff had no evidence in support of his claims—the Court did not grant judgment as a matter of law in favor of any party. Nor is it the Court's intent, in reciting the evidence above, to express any personal views about the evidence at trial. The Court has set forth the analysis of the evidence above to demonstrate a small portion of the evidence introduced at trial that favored Defendants' case and supported the jury's verdict. By contrast, Plaintiff's best evidence could adequately be divided into three categories: (1) Plaintiff's own testimony, (2) a vague phrase located in FAU documents, suggesting that, in the context of Plaintiff's employment, the university should "find winning metaphors" (a phrase the jury could construe to mean anything at all), and (3) celebratory e-mails that FAU employees exchanged after Plaintiff was terminated. When Plaintiff's evidence is juxtaposed to Defendants' evidence, the great weight of the evidence was in Defendants' favor, not Plaintiff's. For this reason, Plaintiff's Motion for New Trial is denied as to any argument that the evidence did not support the jury's verdict.

**B. The Court's Exclusion of an Audio Recording**

Plaintiff argues he is entitled to a new trial because the Court erred in excluding an audio recording of an FAU senate faculty meeting. The Court extensively reviewed that recording and excluded the recording in a detailed ruling. Plaintiff argues that the exclusion of this evidence prejudiced him at trial because the recording showed that FAU's outside activities policy and forms were confusing not just to Plaintiff, but to others as well. This was not a case about confusion, nor was this a case about what Plaintiff was thinking when he acted as he did. This was a case about why Plaintiff was terminated. For that reason, evidence of Plaintiff's confusion, or evidence of the confusion of others, was not a core issue in this case. Still, Plaintiff's refusal to

complete FAU's outside activity forms did warrant some sort of explanation, and Plaintiff's purported confusion was his explanation for his refusal. The Court therefore permitted Plaintiff—over Defendants' repeated objections—to introduce evidence of his confusion, but the Court cautioned Plaintiff that this was an area of limited probative value.

Plaintiff was successful in introducing evidence of his confusion and the confusion of others on a number of occasions throughout the trial. *E.g.*, DE 467 at 55 ("I had conversations with other faculty members on occasions and they expressed equal confusion concerning the policy and form."); DE 470 at 221 ("*Question to Mr. Robe:* Has the policy ever confused you? *Answer:* Absolutely.").[12] To the extent Plaintiff wishes he had introduced even more evidence of the confusion of others, the Court consistently reminded Plaintiff that he was not prevented from bringing in witnesses to testify about their own confusion. DE 470 at 63. ("I haven't precluded you from bringing in witnesses to testify about confusion."). As a result, even if the Court erred in excluding the audio recording, the Court's exclusion did not affect the substantial rights of Plaintiff, particularly in light of the large amount of evidence introduced by Defendants that questioned the veracity of Plaintiff's purported confusion. *Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984). It is, however, the Court's conclusion that its decision to exclude the recording was correct for the reasons the Court set forth on the record as stated below:

> Defendant argues that hearsay testimony about what FAU professors said at a certain senate faculty meeting should be excluded. The Court agrees with Defendant that any such evidence would be hearsay. The Court has reviewed the audio recording of the faculty senate meeting. It is clear that the relevant subject matter of that meeting was that, generally, FAU policies were confusing, that FAU was improperly applying that policy to the faculty, and that the faculty thought that FAU should cease and desist from its administration of that policy.

---

12 Plaintiff even admits that "confusion and uncertainty about the scope and application of the Policy was a recurring theme during testimony at trial." DE 450 at 9.

The Court is unable to discern how that evidence could be offered in any way other than to prove the truth of the matter and, as a result, Plaintiff would have to proffer a hearsay exception for this evidence to be admitted. Plaintiff argues that faculty member statements were admissions by a party opponent. The mere fact that some of the faculty members had administrative duties does not mean that the faculty members are empowered in the course of their duties to determine whether a policy is confusing, whether it is being applied correctly, and whether the policy should continue to be applied. The operative inquiry for this Court is whether the hearsay declarants were speaking within the scope of his or her agency or employment. *City of Tuscaloosa v. Harcross Chemicals, Inc.*, 158 F.3d 548, 557 (11th Cir. 1998).

For example, in *Staheli v. University of Mississippi*, 854 F.2d 121, 127 (5th Cir. 1988), statements made to a Plaintiff professor by a professor that was a member of the faculty senate were not admissions of a party opponent because the senate professor "had nothing to do with Plaintiff's tenure decision" and "did not concern a matter within the scope of his agency."

The Defendant's motion on this point is therefore granted. For Plaintiff to be able to admit this hearsay evidence, Plaintiff would have to proffer to the Court evidence that the faculty members' duties included the administration of the FAU policy, such that their comments were within the capacity of their relationship with FAU. See *Wilkinson v. Carnival Cruise Lines, Inc*. 920 F.2d 1560, 1565 (11th Cir. 1991). This is quoting, "it is necessary, in order to support admissibility, that the content of the declarant's statement concerned a matter within the scope of the agency."

At present, the Court is unable to discern any evidentiary basis for which the comments at the senate faculty meeting, helpful and relevant to Plaintiff, would be within the agency and scope of the declarant's duties. Although the Court acknowledges that theoretically, perhaps, Plaintiff could proffer additional evidence such that certain statements at the senate faculty meeting could qualify as admissions of a party opponent, the Court's granting of Defendant's motion on this point is not without prejudice, it is with prejudice for the following reasons:

The Court notes that the majority of the faculty senate meeting recording is not relevant. Much of that recording concerns the university's efforts at outside community activities, and frustrations that various faculty members had about specific communications from FAU that have no bearing on this case. The Court excludes all such evidence as irrelevant.

To the extent that Plaintiff would attempt to admit the audio recording or otherwise elicit testimony about the statements at the senate faculty meeting on relevant matters, the Court concludes the probative value of that evidence is outweighed by danger of confusion of the issues and unfair prejudice. As to the probative value,

the Court has already noted and ruled that the probative value of confusion about FAU policies is limited. In connection therewith, Plaintiff has ample grounds through various witnesses to elicit testimony about faculty confusion about the policy. In contrast, the unfair prejudice and danger of confusion is substantial.

The faculty members at the senate meeting were angry. Much frustration can be heard in the recording. That frustration and anger, and the faculty members' reactions and discussion of the FAU policy, were framed by issues and communications entirely irrelevant to this case. For example, one faculty member was upset that he had received an email pertaining to his outside speech, and other faculty members at the meeting tried to support him. Thus, to the extent the faculty meeting did discuss matters somewhat relevant to this case, the FAU policy for outside activity disclosures, that discussion was framed and developed in an emotional, heated context completely irrelevant to this case.

The Court concludes that this evidence, even if otherwise admissible, is unfairly prejudicial to Defendant and could confuse the jury. For this reason and all of the foregoing reasons, Defendant's motion is granted insofar as Plaintiff is excluded from introducing testimony pertaining to the FAU senate faculty meeting or from introducing the audio recording of the senate faculty meeting, Plaintiff's Exhibit 67. Plaintiff's exhibits related to the audio recording, Exhibits 27, 28 and 106 are also excluded.

DE 465 at 55-58.[13] Finally, Plaintiff's argument that a witness opened the door to the admission of

the audio recording is without merit. Plaintiff relies upon the following testimony:

*Q.* And so, what options did Dr. Tracy have if he didn't agree that his memoryhole blog was a reportable outside activity?

*A.* . . . . He could have asked -- if he felt this was undue, he could have asked the university faculty senate, as a due process, he could have asked them to review the situation. He could have responded to this proposed grievance -- proposed Notice of Discipline Termination. He could have -- he could have grieved the termination with the United Faculty of Florida independently or with an attorney.

DE 469 at 39. This witness (Diane Alperin) did not reference the senate faculty meeting recording,

confusion at the senate, discussions at the senate, or any other issue implicated by the recording.

Ms. Alperin merely stated that Plaintiff had certain administrative avenues available to him in lieu

---

13 The Court also notes that the recording contained legal opinions and legal conclusions.

of refusing to comply with FAU's insistence that he complete an outside activities form.  Even if certain members of the senate faculty were unhappy with FAU's policies or personally thought the policies were confusing, this fact does not call into question Ms. Alperin's statement that the senate faculty was an avenue through which Plaintiff could air his grievances.

For the foregoing reasons, Plaintiff's Motion for New Trial is denied as to any argument pertaining to the Court's exclusion of the senate faculty audio recording, together with related exhibits.

### C.  The Court's Exclusion of Letters Authored by Constitutional Rights Groups

Plaintiff argues that he is entitled to a new trial because the Court excluded two letters from constitutional rights groups expressing their support for Plaintiff in the year 2013.  The exclusion of those letters, which contained legal conclusions and were written years before Plaintiff's termination, did not affect Plaintiff's substantive rights at trial.  Furthermore, in recognition that Plaintiff was seeking to introduce those letters to show the affect the letters had on FAU officials, the Court did not prevent Plaintiff from introducing evidence of the same through another form:

> *MR. BENZION:* The letters from FIRE are not being offered for their truth, but for the effect on the listener. FIRE are letters that will come up, 10-A and 10-B, 10-B being in Exhibit 36. These letters are written by constitutional rights groups in response to the discipline on the Plaintiff in 2013, and subsequent to receiving these letters, the Defendant university backed down from their discipline and entered into a settlement agreement with the Plaintiff.
>
> *THE COURT:* Okay, I understand. I am not going to allow it, it is hearsay. I understand you don't want it for the truth of the matter, but it seems to me you can accomplish the same goal by questioning whoever the witness is whom you would question about, you know, did you receive a letter from such and such on such and such date, you know, what action did you take as a result of that letter. So, there would be a way to accomplish what you need to accomplish without bringing in a letter which, although you are representing that it is not being offered for the truth of the matter, that is always a hard thing when you are giving a limiting instruction to a jury that, and it is absolutely a hearsay document, the prejudicial effect is

outweighing the probative value when considering that the same goal can be accomplished by the Plaintiff through proper questioning of proper witnesses as to when and what witnesses received and how they responded as a result of receiving certain things.

DE 465 at 78-79. Accordingly, Plaintiff *did* introduce evidence that the letters were received:

> *Q.* Dr. Tracy, did you receive letters in support of your defense of this notice of discipline and after receiving the notice of discipline in 2013?
>
> *A.* In April of 2013, yes.
>
> *Q.* What effect did those letters have on you, if any?
>
> *A.* It galvanized my belief that I was correct in my assertions that the disclaimer on my blog was sufficient and satisfactory.
>
> *Q.* Did anyone else receive the letters, if you know?
>
> *A.* Yes.
>
> *Q.* Who?
>
> *A.* Who were the letters cc'd to?
>
> *Q.* Yes.
>
> *A.* Dean Heather Coltman and Provost Diane Alperin and several members of the Florida Atlantic University Board of Trustees, and President Saunders, who was at the time President of Florida Atlantic University, Mary Saunders.

DE 466 at 118-19. Plaintiff's objection is that "Plaintiff's testimony would have been far more credible had the jury knew [sic] that credible civil rights groups came to his aid." DE 453 at 11. The Court concludes that the authorship or content of the letters, written years before Plaintiff's termination, would have had no impact on the great weight of the evidence in this case, which favored Defendants, nor did the exclusion of the letters affect the substantive rights of Plaintiff. Accordingly, Plaintiff's Motion for New Trial is denied as to any argument premised upon the aforementioned letters.

For all of the foregoing reasons, Plaintiff's Motion for New Trial is denied.

**D. Plaintiff's Renewed Motion for Judgment as a Matter of Law**

For the same reasons the Court has denied Plaintiff's Motion for New Trial, the Court also denies Plaintiff's Renewed Motion for Judgment as a Matter of Law.

**E. Plaintiff's Third Motion for Reconsideration**

Defendants previously moved for summary judgment as to Plaintiff's claim that FAU's outside activity policy is unconstitutional. Defendants argued that Plaintiff could not challenge the constitutionality of the policy because, pursuant to his collective bargaining agreement, he was required to file a grievance before litigating the matter in court. In support of their argument, Defendants relied upon *Hawks v. City of Pontiac*, 874 F.2d 347, 349 (6th Cir. 1989). That case was analogous to the instant case, and this Court relied upon *Hawks* as follows:

> In *Hawks*, the plaintiff was an employee of a police department. *Id.* at 348. The plaintiff moved his residence out of the city in which he worked. *Id.* The plaintiff's collective bargaining agreement required police officers to maintain residency in the city and, as a result of the plaintiff's decision to move his residence, he was demoted. *Id.* at 348-49. The plaintiff challenged the residency requirement as being unconstitutionally vague. *Id.* The district court in *Hawks* granted summary judgment in favor of the defendant by concluding that the contractual provision could not be challenged as unconstitutionally vague in the same manner as positive law. *Id.* The appellate court affirmed, finding: "As a contract provision entered into through voluntary collective bargaining, it may not be characterized as a positive law subject to due process challenge for vagueness. Its interpretation and clarification is subject to the grievance and arbitration process." *Id.*

> Notably, the plaintiff in *Hawks* had a stronger basis to argue that his collective bargaining agreement terms were subject to a constitutional challenge than the Plaintiff in the instant case. In *Hawks*, the plaintiff argued that the residency requirement originated from the city's charter, and had only been *incorporated* into his collective bargaining agreement. *Id.* at 349. The *Hawks* court rejected that argument, and no such nuance exists in the instant case.

DE 362 at 19.[14]  When Plaintiff filed his response to Defendants' Motion for Summary Judgment,

Plaintiff limited his discussion of *Hawks* to two sentences: "In *Hawks v. City of Pontiac*, the Sixth

Circuit affirmed summary judgment after concluding that the plaintiff 'has not demonstrated that'

procedures used in the past would be futile in this case." 874 F. 2d 347, 351 (6th Cir. 1989). That is

not the case here." DE 275 at 4-5.  Plaintiff's analysis of *Hawks* was therefore extremely limited,

and the Court accepted Defendants' argument as follows:

> Plaintiff argues that the holding in *Hawks* should not apply to his case because, if he had grieved, his grievance would have been futile. The Court does not agree. Here, Plaintiff alleges that the terms of the Policy are "overbroad and vague . . . do[] not serve a significant governmental interest . . . [and are] so vague and overbroad, persons of common intelligence must necessarily guess at its meaning and differ as to its application." DE 93 at 44. If Plaintiff had challenged the vagueness of the Policy by filing a grievance, the Court would have the benefit of evaluating the official rationale, purpose, and scope of the Policy through that grievance procedure—the plaintiff in *Hawks* complied with his grievance procedures and the court had the benefit of the underlying record. Regardless of Plaintiff's reasons for failing to grieve, that fact remains that Plaintiff did not file a grievance. A grievance was required. DE 243-1 at 134-36; *see generally* DE 246-6. While Plaintiff may have subjectively believed that his desired outcome would have been a futile goal if he grieved, the grievance procedure would have enabled the Court to evaluate FAU's implementation of the scope, purpose, and terms of the Policy.
>
> On this issue, Plaintiff conflates the relief he seeks. Plaintiff's contention that he was advised that his employment situation was not grievable (DE 275 at 6) is not germane to the relief Plaintiff seeks through his vagueness challenges. Plaintiff seeks a declaration that the terms of the Policy are unconstitutionally vague. Any such declaration by the Court would have a far-reaching impact beyond Plaintiff's individual employment circumstances and would be directly tied to the wording and implementation of the Policy generally. Plaintiff has not shown or cited any evidence to this Court that it would have been futile to file a grievance to establish the rationale, purpose, and scope of the Policy.

DE 362 at 19-20.

---

14 While Plaintiff pointed out at trial that there are employees at FAU who are subject to FAU's outside activities policy that are not bound by the dispute resolution procedures of Plaintiff's collective bargaining agreement, those employees are not before this Court.

After the Court's decision, Plaintiff filed a motion for reconsideration. For the first time, Plaintiff discussed *Hawks*, and attempted to distinguish it. The Court denied the motion for reconsideration on many different grounds, each of which is set forth at docket entry 383. The Court need not restate those grounds here. For reasons the Court could not discern, Plaintiff moved for reconsideration a second time at the conclusion of trial, styling the motion for reconsideration as a motion for judgment as a matter of law. Now, Plaintiff has moved for reconsideration a third time, styling the request as part of his renewed motion for judgment as a matter of law.

Because Plaintiff has styled his third motion for reconsideration as part of his renewed motion for judgment as a matter of law, the Court is uncertain how the motion should be treated. If Plaintiff's intent was solely to move for reconsideration of the Court's Order on Summary Judgment for a third time, the Court denies that request for all of the reasons set forth in the Court's Order on Summary Judgment and also at docket entry 383 in the Court's order denying Plaintiff's first motion for reconsideration. If Plaintiff's intent was to move for judgment as a matter of law on his constitutional claims a second time, the Court denies that request as well because the Court cannot agree with Plaintiff, for all of the reasons set forth above, that "the record **unquestionably** establishes that FAU implemented a government policy, in the form of the conflict of interest Policy, that unconstitutionally chilled the speech of Plaintiff and others." DE 450 at 18 (emphasis added).

The Court addresses three final points. First, Plaintiff criticizes the Court's decision on the grounds that no court, besides the instant Court, has cited *Hawks* for the proposition outlined in the Court's prior order on summary judgment. As best as the Court's research can discern, this is

because no collective-bargaining-plaintiff—besides the instant Plaintiff—has ever tried to challenge a policy sourced in a collective bargaining agreement as unconstitutionally vague without first exhausting the governing dispute procedures in the applicable collective bargaining agreement. Plaintiff certainly has provided no case law that supports his challenge here in the context of his failure to comply with his collective bargaining agreement. Instead, Plaintiff's authority may establish the opposite. Plaintiff cites to *Gilson v. Pennsylvania State Police*, 676 F. App'x 130 (3d Cir. 2017), but in that case the plaintiff arbitrated his adverse employment action before filing suit in court. Plaintiff cites to *Hamilton v. USPS*, 746 F.2d 1325 (8th Cir. 1984), but in that case the plaintiff also grieved his adverse action before filing suit in court. Indeed, there are a number of cases in which a plaintiff has challenged the constitutionality of a policy *after* exhausting collective bargaining procedures or, alternatively, when no collective bargaining procedures apply. *E.g., Hawks.* The Court was unable to locate any analogous authority to the contrary, and Plaintiff has provided none.

Second, the Court is unable to make any sense of Plaintiff's argument that "[s]ubstantive 1983 claims such as these challenging a governmental policy on First Amendment grounds do not need to be grieved." DE 450 at 20.[15] Defendants have never sought to preclude Plaintiff's First Amendment section 1983 claim on failure-to-grieve grounds. Defendants have repeatedly stated the same in filings in this Court. *E.g.*, DE 455 at 11. Plaintiff's First Amendment section 1983 claim was presented to the jury. Plaintiff's confusion, and his exercise of free speech under the

---

[15] As with Plaintiff's prior briefing on this subject, the cases that Plaintiff cites are not on-point. Plaintiff cites to *Patsy v. Florida*, 457 U.S. 496 (1982), but that case did not concern a challenge to the constitutionality of a policy in a collective bargaining agreement; *Patsy* is a discrimination case in the context of employment law. Similarly, Plaintiff cites to *Narumanchi v. Connecticut State University*, 850 F.2d 70 (1988), but that case is a Title VII case—*Narumanchi* had nothing to do with a challenge to the constitutionality of a policy in a collective bargaining agreement.

parameters of FAU's policies and the collective bargaining agreement, were the central issue at trial. While Plaintiff may have included a reference to 42 U.S.C. § 1983 in his constitutional challenges against FAU's policies, section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Just as section 1983 claims do not require the exhaustion of administrative procedures, constitutional challenges to positive, enacted law also have no exhaustion requirement. There is no exhaustion requirement to attack the constitutionality of a Florida statute. But contractual terms are not the same as positive law, and Plaintiff did not challenge the constitutionality of a state statute or some other enacted, positive law. *E.g., Stover v. U.S.*, No. 1:04CR298, 2007 WL 928643 ("Positive law is defined as 'a system of law promulgated on and implemented within a particular community by political superiors . . . . Positive law typically consists of enacted law—the codes, statutes, and regulations that are applied in the courts.'" (quoting Black's Law Dictionary (8th ed.))).

Plaintiff challenged the constitutionality of FAU policies sourced in the contract terms of a collective bargaining agreement that he agreed to.[16] Plaintiff's own words, contained in his own pleading, confirm that his challenge is sourced in the collective bargaining agreement: "You have recommended that I complete a 'Report of Outside Employment/Activity Form' in accordance with the BOT/UFF Collective Bargaining Agreement." DE 93 at 17-18. Plaintiff's challenge rested on the premise that terms in the collective bargaining agreement, together with FAU's implementation of the same, were too vague. The Court has been unable to locate an example of a

---

16 Plaintiff's constitutional challenge was focused and construed as seeking a declaration that FAU's policies were unconstitutional, together with related injunctive relief, as exemplified by Plaintiff's request for relief: "[T]his Court [should] issue an Order declaring that [the policy] is unconstitutional . . . . [Plaintiff] is entitled to declaratory relief [and] injunctive relief." DE 93 at 49-50.

vagueness challenge against a collective bargaining agreement wherein the plaintiff did not first exhaust his administrative remedies. Plaintiff has provided no authority for the proposition that by inserting a reference to 42 U.S.C. § 1983 in the pleading of his contractual challenge that he is relieved of the obligation to comply with the terms of the grievance procedure in the very agreement he is challenging as vague, nor did Plaintiff distinguish the case law cited by the Court, *Hawks*, for the proposition that Plaintiff is *not* relieved of his requirement to grieve.[17]

Third and perhaps most importantly, the Court is unable to ascertain how Plaintiff has standing to pursue his constitutional claims. Assuming, for the sake of argument, that the Court were to reinstate Plaintiff's constitutional challenge and permit a trial on those claims, the jury's verdict in Plaintiff's original trial binds Plaintiff. As a result of the jury's verdict, it is no longer possible for Plaintiff to be reinstated to his former position at FAU by this Court. Thus, while Plaintiff had standing to argue that FAU policies were unconstitutional at the onset of this case, the jury's verdict has had the result of Plaintiff losing his standing to make that argument. This case is like *Lopez v. Garriga*, 917 F.2d 63 (1st Cir. 1990). In *Lopez*, the jury returned a verdict that found that the plaintiff's rights had not been violated by the defendant. *Id.* at 66. After the verdict, Plaintiff sought injunctive relief. The appellate court held:

> A court can only grant permanent injunctive relief to a plaintiff who has met certain preconditions. The first of these implicates the doctrine of standing; an injunction-seeking plaintiff must establish that he "'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (citations omitted). **While Lopez, when he filed this suit, alleged a claim for injunctive relief which rose to the level of a case or controversy**, a court does not retain authority to grant an injunction, **even though the plaintiff**

---

17 The Court also stands by its decision on summary judgment that Plaintiff's "as-applied" challenge is not ripe for judicial review. *See Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).

**originally had standing to ask for one, if during the course of the proceeding the plaintiff loses his toehold on the standing ladder**.

*Id.* at 67 (emphasis added).  Although in *Lopez* the second claim sought injunctive relief,[18] the Court fails to see how Plaintiff can establish standing for his constitutional challenge to FAU's policies as a citizen no longer employed by FAU.  As the Supreme Court set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992):

> If [the plaintiff is the object of the asserted injury], there is ordinarily little question that the action or inaction [of the government] caused him injury, and that a judgment preventing or requiring the action will redress it.  When, however, . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation of *someone else*, much more is needed.  In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made **in such manner as to produce causation** and permit redressability of injury.

(emphasis added).  Thus, for Plaintiff to have standing to bring his constitutional claims, he must be able to show causation between FAU's unconstitutional policies and himself—the Court fails to see how Plaintiff could do so given that he is no longer an employee of FAU and cannot be reinstated to FAU by this Court.  *Id.*  Plaintiff cannot argue that FAU's policies caused his termination, because the jury's verdict found that Plaintiff's exercise of free speech had nothing to do with Plaintiff's termination.  Instead, the issue squarely before the jury was whether Plaintiff was terminated as a result of his own actions—insubordination.  Similarly, the Court cannot discern how Plaintiff could argue that FAU's policies were so unconstitutional that those policies *caused* him to become insubordinate, which caused his termination, in light of the fact that (1) every other faculty member complied with FAU policies, (2) those faculty members did not

---

18 One of the claims that Plaintiff seeks to reinstate is a request for an injunction.  DE 93 at 50.

become insubordinate while trying to comply with those policies, and (3) Plaintiff complied with FAU policies in the past without becoming insubordinate.[19]

Other standing-related arguments preclude the reinstatement of Plaintiff's constitutional claims as well. The Supreme Court has recognized that constitutional rights may be waived where the facts surrounding the waiver make it clear that the party waiving his or her rights did so voluntarily, with a full understanding of the consequences of the waiver. *Patteron v. Illinois*, 487 U.S. 285 (1988). Factors courts consider in such a determination are whether the parties bargained equally, the parties negotiated, and whether the waiving party was advised by competent advisors. *See Erie Telecomm., Inc. v. Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988). Here, not only did Plaintiff agree to the terms of the collective bargaining agreement as a union employee, and not only were the terms of the collective agreement bargained for, but Plaintiff actually served as the *president of the union*, voted to ratify the collective bargaining agreement, and *signed* the agreement. DE 246 at 2; DE 274 at 1-2. The collective bargaining agreement is not so vague and ambiguous that Plaintiff could not have been aware of the consequences when he voted for the ratification of the agreement and signed the agreement on behalf of the union. Thus, to the extent the collective bargaining agreement restricts Plaintiff's ability to engage in outside activities that conflict with his responsibilities at FAU, or to the extent the agreement requires Plaintiff to disclose his outside activities to FAU, Plaintiff knowingly waived a challenge to the same by virtue of his knowing and intelligent consent to the terms of the collective bargaining agreement. *See Leonard v. Clark*, 758 F. Supp. 616, 619-20 (D. Or. 1991). Similarly, Plaintiff waived the argument that the terms of the

---

19 Stated another way, Plaintiff made a deliberate, conscience choice to engage in insubordination, even when peaceful avenues were available to him to dispute the constitutionality of FAU's policies—avenues Plaintiff chose not to utilize, although he had used those avenues before.

collective bargaining agreement were vague when he presided over the union's adoption and negotiation of the very same agreement.

### III.    CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion for New Trial [DE 453] and Renewed Motion for Judgment as a Matter of Law [DE 450] are both **DENIED**.

**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 24th day of April, 2018.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record